MICHAEL F. HERTZ
Acting Assistant Attorney General, Civil Division
DOUGLAS N. LETTER
Terrorism Litigation Counsel
JOSEPH H. HUNT
Director, Federal Programs Branch
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
Special Litigation Counsel
MARCIA BERMAN
PAUL G. FREEBORNE
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Rm. 6102
Washington, D.C. 20001
Phone: (202) 514-4782
Fax: (202) 616-8460

*Attorneys for the Government Defendants
Sued in their Official Capacity*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CAROLYN JEWEL, TASH HEPTING, GREGORY HICKS, ERIK KNUTZEN, and JOICE WALTON, <br><br> *Plaintiffs*, <br><br> v. <br><br> NATIONAL SECURITY AGENCY ("NSA"); KEITH B. ALEXANDER, Director of the NSA; UNITED STATES OF AMERICA; BARACK OBAMA, President of the United States; UNITED STATES DEPARTMENT OF JUSTICE; ERIC HOLDER, Attorney General of the United States; DENNIS C. BLAIR, Director of National Intelligence. <br><br> *Government Defendants Sued in Their Official Capacity.* | Case No. C:08-cv-4373-VRW <br><br> **EXHIBITS TO GOVERNMENT DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AND FOR SUMMARY JUDGMENT** <br><br> Date: July 15, 2009 <br> Time: 10:30 a.m. <br> Courtroom: 6, 17th Floor <br><br> Chief Judge Vaughn R. Walker |

**Government Defendants' Reply Exhibits (6, 7) in Support of Motion to Dismiss and For Summary Judgment**
*Jewel et al. v. National Security Agency et al.*, **Case No. 08-cv-4373-VRW**

The Government Defendants hereby submit Exhibits 6 and 7 in support of their Motion to Dismiss and for Summary Judgment.

Exhibit 6 -   Excerpts from Congressional Record, October 25, 2001

Exhibit 7 -   Excerpts from Department of Justice Search and Seizure Manual for Computers and Electronic Evidence (July 2002) pages 109-110

**Government Defendants' Reply Exhibits (6, 7) in Support of Motion to Dismiss and For Summary Judgment**
*Jewel et al. v. National Security Agency et al.*, **Case No. 08-cv-4373-VRW**

# EXHIBIT No. 6
Excerpts from Congressional Record, October 25, 2001

## CONCLUSION OF MORNING BUSINESS

The PRESIDENT pro tempore. Is there further morning business?

If there is no further morning business, morning business is closed.

## USA PATRIOT ACT OF 2001

The PRESIDENT pro tempore. Under the previous order, the Senate will now proceed to consideration of H.R. 3162, which the clerk will report.

The bill clerk read as follows:

A bill (H.R. 3162) to deter and punish terrorist acts in the United States and around the world, to enhance law enforcement investigatory tools, and for other purposes.

The PRESIDENT pro tempore. The senior Senator from Vermont, Mr. LEAHY, is recognized.

Mr. LEAHY. Mr. President, what is the time agreement that we now have before us?

The PRESIDENT pro tempore. The chairman and ranking member of the Judiciary Committee have 90 minutes each; the Senator from Michigan, Mr. LEVIN, has 10 minutes; the Senator from Minnesota, Mr. WELLSTONE, has 10 minutes; the Senator from Maryland, Mr. SARBANES, has 20 minutes; the Senator from Wisconsin, Mr. FEINGOLD, has 1 hour; the Senator from Florida, Mr. GRAHAM, has 15 minutes; and the Senator from Pennsylvania, Mr. SPECTER, has 15 minutes.

Mr. LEAHY. I thank the Presiding Officer, the President pro tempore of the Senate.

Mr. President, I yield myself such time as I may need out of my 90 minutes.

Mr. REID. Will the Senator yield?

Mr. LEAHY. Of course.

Mr. REID. Mr. President, I ask unanimous consent that during the day, when quorum calls are initiated, the time be charged proportionately, not only against the person who asked for the quorum to be initiated, but that it be charged proportionately against all people who have time under the agreement that is now in effect.

The PRESIDENT pro tempore. Is there objection?

The Chair hears no objection. That will be the order of the Senate.

The Senator from Vermont, Mr. LEAHY, is recognized.

(Mrs. CLINTON assumed the chair.)

Mr. LEAHY. Thank you, Mr. President. I agree with the distinguished Democratic leader in his request because we do want to have discussion of this piece of legislation, but there is no question we will vote on this piece of legislation today and we will pass this legislation today.

I think it is only fitting the Senator from New York is now in the chair as we begin discussion of this legislation because her State was one of those that was badly impacted, terribly impacted, tragically impacted on September 11, as were the people of New Jersey and Connecticut, who worked in the World Trade Towers, and, of course, those at the Pentagon in Virginia, including those in Maryland and the District of Columbia, and actually the whole Nation.

Today we consider H.R. 3162, the second House-passed version of the "Uniting and Strengthening of America Act" or "USA Act of 2001." Senate passage of this measure without amendment will amount to final passage of this important legislation, and the bill will be sent to the President for his signature. We complete our work six weeks after the September 11 attacks and months ahead of final action following the destruction of the Federal Building in Oklahoma City in 1995. The American people and the Members of this body deserve fast work and final action.

On October 4, I was pleased to introduce with the Majority Leader, Senator DASCHLE, and the Chairmen of the Banking and Intelligence Committees, as well as the Republican Leader, Senator LOTT, and Senator HATCH and Senator SHELBY, the Uniting and Strengthening America, or USA Act. This was not the bill that I, or any of the sponsors, would have written if compromise was unnecessary. Nor was it the bill the Administration had initially proposed and the Attorney General delivered to us on September 19, at a meeting in the Capitol.

We were able to refine and supplement the Administration's original proposal in a number of ways in the original USA Act, and have continued that process in the development of H.R. 3162. The Administration accepted a number of the practical steps I had originally proposed on September 19 to improve our security on the Northern Border, assist our Federal, State and local law enforcement officers, and provide compensation to the victims of terrorist acts and to the public safety officers who gave their lives to protect ours. This final version of the USA Act further improves the compromise by including additional important checks on the proposed expansion of government powers that were not contained in the Attorney General's initial proposal.

Let me outline just ten ways in which we in the bicameral, bipartisan negotiations were able to supplement and improve this legislation from the original proposal we received from the Administration.

We improved security on the Northern Border;

We added money laundering;

We added programs to enhance information sharing and coordination with State and local law enforcement, grants to State and local governments to respond to bioterrorism, and to increase payments to families of fallen firefighters, police officers and other public safety workers;

We added humanitarian relief to immigrant victims of the September 11 terrorist attacks;

We added help to the FBI to hire translators;

We added more comprehensive victims assistance;

We added measures to fight cybercrime;

We added measures to fight terrorism against mass transportation systems;

We added important measures to use technology to make our borders more secure;

Finally, and most importantly, we were able to include additional important checks on the proposed expansion of government powers contained in the Attorney General's initial proposal.

In negotiations with the Administration, I did my best to strike a reasonable balance between the need to address the threat of terrorism, which we all keenly feel at the present time, and the need to protect our constitutional freedoms. Despite my misgivings, I acquiesced in some of the Administration's proposals to move the legislative process forward. That progress has been rewarded by a bill we have been able to improve further during discussions over the last two weeks.

The Senate passed the original version of the USA Act, S. 1510, by a vote of 96-1 on October 11. The House passed a similar bill, based largely on the USA Act, the following day. The Majority Leader and I both strongly believed that a conference would have been the better and faster way to reconcile the differences between the bills, and to consider the proposals that had been included in the managers' amendment to S. 1510, which Republicans did not approve in time for consideration and passage with the Senate bill. The House did not request a conference when it passed the bill, however, and despite the understanding among House and Senate leadership, the House leadership abruptly incorporated the product of our discussions in a new bill rather than proceed to a quick conference.

Yesterday, the House passed H.R. 3162, which was based upon informal agreements reached by Senate and House negotiators, but which did not include additional important provisions to make the Justice Department more efficient and effective in its antiterrorism efforts and to reduce domestic demand for illegal drugs, some of which are produced and supplied from Taliban-controlled regions of Afghanistan. I am disappointed that the commitment we received to hold a conference—at which these proposals could have been considered more fully—was not honored. Nonetheless, H.R. 3162, which the House passed yesterday, contains additional improvements to the USA Act that had been negotiated on a bicameral, bipartisan basis, and deserves the support of the Senate.

I do believe that some of the provisions contained both in this bill and the original USA Act will face difficult tests in the courts, and that we in Congress may have to revisit these issues at some time in the future when the present crisis has passed, the sunset has expired or the courts find an infirmity in these provisions. I also intend

other criminal investigative techniques including the infiltration of organizations with informants. However, that authority to disclose without judicial review is subject to the sunset in four years.

Other safeguards can, if used properly, minimize the unnecessary disclosure of "foreign intelligence" that identifies an American. When the information comes from grand juries or wiretaps, the Attorney General is required under the bill to establish procedures for the disclosure of information that identifies a United States person. The Senate Judiciary Committee will want to take a very close look at these procedures. Although not required under the bill, such procedures would also be desirable for disclosure of information from criminal investigations generally, as permitted under section 203(d). In section 905, where the bill requires disclosure to intelligence agencies from criminal investigations, the Attorney General is authorized to make exceptions and must issue implementing procedures. Again, these procedures will be closely examined by the Senate Judiciary Committee.

These procedures will be critical in determining the scope and impact of these provisions. Will they focus the sharing of information on international terrorism, which is the immediate and compelling need before us, or will they sweep more broadly? Will they permit automatic dissemination to intelligence agencies of any information about foreign governments, foreign organizations, or foreign persons that is obtained in FBI investigations of international organized crime and white collar crime? What are the specific circumstances under which confidential information collected by particular agencies, such as the Internal Revenue Service or the Bureau of Alcohol, Tobacco and Firearms, will be disseminated to the U.S. Military or other agencies? What will be the guidelines for including information that identifies United States persons? How will need-to-know decisions be made on the handling of this information, and how will access be controlled? What will be done to ensure compliance with the 1947 ban on CIA having "police, subpoena, or law enforcement powers or internal security functions?"

These and many other questions must be the subject of the Judiciary Committee's oversight of the implementation of the surveillance and intelligence provisions of this bill. Our government is entering uncharted territory. Much of the government's experience from the Cold War era before the mid-1970s warns us of the risks of abuse. Reasonable measures that we are taking to protect against international terrorism may have far-reaching ramifications beyond the immediate crisis. There has never been a greater need for Congressional vigilance to ensure against unnecessary and improper use of the wide discretion being granted by a new law. I intend to ask the Attorney General and the Director of Central Intelligence to advise the Judiciary Committee of their implementation plans and practices every step of the way.

The final bill includes a long overdue remedy for unauthorized disclosure of information obtained from electronic surveillance under FISA and under criminal procedures. If the government monitors the conversations of a person under the electronic surveillance procedures of title 18 or FISA and that information is disclosed without proper authority, the aggrieved person may recover money damages from the Federal Government. Such improper disclosure is what happened in the past when the FBI passed information from the electronic surveillance of Dr. Martin Luther King to selected private individuals and organizations in an effort to discredit Dr. King. The government itself would be liable, in addition to individual employees, if something like this ever happens again.

This provision is especially valuable in this bill, because of the expanded sharing of information from electronic surveillance in criminal cases to agencies with intelligence, military, and other national security responsibilities. When this kind of sensitive information is disseminated more widely, the risk increases that it will be leaked.

As a deterrent against malicious leaks, this provision wisely includes procedures for administrative discipline as well as the civil remedy against the Government. When a court or the appropriate agency determines that there is serious question about whether or not an employee willfully disclosed information without proper authority, disciplinary proceedings must be initiated. If the agency head decides that discipline is not warranted, he or she must notify the Inspector General with jurisdiction over the agency and provide the reasons for the decision not to impose discipline.

Representative BARNY FRANK deserves credit for developing this proposal, and the Department of Justice has worked with Representative FRANK to ensure that the procedures for civil discovery take into account the needs for protecting related criminal investigations or prosecutions and classified operations under the Foreign Intelligence Surveillance Act.

When Congress authorized electronic surveillance in 1968 under title 18 and in 1978 under FISA, the legislation imposed civil and criminal sanctions for violations by individuals. This bill takes the law two steps forward by adding government liability and administrative discipline against government employees. Along with the sunset provision, judicial oversight of the sharing of grand jury information, and other improvements, the Frank amendment reflects the valuable contribution of the House of Representatives towards making this a balanced bill.

The heart of every American aches for those who died or have been injured because of the tragic terrorist attacks in New York, Virginia, and Pennsylvania on September 11. Even now, we cannot assess the full measure of this attack in terms of human lives, but we know that the number of casualties is extraordinarily high.

Congress acted swiftly to help the victims of September 11. Within 10 days, we passed legislation to establish a Victims Compensations Program, which will provide fair compensation to those most affected by this national tragedy. I am proud of our work on that legislation, which will expedite payments to thousands of Americans whose lives were so suddenly shattered.

But now more than ever, we should remember the tens of thousands of Americans whose needs are not being met—the victims of crimes that have not made the national headlines. Just one day before the events that have so transformed our nation, I came before this body to express my concern that we were not doing more for crime victims. I noted that the pace of victims legislation had slowed, and that many opportunities for progress had been squandered. I suggested that this year, we had a golden opportunity to make significant progress in this area by passing S. 783, the Leahy-Kennedy Crime Victims Assistance Act of 2001.

I am pleased, therefore, that the antiterrorism package now before the Senate contains substantial portions of S. 783 aimed at refining the Victims of Crime Act of 1984 (VOCA), and improving the manner in which the Crime Victims Fund is managed and preserved. Most significantly, section 621 of the USA Act will eliminate the cap on VOCA spending, which has prevented more than $700 million in Fund deposits from reaching victims and supporting essential services.

Congress has capped spending from the Fund for the last two fiscal years, and President Bush has proposed a third cap for fiscal year 2002. These limits on VOCA spending have created a growing sense of confusion and unease by many of those concerned about the future of the Fund.

We should not be imposing artificial caps on VOCA spending while substantial unmet needs continue to exist. Section 621 of the USA Act replaces the cap with a self-regulating system that will ensure stability and protection of Fund assets, while allowing more money to be distributed to the States for victim compensation and assistance.

Other provisions included from S. 783 will also make an immediate difference in the lives of victims, including victims of terrorism. Shortly after the Oklahoma City bombing, I proposed and the Congress adopted the Victims of Terrorism Act of 1995. This legislation authorized the Office for Victims of Crime (OVC) to set aside an emergency reserve of up to $50 million as part of the Crime Victims Fund. The emergency reserve was intended to serve as a "rainy day" fund to supplement compensation and assistance

crucial part of our efforts to defeat terrorism, and it was important for Congress to develop a bipartisan approach to strengthening our laws. This bill contains such an approach.

I am also pleased that a number of provisions that would have undermined the Civil Asset Forfeiture Act of 2000, which I sponsored in the Senate, have been removed. In addition, this bill does not include language that would have unduly expanded administrative subpoena powers in all money laundering cases. A more targeted approach was necessary, and has been produced.

This measure could not be considered today and would not be in the improved condition it is without the steadfast commitment of our Majority Leader. Senator DASCHLE deserves all the credit for all that is good in this bill. Without his commitment and focus, we simply would not be in the position to pass this bill today.

On my behalf and more importantly on behalf of the American people, I want to publicly acknowledge his vital role in this legislation.

I have done my best under the circumstances and want to thank especially Senator KENNEDY for his leadership on the Immigration parts of the bill. My efforts have not been completely successful and there are a number of provisions on which the Administration has insisted with which I disagree. Frankly, the agreement of September 30, 2001 on the sharing of criminal justice information would have led to a better balanced bill. I could not stop the Administration from reneging on the agreement any more than I could have sped the process to reconstitute this bill in the aftermath of those breaches. In these times we need to work together to face the challenges of international terrorism. I have sought to do so in good faith.

We have worked around the clock for the past month to put forward the best legislative package we could. While I share the administration's goal of promptly providing the tools necessary to deal with the current terrorist threat, I feel strongly that our responsibilities include equipping such tools with safety features to ensure that these tools do not cause harm and are not misused.

I want to conclude my remarks with thanks for the efforts of many staff members who have worked tirelessly under unusual and enormously inconvenient circumstances to help us craft the legislation before us today. In particular, I want to thank Mark Childress and Andrea LaRue on the staff of Majority Leader DASCHLE, and David Hoppe on the staff of Republican Leader LOTT. I would also like to thank Makan Delrahim, Jeff Taylor, Stuart Nash, and Leah Belaire with Senator HATCH, the Ranking Member of the Judiciary Committee, Melody Barnes and Esther Olavarria with Senator KENNEDY, Neil McBride and Eric Rosen with Senator BIDEN, Bob Schiff with Senator FEINGOLD, and Stacy Baird and Beth Stein with Senator CANTWELL. Finally, I would like to thank my own Judiciary Committee staff, especially Bruce Cohen, Beryl Howell, Julie Katzman, Ed Pagano, John Elliff, David James, Ed Barron, Tim Lynch, Susan Davies, Manu Bhardwaj, Liz McMahon, and Tara Magner.

I ask unanimous consent that a section-by-section analysis be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

THE UNITING AND STRENGTHENING AMERICA BY PROVIDING APPROPRIATE TOOLS REQUIRED TO INTERCEPT AND OBSTRUCT TERRORISM (USA PATRIOT) ACT OF 2001, H.R. 3162—SECTION-BY-SECTION ANALYSIS

Sec. 1. Short title and table of contents. Both S. 1510 passed by the Senate on October 11, 2001 (the "Senate bill"), and H.R. 2975 passed by the House of Representatives on October 12, 2001, included this section containing the short title "Uniting and Strengthening America (USA) Act of 2001" and the table of contents for the Act. H.R. 3162, the bill subsequently passed by the House on October 24, 2001 (the "House bill"), changed the title to the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001."

Sec. 2. Construction; severability. Both the House and Senate bills included this rule of construction to provide that any portion of this Act found to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed to give it the maximum effect permitted by law and that any portion found invalid or unenforceable in its entirety shall be severable from the rest of the Act.

TITLE I—ENHANCING DOMESTIC SECURITY AGAINST TERRORISM

Sec. 101. Counterterrorism fund. Both the House and Senate bills included this provision to establish a counterterrorism fund in the Treasury of the United States, without affecting prior appropriations, to reimburse Department of Justice components for costs incurred in connection with terrorism and terrorism prevention, rebuild any Justice Department component damaged or destroyed as a result of a terrorism incident, pay terrorism-related rewards, conduct terrorism threat assessments, and reimburse Federal agencies for costs incurred in connection with detaining suspected terrorists in foreign countries. Not in original Administration proposal.

Sec. 102. Sense of Congress condemning discrimination against Arab and Muslim Americans. Both the House and Senate bills included this provision to condemn acts of violence and discrimination against Arab Americans, American Muslims, and Americans from South Asia, and to declare that every effort must be taken to protect their safety. Not in original Administration proposal.

Sec. 103. Increased funding for the technical support center at the Federal Bureau of Investigation. Both the House and Senate bills included this provision to authorize $200,000,000 per year for fiscal years 2002, 2003 and 2004 for the Technical Support Center established in section 811 of the Antiterrorism and Effective Death Penalty Act of 1996 to help meet the demands of activities to combat terrorism and enhance the technical support and tactical operations of the FBI. Not in original Administration proposal.

Sec. 104. Requests for Military Assistance to Enforce Prohibition in Certain Emergencies. Both the House and Senate bills included this provision to authorize the Attorney General to request military assistance in support of Department of Justice activities relating to the enforcement of 18 U.S.C. §2332a during an emergency situation involving a weapon of mass destruction. Current law references a statute that was repealed in 1998, relating to chemical weapons. Not in original Administration proposal.

Sec. 105. Expansion of National Electronic Crime Task Force Initiative. Both the House and Senate bills included this provision to allow the Secret Service to develop a national network of electronic crime task forces, based on the highly successful New York Electronic Crimes Task Force model, for the purpose of preventing, detecting, and investigating various forms of electronic crimes, including potential terrorist attacks against critical infrastructure and financial payment systems. Not in original Administration proposal.

Sec. 106. Presidential authority. Both the House and Senate bills included this provision to give to the President, in limited circumstances involving armed hostilities or attacks against the United States, the power to confiscate and vest in the United States the property of enemies of the United States during times of national emergency, which was permitted by the Trading with the Enemy Act, 50 app. U.S.C. §5(b), until 1977, when the International Economic Emergency Act was passed. The new provision permits the President, when the United States is engaged in military hostilities or has been subject to attack, to confiscate property of any foreign country, person or organization involved in hostilities or attacks on the United States. This section also permits courts, when reviewing determinations made by the executive branch, to consider classified evidence ex parte and in camera. Same as original Administration proposal.

TITLE II—ENHANCED SURVEILLANCE PROCEDURES

[Note: Elimination of original Administration proposal to allow government use of wiretap information on U.S. citizens obtained illegally overseas in violation of the Fourth Amendment and of foreign government laws.]

Sec. 201. Authority to intercept wire, oral, and electronic communications relating to terrorism. Both the House and Senate bills included this provision to add criminal violations relating to terrorism to the list of predicate statutes in the criminal procedures for interception of communications under chapter 119 of title 18, United States Code. Not in original Administration proposal.

Sec. 202. Authority to intercept wire, oral, and electronic communications relating to computer fraud and abuse offenses. Both the House and Senate bills included this provision to add criminal violations relating to computer fraud and abuse to the list of predicate statutes in the criminal procedures for interception of communications under chapter 119 of title 18, United States Code. Not in original Administration proposal.

Sec. 203. Authority to share criminal investigative information. Both the House and Senate bills included provisions amending the criminal procedures for interception of communications under chapter 119 of title 18, United States Code, and the grand jury procedures under Rule 6(e) of the Federal Rules of Criminal Procedures to authorize disclosure of foreign intelligence information obtained by such interception or by a grand jury to any Federal law enforcement, intelligence, national security, national defense, protective or immigration personnel to assist the official receiving that information in

"addressing" information for Internet users does not authorize the interception of the content of any such communications. It further requires the government to use the latest available technology to insure that a pen register or trap and trace device does not intercept the content of any communications. Finally, it provides for a report to the court on each use of "Carnivore"-like devices on packet-switched data networks. Makes a number of improvements over Administration proposal, including exclusion of content, exclusion of ISP liability, and Carnivore report.

Sec. 217. Interception of computer trespasser communications. Both the House and Senate bills included this provision to allow computer service providers who are victims of attacks by computer trespassers to authorize persons acting under color of law to monitor trespassers on their computer systems in a narrow class of cases. A computer trespasser is defined as a person who accesses a protected computer without authorization and thus has no reasonable expectation of privacy in any communications transmitted to, through, or from the protected computer. However, it does not include a person known by the owner or operator of the protected computer to have an existing contractual relationship with the owner or operator for access to all or part of the protected computer. Narrower than original Administration proposal, which did not exclude service provider subscribers from definition of trespasser and did not limit interception authority to only those communications through the computer in question.

Sec. 218. Foreign intelligence information. Both the House and Senate bills included this provision to amend FISA to require a certification that "a significant purpose" rather than "the purpose" of a surveillance or search under FISA is to obtain foreign intelligence information. Narrower than Administration proposal, which would have allowed FISA surveillance if intelligence gathering was merely "a" purpose.

Sec. 219. Single-jurisdiction search warrants for terrorism. Both the House and Senate bills included this provision to amend Federal Rule of Criminal Procedure 41(a) to provide that warrants relating to the investigation of terrorist activities may be obtained in any district in which the activities related to the terrorism may have occurred, regardless of where the warrants will be executed. Same as Administration proposal.

Sec. 220. Nationwide service of search warrants for electronic surveillance. Both the House and Senate bills included this provision to amend 18 U.S.C. §2703(a) to authorize courts with jurisdiction over the offense to issue search warrants for electronic communications in electronic storage anywhere in the United States, without requiring the intervention of their counterparts in the districts where Internet service providers are located. Narrower than Administration proposal in that it limits forum-shopping problem by limiting to courts with jurisdiction over the offense.

Sec. 221. Trade sanctions. Both the House and Senate bills included this provision to authorize the President unilaterally to restrict exports of agricultural products, medicine or medical devices to the Taliban or the territory of Afghanistan controlled by the Taliban. Narrower than original Administration proposal which would have undermined the congressional approval requirement, conferring upon the President control of agricultural and medical exports "to all designated terrorists and narcotics entities wherever they are located."

Sec. 222. Assistance to law enforcement agencies. Both the House and Senate bills included this provision that this Act does not impose any additional technical requirements on a provider of a wire or electronic communication service and that a provider of a wire or electronic communication service, landlord, custodian or other person who furnishes facilities or technical assistance pursuant to section 216 shall be reasonably compensated for expenditures incurred in providing such facilities or assistance. Not in original Administration proposal.

Sec. 223. Civil liability for certain unauthorized disclosures. H.R. 2975 included this provision to create civil liability for violations, including unauthorized disclosures, by law enforcement authorities of the electronic surveillance procedures set forth in title 18, United States Code (e.g., unauthorized disclosure of pen trap, wiretap, stored communications), or FISA information. Also requires administrative discipline of officials who engage in such unauthorized disclosures. Not in original Administration proposal.

Sec. 224. Sunset. H.R. 2975 included a provision to sunset certain amendments made by this title in 3 to 5 years. H.R. 3162 provides a 4-year sunset for sections 206, 201, 202, 203(b), 204, 206, 207, 209, 210, 212, 214, 215, 217, 218, 220, 223—at the end December 31, 2005, with the authorities "grandfathered" as to particular investigations based on offenses occurring prior to sunset. No sunset provided in original Administration proposal or S. 1510, and four-year sunset shorter than the five-year sunset in H.R. 2975.

TITLE III—INTERNATIONAL MONEY LAUNDERING ABATEMENT AND ANTI-TERRORIST FINANCING ACT OF 2001

[Note: Elimination of original Administration proposals to allow broad disclosure of individual tax return information; pre-trial restraint of legitimately obtained property in all criminal forfeiture cases; carve-out of tobacco companies from RICO liability for foreign excise taxes; and creation of new criminal offense to misrepresent identification when opening bank account. The Administration bill contained none of the money laundering provisions contained in either the Senate bill or H.R. 3004.]

Sec. 301. Short title. This section contains the short title of Title III, "International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001," which merges the short title of Title III of the Senate bill with the short title of H.R. 3004, which passed the House of Representatives on October 17, 2001 ("H.R. 3004"). This section also contains the table of contents for Title III.

Sec. 302. Findings and purposes. The Senate bill included this provision, which states the legislative findings and purposes in support of Title III.

Sec. 303. 4-Year congressional review; expedited consideration. Section 303, included in the Senate bill, provides that the provisions added and amendments made by Title III will terminate after September 30, 2004, if the Congress enacts a joint resolution to that effect, and that any such joint resolution will be given expedited consideration by the Congress.

Subtitle A—International Counter-Money Laundering and Related Measures

Sec. 311. Special measures for jurisdictions, financial institutions, or international transactions or accounts of primary money laundering concern. Section 311, included in both the Senate bill and H.R. 3004, adds a new section 5318A to the Bank Secrecy Act, to give the Secretary of the Treasury, in consultation with other senior government officials, authority (in the Secretary's discretion), to impose one or more of five new "special measures" against foreign jurisdictions, foreign financial institutions, transactions involving such jurisdictions or institutions, or one or more types of accounts, that the Secretary, after consultation with Secretary of State and the Attorney General, determines to pose a "primary money laundering concern" to the United States. The special measures include: (1) requiring additional recordkeeping or reporting for particular transactions; (2) requiring the identification of the foreign beneficial owners of certain accounts at a U.S. financial institution; (3) requiring the identification of customers of a foreign bank who use an interbank payable-through account opened by that foreign bank at a U.S. bank; (4) requiring the identification of customers of a foreign bank who use an interbank correspondent account opened by that foreign bank at a U.S. bank; and (5) after consultation with the Secretary of State, the Attorney General, and the Chairman of the Federal Reserve Board, restricting or prohibiting the opening or maintaining of certain interbank correspondent or payable-through accounts. Measures (1) through (4) may not be imposed for more than 120 days except by regulation, and measure (5) may only be imposed by regulation.

Sec. 312. Special due diligence for correspondent accounts and private banking accounts. Section 312, included in both the Senate bill and H.R. 3004, adds a new subsection (i) to 31 U.S.C. §5318, to require a U.S. financial institution that maintains a correspondent account or private banking account for a non-United States person to establish appropriate and, if necessary, enhanced due diligence procedures to detect and report instances of money laundering. The new provision also creates minimum anti-money laundering due diligence standards for U.S. financial institutions that enter into correspondent banking relationships with banks that operate under offshore banking licenses or under banking licenses issued by countries that (1) have been designated as noncooperative with international counter money laundering principles by an international body with the concurrence of the U.S. representative to that body, or (2) have been the subject of special measures authorized by section 311. Finally, the new provision creates minimum anti-money laundering due diligence standards for maintenance of private banking accounts by U.S. financial institutions. New section 31 U.S.C §5318(i) will take effect 270 days after the date of enactment; the Secretary of the Treasury is required to issue regulations (in consultation with the appropriate Federal functional regulators) within 180 days of enactment further delineating the requirements of the new subsection, but the statute is to take effect whether or not such regulations are issued, and failure to issue final regulations shall in no way affect the enforceability of §5318(i) as added by section 312.

Sec. 313. Prohibition on United States correspondent accounts with foreign shell banks. Section 313, included in both the Senate bill and H.R. 3004, adds a new subsection (j) to 31 U.S.C. §5318, to bar depository institutions and brokers and dealers in securities operating in the United States from establishing, maintaining, administering, or managing correspondent accounts for foreign shell banks, other than shell bank vehicles affiliated with recognized and regulated depository institutions. The new 31 U.S.C. §5318(j) takes effect 60 days after enactment. The House receded to the Senate with respect to differences in the language of the versions of the provision in the Senate bill and H.R. 3004.

Sec. 314. Cooperative efforts to deter money laundering. Section 314, contained in the Senate bill, requires the Secretary of the Treasury to issue regulations, within 120 days of the date of enactment, to encourage

liability immunity to financial institutions that disclose suspicious activity. (§ 314). The bill further includes financial institutions in this endeavor by requiring them to have anti-money laundering programs. (§§ 314, 352).

The bill would expand the scope of predicate money laundering offenses to include providing material support for terrorist organizations. (§ 301). These offenses would further not be limited to conduct occurring within the United States, as long as the tools of the offense are in or passed through the United States. (§§ 302, 377).

Various common banking problems are also addressed in the bill, such as shell banks, correspondent accounts, and concentration accounts. (§§ 312, 313, 325). Treasury would be authorized to order special measures be taken by financial institutions where they are involved in such accounts or other primary money laundering concerns. (§ 311). Information would be made available as to such crucial facts as the beneficial, as opposed to nominal, owner of a bank account and minimum standards and policies would be put into effect to deal with correspondent and concentration accounts involving foreign persons. (§§ 312, 313, 325, 326).

Employee references would be permitted to include reference to suspicious activity by the employee without fear of liability and other cooperation among financial institutions, law enforcement, and regulatory authorities would be encouraged. (§§ 314, 330, 355).

These money laundering provisions are all subject to the four-year sunset.

### Protecting the border (title IV)

The legislation expands the grounds for deeming an alien inadmissible or deportable from the United States for terrorist activity, provides for the mandatory detention of aliens whom the Attorney General certifies pose a risk to the national security, and facilitates information sharing within the U.S. and with foreign governments. Current law allows some aliens who are threats to the national security to enter and remain in the United States. The provisions in the bill correct those inadequacies and are necessary tools to prevent detain and remove aliens who are national security threats from the United States. The Attorney General would also have the authority to detain suspected terrorists who are threats to national security, as long as removal proceedings or criminal charges are filed within 7 days. (§ 412). In the rare cases where removal is determined appropriate but is not possible, detention may continue upon a review by the Attorney General every 6 months. (§ 412). The bill further would expand the definition of terrorists for purpose of inadmissibility or removal to include public endorsement of terrorist activity or provision of material support to terrorist organizations. (§ 411). The bill further expands the types of weapons the use of which can be considered terrorist activity. (§ 411).

The ability of alien terrorists to move freely across borders and operate within the United States is critical to their capacity to inflict damage on the citizens and facilities in the United States. Under current law, the existing grounds for removal of aliens for terrorism are limited to direct material support of an individual terrorist. The bill would expand these grounds for removal to include material support to terrorist organizations. (§ 412).

To address the need for better border patrol, additional border patrol officers would be authorized, specifically on the northern border which has, during the investigation into the September 11th events, been shown to be extremely problematic. (§§ 401, 402). To aid INS agents, the FBI would also be required to provide criminal records information to those agents. (§ 403).

The bill addresses not only unwelcome suspected terrorist aliens but also immigrants who may need additional consideration to stay within the United States where their loved ones were victims of terrorist activity. (§§ 421–428).

### Removing obstacles to investigating terrorism (title V)

The bill authorizes the Attorney General and Secretary of State to pay rewards related to terrorism investigations. It also provides for the DNA data collection from those convicted of terrorism offenses and the coordination of Federal law enforcement agencies. (§§ 501, 502, 503, 504).

### Providing for victims and public safety officers (title VI)

The bill establishes procedures for expedited payment of public safety officers involved in the prevention, investigation, rescue or recovery efforts related to a terrorist attack, as well as providing increases to the Public Safety Officer Benefit Program. (§§ 611–614).

### Increased information sharing (title VII)

The bill would require information sharing among Federal, State and Local law enforcement, thus, providing the necessary full picture needed to address terrorism. (§ 711).

### Substantive criminal law/criminal procedure: Strengthening the criminal law against terrorism (title VIII)

These provisions reform substantive and procedural criminal law to strengthen federal law enforcement's ability to investigate, prosecute, prevent, and punish terrorist crimes. There are substantial deficits in each of these areas which impede or weaken our antiterrorism efforts.

We must make fighting terrorism a national priority in our criminal justice system. Current law makes it easier to prosecute members of organized crime than to crack down on terrorists who can kill thousands of Americans in a single day. The same is true of drug traffickers and individuals involved in espionage—our laws treat these criminals and those who aid and abet them more severely than terrorists.

Our investigation has found that wide terrorist networks, not isolated individuals, are responsible for the September 11 attacks. Whether the members of these networks are in the United States or in other countries, they and those who aid them must be subject to the full force of our laws. Just as the law currently regards those who harbor persons engaged in espionage, the bill would make the harboring of terrorists a criminal offense. The bill also increases the penalties for conspiracy to commit terrorist acts to a serious level as we have done for many drug crimes.

### Key Provisions

Removing impediments to effective prosecution—elimination of statute of limitations for offenses creating the risk of death or personal injury and extending the statute for all other terrorism offenses to 8 years (§ 809).

Removing impediments to effective investigation—single jurisdiction search warrants; expanded jurisdiction to include terrorism against U.S. facilities abroad. (§ 804).

Strengthening substantive criminal law—prohibition on harboring terrorists and on material support of terrorists (§§ 803, 805, 807); making terrorist crimes RICO predicates (§ 813); extending powers of asset forfeiture to terrorists' assets (§ 806); including altering cyberterrorism offense (§ 814); expanding the offense of possession of bioweapons (prohibiting possession of biological toxins by felons and aliens) (§ 817); creating a federal offense for attacking mass transportation systems (§ 801); expanding definition of domestic terrorism and offenses of the crime of terrorism, requiring a showing of coercion of government as an element of the offense (§§ 802, 808).

Strengthening criminal penalties—longer prison terms and postrelease supervision of terrorists (§ 812); higher conspiracy penalties for terrorists (§ 811); alternative maximum sentences up to life for terrorism offenses (§ 810).

### Improved intelligence (title IX)

The bill authorizes the Director of the CIA to establish requirements and provide for the collection of foreign intelligence. The Director would also be asked to ensure proper dissemination of foreign intelligence information. Only if the appropriate officials have all the relevant information will prevention, investigation, and prosecution be fully functioning. The bill also would provide for the tracking of terrorist assets as part of the collection of information. (§§ 901, 905).

### Miscellaneous (title X)

The bill would finally require the Department of Justice Inspector General to designate an official to receive civil liberty and civil rights complaints and report those complaints to Congress. The presumption is that such information will be used in determining the continuing viability of the provisions in the bill subject to sunset in 2005. (§ 1001).

Mr. HATCH. Mr. president, I also ask unanimous consent that a section-by-section analysis be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

FINAL COUNTER-TERRORISM BILL SECTION-BY-SECTION ANALYSIS

| Bill provision No. | Bill description |
| --- | --- |
| 1 | Title and table of contents. |
| 2 | Construction and severability clause. |
| 101 | Establishes a fund to reimburse DOJ components for costs incurred to rebuild facilities, investigate and prosecute terrorism, and to reimburse other Federal agencies for detaining individuals in foreign countries accused of terrorist acts. |
| 102 | Sense of Congress condemning discrimination against Arab and Muslim Americans. |
| 103 | Authorizes $200M for each of FY 2002, 2003 and 2004 for the FBI Technical Support Center (established by AEDPA). |
| 104 | Broadens Attorney General's authority to request assistance of Secretary of Defense in emergency situations involving weapons of mass destruction. |
| 105 | Directs the Secret Service to develop a national network of electronic crime task forces modeled on the New York task force. |
| 106 | Grants President the power to confiscate and take title to enemies' property, when United States has been attacked or is engaged in military hostilities; also authorizes courts to consider classified evidence, without making it public, in lawsuits that challenge the government's seizure of property. |
| 201 | Adds terrorism statutes—including chemical weapons offenses under 18 U.S.C. 22—as predicate offenses for which Title III wiretap orders are available. |
| 202 | Allows voice wiretaps in computer hacking investigations. |

FINAL COUNTER-TERRORISM BILL SECTION-BY-SECTION ANALYSIS—Continued

| Bill provision No. | Bill description |
|---|---|
| 203(a) | Permits sharing of grand jury information regarding foreign intelligence and counterintelligence with federal law-enforcement, intelligence, protective, immigration, national defense and national security personnel; must notify court that disclosure has taken place. Can share grand jury information with state officials upon court order. |
| 203(b) | Sharing of wiretap information regarding foreign intelligence, counterintelligence, and foreign intelligence information with federal law-enforcement, intelligence, protective, immigration, national defense and national security personnel. |
| 203(c) | Requires AG to establish procedure for information sharing in 203(a) and (b). |
| 203(d) | Permits sharing of information regarding foreign intelligence, counterintelligence, and foreign intelligence information with federal law-enforcement, intelligence, protective, immigration, national defense and national security personnel notwithstanding other law. |
| 204 | Assures that foreign intelligence gathering authorities are not disrupted by changes to pen register/trap and trace statute. |
| 205 | Employment of translators by the FBI. |
| 206 | Allows court to authorize roving surveillance under FISA where court finds that the actions of the target may have effect of thwarting the identification of a target. |
| 207 | Initial authorization for surveillance and search of officers/employees of foreign powers changed to 120 days; can be extended for one year period. All other searches authorized for 90 day period. |
| 208 | Increases the number of judges on the FISA Court to 11, no less than 3 of whom must live within 20 miles of Washington, D.C. |
| 209 | Allows voice mail stored with a third party provider to be obtained with a search warrant, rather than a wiretap order. |
| 210 | Broadens the types of records that law enforcement can subpoena from communications providers, including the means and source of payment. |
| 211 | Clarifies that statutes governing telephone and internet communications (and not the burdensome provisions of the Cable Act) apply to cable companies that provide internet or telephone service in addition to television programming. |
| 212 | Allows computer-service providers to disclose communications and records of communications to protect life and limb; and clarifies that victims of computer hacking can disclose non-content records to protect their rights and property. |
| 213 | Amends 18 U.S.C. 3103a to permit delayed notice of search warrants where court determines that immediate notice would have an "adverse result"; officers may seize property if court finds "reasonable necessity." |
| 214 | To get pen register/trap and trace order under FISA, must certify that information likely to be obtained is relevant to an ongoing investigation to protect against international terrorism or clandestine intelligence activities; investigations of US persons may not be conducted upon the basis of First Amendment protected activities. |
| 215 | Business records provision allows any designee of FBI director no lower than Assistant Special Agent in Charge to apply to FISA court or a magistrate designated by Chief Justice for an ex parte order requiring production of any tangible things for an investigation to protect against international terrorism or clandestine intelligence activities; investigation must be conducted under AG Guidelines under EO 12333, and investigation of a US person cannot be based on First Amendment protected behavior; also requires semiannual reporting to Congress. |
| 216 | Amends the pen register/trap and trace statute to apply to internet communications, and to allow for a single order valid across the country. |
| 217 | Allows victims of computer-hacking crimes to request law enforcement assistance in monitoring trespassers on their computers; "computer trespasser" does not include persons who have a contractual relationship with the hacked computer's owner. |
| 218 | Allows law enforcement to conduct surveillance or searches under FISA if "a significant purpose" is foreign intelligence. |
| 219 | Permits courts to issue search warrants that are valid nationwide for investigations involving terrorism. |
| 220 | Permits courts to issue search warrants for communications stored by providers anywhere in the country; court must have jurisdiction over the offense. |
| 221 | Authorizes President to impose sanctions relating to the export of devices that could be used to develop missiles or other weapons of mass destruction. Also expands President's ability to restrict exports to the portions of Afghanistan controlled by the Taliban. |
| 222 | Protects communications providers from having to develop or deploy new technology as a result of the Bill, and assures that they will be reasonably compensated. |
| 223 | Creates a cause of action and authorizes money damages against the United States if officers disclose sensitive information without authorization. |
| 224 | Provides that all changes in Title II sunset after four years (except sections 203(a), 203(c), 205, 208, 210, 211, 213, 216, 219, 221, and 222). |
| 225 | Grants immunity from civil liability to persons who furnish information in compliance with a FISA order. |
| 301 | Title of money-laundering act. |
| 302 | Congressional findings. |
| 303 | Sunset provision; money-laundering provisions will expire in 2005 if Congress enacts joint resolution. |
| 311 | Authorizes the Treasury Secretary to require that financial institutions undertake a variety of special measures to prevent money laundering, such as recording certain transactions and obtaining information about correspondent accounts. |
| 312 | Imposes special due diligence requirements for private banking and correspondent accounts that involve foreign persons. |
| 313 | Prohibits domestic financial institutions from maintaining correspondent accounts with foreign shell banks. |
| 314 | Requires Treasury Secretary to promulgate regulations to encourage cooperation among financial institutions, regulators, and law enforcement; allows financial institutions to share information regarding persons suspected of terrorism-related money laundering. |
| 315 | Includes various foreign-corruption offenses—including bribery and smuggling—as "specified unlawful activities" under the money-laundering statute. |
| 316 | Allows persons to contest confiscations of their property in connection with antiterrorism investigations. |
| 317 | Authorizes long-arm jurisdiction over foreign money launderers; also allows courts to restrain foreign-money launderers' assets before trial. |
| 318 | Essentially a technical amendment, defines "financial institution" to include a "foreign bank." |
| 319 | Permits forfeiture of funds held in United States interbank accounts; upon the request of federal banking agencies, requires financial institutions to disclose information about anti-money laundering compliance. |
| 320 | Authorizes the civil forfeiture of property related to certain offenses against foreign nations, including controlled-substances crimes, murder, and destruction of property. |
| 321 | Includes various entities in the definition of "financial institution," including futures commission merchants and the Commodity Futures Trading Commission. |
| 322 | Provides that a statute preventing fugitives from using court resources in forfeiture actions, also applies to claims brought by corporations whose officers are fugitives. [typo in bill; refers to title 18; should be title 28] |
| 323 | Allows courts to issue restraining orders to preserve the availability of property subject to forfeiture by a foreign government. |
| 324 | Requires Treasury Secretary to report on the operation of this subtitle. |
| 325 | Allows Treasury Secretary to issue regulations governing concentration accounts, to ensure that customers cannot secretly move funds. |
| 326 | Requires Treasury Secretary to promulgate rules requiring financial institutions to verify the identities of persons opening accounts. |
| 327 | Requires the government to consider financial institutions' anti-money laundering record when deciding to approve various requests, including proposed mergers. |
| 328 | Requires Treasury Secretary to cooperate with foreign governments to identify the originators of wire transfers. |
| 329 | Imposes criminal penalties on government employee who is bribed in connection with his duties under the money-laundering title. |
| 330 | Sense of Congress that the United States should negotiate with foreign nations to secure their cooperation in investigations of terrorist groups' finances. |
| 351 | Grants immunity to a financial institution that voluntarily discloses suspicious transactions; prohibits the institution from notifying the person who conducted the suspicious transaction that it has been reported. |
| 352 | Directs financial institutions to establish anti-money laundering programs, and allows Treasury Secretary to prescribe minimum standards. |
| 353 | Imposes civil and criminal penalties for violations of geographic targeting orders; extends the effective period for geographic targeting orders from 60 to 180 days. |
| 354 | Requires the President's national strategy on money laundering to include data regarding the funding of international terrorism. |
| 355 | Allows financial institutions to disclose suspicious activity in employment references. |
| 356 | Obliges Treasury Secretary to issue regulations that require securities brokers and commodities merchants to report suspicious activities. |
| 357 | Requires Treasury Secretary to report on the administration of Bank Secrecy Act provisions. |
| 358 | Makes various amendments to Bank Secrecy Act to enhance United State's ability to fight international terrorism, including making information available to intelligence agencies. |
| 359 | Requires reporting on the suspicious activities of underground banking systems. |
| 360 | Instructs United States Executive Directors of international financial institutions to use their voice and vote to support loans to foreign countries that assist the United States' fight against international terrorism. |
| 361 | Establishes procedures and rules governing the Treasury Department's Financial Crimes Enforcement Network. |
| 362 | Requires Treasury Secretary to establish in the Financial Crimes Enforcement Network, a highly secure network that will allow the exchange of information with financial institutions. |
| 363 | Increases civil and criminal penalties for money laundering. |
| 364 | Authorizes the Federal Reserve to hire security personnel. |
| 365 | Requires companies that receive more than $10,000 in currency in a transaction to file a report with the Financial Crimes Enforcement Network. |
| 366 | Requires Treasury Secretary to study expanding exemptions from currency reporting requirements. |
| 371 | Makes it a crime to smuggle more than $10,000 in currency into or out of the United States, with the intent of avoiding a currency reporting requirement, also authorizes civil forfeiture. |
| 372 | Authorizes criminal and civil forfeiture in currency-reporting cases. |
| 373 | Includes a scienter requirement for the crime of operating an unlicensed money transmitting business. |
| 374 | Increases penalties for counterfeiting United States currency and obligations; clarifies the counterfeiting statutes apply to counterfeits produced by electronic means. |
| 375 | Increases penalties for counterfeiting foreign currency and obligations. |
| 376 | Designates a new predicate money-laundering offense: providing material support or resources to foreign terrorist organizations in violation of 18 U.S.C. §2339B. |
| 377 | Provides for extraterritorial jurisdiction over certain crimes of fraud in connection with access devices. |
| 401 | Authorizes AG to waive caps on immigration personnel assigned to protect Northern Border. |
| 402 | Triples the number of Border Patrol personnel, Customs Service personnel, and Immigration and Naturalization Service inspectors; also allocates an additional $50 million each to the Customs Service and the INS. |
| 403 | Requires the FBI to share criminal-record information with the INS and the State Department for the purpose of adjudicating visa applications. |
| 404 | One-time expansion of INS authority to pay overtime. |
| 405 | Requires AG to report to Congress on feasibility of enhancing FBI's Integrated Automated Fingerprint Identification System, or "IAFIS," to prevent foreign terrorists from receiving visas and from entering United States. |
| 411 | Broadens the Immigration and Nationality Act's terrorism-related definitions. Expands grounds of inadmissibility to include persons who publicly endorse terrorist activity. Expands definition of "terrorist activity" to include all dangerous devices in addition to firearms and explosives. Expands definition of "engaging in a terrorist activity" to include providing material support to groups that the person knows or should know that are terrorist organizations, regardless of whether the support's purpose is terrorism related. |
| 412 | Requires AG to detain aliens whom he certifies as threats to national security. AG must charge aliens with criminal or immigration offenses within seven days. AG must detain aliens until they are removed or until he determines that they no longer pose threat. Establishes D.C. Circuit as exclusive jurisdiction for appeals. |
| 413 | Gives Secretary of State discretion to provide visa-records information to foreign governments, for the purpose of combating international terrorism or crime; gives certain countries general access to State Department's lookout databases. |
| 414 | Sense of Congress regarding need to expedite implementation of an integrated entry and exist data system. |
| 415 | Provides that Office of Homeland Security shall participate in the entry-exit task force authorized by Congress in 1996. |
| 416 | Requires AG to implement fully and expand the foreign student visa monitoring program authorized by Congress in 1996. |
| 417 | Requires Secretary of State to enhance efforts to develop machine-readable passports. |
| 418 | Obliges Secretary of State to review how consular officers issue visas to determine whether consular shopping is a problem. |
| 421 | Grants special immigrant status to people who were in the process of securing permanent residence through a family member who died, was disabled, or lost employment as a result of the September 11 attacks. |
| 422 | Provides a temporary extension of status to people who are present in the United States on a "derivative status" (the spouse or minor child) of a non-immigrant who was killed or injured on September 11. |
| 423 | Provides that aliens whose spouses or parents were killed in the September 11 attacks will continue to be considered "immediate relatives" entitled to remain in the United States. |
| 424 | Provides that aliens who turn 21 during or after September 2001 shall be considered children for 90 or 45 days, respectively, after their birthdays. |
| 425 | Authorizes AG to provide temporary administrative relief, for humanitarian purposes, to any alien who is related to a person killed by terrorists. |
| 426 | Requires AG to establish evidentiary guidelines for demonstrating that death or disability occurred as a result of terrorist activity. |
| 427 | Provides that no benefits shall be given to terrorists or their family members. |

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | **EXHIBIT No. 7** |
| 6 | Excerpts from DOJ Search and Seizure Manual for Computers and Electronic Evidence (July 2002) pages 109-110. |

# Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations



Computer Crime and Intellectual Property Section
Criminal Division
United States Department of Justice

July 2002

Navy for substituting subterfuge for ECPA's legal process to obtain McVeigh's basic subscriber information from AOL, Judge Sporkin made statements that could be interpreted as reading a suppression remedy into ECPA for flagrant violations of the statute:

> [I]t is elementary that information obtained improperly can be suppressed where an individual's rights have been violated. In these days of 'big brother,' where through technology and otherwise the privacy interests of individuals from all walks of life are being ignored or marginalized, it is imperative that statutes explicitly protecting these rights be strictly observed.

Id. at 220. While ECPA should be strictly observed, the statement that suppression is appropriate when information is obtained in violation of "an individual's rights" is somewhat perplexing. Both the case law and the text of ECPA itself make clear that ECPA does not offer a suppression remedy for nonconstitutional violations. Accordingly, this statement must be construed to refer only to *constitutional* rights.

*2. Civil Actions and Disclosures*

Although ECPA does not provide a suppression remedy for statutory violations, it does provide for civil damages (including, in some cases, punitive damages), as well as the prospect of disciplinary actions against officers and employees of the United States who have engaged in willful violations of the statute. Liability and discipline can result not only from violations of the rules already described in this chapter, but also from the improper disclosure of some kinds of ECPA-related information. Information that is obtained through process (subpoena, order, or search warrant) under ECPA and that qualifies as a "record" under the Privacy Act, 5 U.S.C. § 552a(a), cannot willfully be disclosed by an officer or governmental entity without violating ECPA. See 18 U.S.C. § 2707(g). However, it is not a violation to make a disclosure "in the proper performance of the official functions of the officer or governmental agency making the disclosure," nor is it unlawful to disclose information that has been previously and lawfully disclosed to the public. Id. Section 2707(g), unless extended, will sunset on December 31, 2005. See PATRIOT Act §§ 223, 224, 115 Stat. 272, 293-95 (2001).

ECPA includes separate provisions for suits against the United States and suits against any other person or entity. 18 U.S.C. § 2707 permits a "person aggrieved" by an ECPA violation to bring a civil action against the "person or entity, other than the United

---

"warrant or the like" to obtain McVeigh's name from AOL. See id. at 220. However, pursuant to the former 18 U.S.C. § 2703(c)(1)(C), the Navy could have obtained McVeigh's name properly with a subpoena, and did not need to give notice of the subpoena to McVeigh.

States, which engaged in that violation." 18 U.S.C. § 2707(a). Relief can include money damages no less than $1,000 per person, equitable or declaratory relief, and a reasonable attorney's fee plus other reasonable litigation costs. Willful or intentional violations can also result in punitive damages, see § 2707(b)-(c), and employees of the United States may be subject to disciplinary action for willful or intentional violations. See § 2707(d). A good faith reliance on a court order or warrant, grand jury subpoena, legislative authorization, or statutory authorization provides a complete defense to any ECPA civil or criminal action. See § 2707(e). Qualified immunity may also be available. See Chapter 4.D.2.

Suits against the United States may be brought under 18 U.S.C. § 2712 for willful violations of ECPA, Title III, or specified sections of the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1801. This section authorizes courts to award actual damages or $10,000, whichever is greater, and reasonable litigation costs. Section 2712 also defines procedures for suits against the United States and a process for staying proceedings when civil litigation would interfere with a related investigation or criminal prosecution. See 18 U.S.C. § 2712 (b), (e). Unless extended, § 2712 will sunset on December 31, 2005. See PATRIOT Act §§ 223, 224, 115 Stat. 272, 293-95 (2001).