# EXHIBIT A

Dockets.Justia.com

# (U) UNCLASSIFIED REPORT ON THE
# PRESIDENT'S SURVEILLANCE PROGRAM

## 10 JULY 2009

    

PREPARED BY THE
OFFICES OF INSPECTORS GENERAL
OF THE
DEPARTMENT OF DEFENSE
DEPARTMENT OF JUSTICE
CENTRAL INTELLIGENCE AGENCY
NATIONAL SECURITY AGENCY
OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

REPORT NO. 2009-0013-AS

## Preface

(U)   Title III of the Foreign Intelligence Surveillance Act
Amendments Act of 2008 required the Inspectors General (IGs) of
the elements of the Intelligence Community that participated in
the President's Surveillance Program (PSP) to conduct a
comprehensive review of the program.  The IGs of the Department
of Justice, the Department of Defense, the Central Intelligence
Agency, the National Security Agency, and the Office of the
Director of National Intelligence participated in the review
required under the Act.  The Act required the IGs to submit a
comprehensive report on the review to the Senate Select
Committee on Intelligence, the Senate Committee on the
Judiciary, the House Permanent Select Committee on Intelligence,
and the House Committee on the Judiciary.

(U)   In response to Title III requirements, we have
prepared this unclassified report on the PSP, which summarizes
the collective results of our reviews.  Because many aspects of
the PSP remain classified, and in order to provide the
Congressional committees the complete results of our reviews,
we also prepared, and have bound separately, a classified
report on the PSP.  The individual reports detailing the
results of each IG's review are annexes to the classified
report.


Glenn A. Fine
Inspector General
Department of Justice

Gordon S. Heddell
Acting Inspector General
Department of Defense


Patricia A. Lewis
Acting Inspector General
Central Intelligence Agency

George Ellard
Inspector General
National Security Agency


Roslyn A. Mazer
Inspector General
Office of the Director of
   National Intelligence

# UNCLASSIFIED REPORT ON THE
# PRESIDENT'S SURVEILLANCE PROGRAM

I.     INTRODUCTION ................................................................... 1

    A.     Scope of Report ..................................................... 2

    B.     Methodology of this Review ..................................... 3

II.    INCEPTION OF THE PRESIDENT'S SURVEILLANCE PROGRAM (PSP) ................................................................................. 4

    A.     Expansion of NSA's Collection Activities ................... 4

    B.     Presidential Authorization of the PSP ....................... 5

    C.     Threat Assessment Memoranda Supporting Authorization of the PSP .......................................................... 7

    D.     Department of Justice Office of Legal Counsel's Early Memoranda Supporting the Legality of the PSP ...................... 10

III.   IMPLEMENTATION OF THE PRESIDENT'S SURVEILLANCE PROGRAM ..................................................................... 14

    A.     NSA Intelligence Activities under the PSP ............... 14

    B.     Access to the PSP ................................................ 16

        1.     Executive Branch Personnel ......................... 16
        2.     Congressional Briefings ............................... 16
        3.     Foreign Intelligence Surveillance Court Briefings .......... 17
        4.     FBI Participation in the PSP ......................... 17
        5.     CIA Participation in the PSP ......................... 17
        6.     ODNI Participation in the PSP ...................... 18

    C.     Impact of PSP-Derived Information on the FISA Process ......... 18

    D.     Discovery Issues ................................................. 18

IV.    LEGAL REASSESSMENT OF THE PRESIDENT'S SURVEILLANCE PROGRAM ..................................................................... 19

    A.     Justice Department Attorneys Become Concerned About the Legality of Some Activities under the PSP ............... 19

    B.     OLC Begins Developing a New Legal Analysis for the PSP ....... 20

    C.     DOJ Officials Convey Concerns to the White House ............... 20

    D.     Conflict Between DOJ and the White House ........................... 21

    E.     White House Counsel Certifies Presidential Authorization Without Department of Justice Concurrence .......................... 26

F.    Department of Justice and FBI Officials Consider Resigning .. 27

G.    White House Agrees to Modify the PSP ................................... 29

H.    Department of Justice OIG Conclusions ................................. 30

V.    TRANSITION OF CERTAIN PROGRAM ACTIVITIES TO FOREIGN
      INTELLIGENCE SURVEILLANCE COURT ORDERS .......................... 30

VI.   IMPACT OF THE PRESIDENT'S SURVEILLANCE PROGRAM ON
      INTELLIGENCE COMMUNITY COUNTERTERRORISM EFFORTS ..... 31

      A.    NSA's Assessment of the PSP ................................................ 31

      B.    DOJ OIG's Assessment of the PSP ......................................... 32

      C.    CIA OIG's Assessment of the PSP .......................................... 33

      D.    ODNI's Assessment of the PSP .............................................. 35

      E.    Intelligence Community Activities Supported by the PSP ........ 36

VII.  PUBLIC STATEMENTS ABOUT THE PRESIDENT'S SURVEILLANCE
      PROGRAM ................................................................................... 36

VIII. CONCLUSION .............................................................................. 37

# UNCLASSIFIED REPORT ON THE
# PRESIDENT'S SURVEILLANCE PROGRAM

## I.   INTRODUCTION

In the weeks following the terrorist attacks of September 11, 2001, the President authorized the National Security Agency (NSA) to conduct a classified program to detect and prevent further attacks in the United States. As part of the NSA's classified program, several different intelligence activities were authorized in Presidential Authorizations, and the details of these activities changed over time. The program was reauthorized by the President approximately every 45 days, with certain modifications. Collectively, the activities carried out under these Authorizations are referred to as the "President's Surveillance Program" or "PSP."[1]

One of the activities authorized as part of the PSP was the interception of the content of communications into and out of the United States where there was a reasonable basis to conclude that one party to the communication was a member of al-Qa'ida or related terrorist organizations. This aspect of the PSP was publicly acknowledged and described by the President, the Attorney General, and other Administration officials beginning in December 2005 following a series of articles published in The New York Times. The Attorney General subsequently publicly acknowledged the fact that other intelligence activities were also authorized under the same Presidential Authorization, but the details of those activities remain classified.

The President and other Administration officials labeled the publicly disclosed interception of the content of certain international communications by the NSA as the "Terrorist Surveillance Program."

Several different agencies had roles in the PSP. At the request of the White House, the NSA was involved in providing the technical expertise necessary to create the program. The NSA also was responsible for conducting the actual collection of information under the PSP and

---

[1] In Title III of the Foreign Intelligence Surveillance Act Amendments Act of 2008 (FISA Amendments Act), the President's Surveillance Program is defined as

> the intelligence activity involving communications that was authorized by the President during the period beginning on September 11, 2001, and ending on January 17, 2007, including the program referred to by the President in a radio address on December 17, 2005 (commonly known as the Terrorist Surveillance Program).

FISA Amendments Act, Title III, Sec. 301(a)(3).

disseminating intelligence reports to other agencies such as the Federal Bureau of Investigation (FBI), the Central Intelligence Agency (CIA), and the Office of the Director of National Intelligence (ODNI) National Counterterrorism Center (NCTC) for analysis and possible investigation.[2] In addition, the NSA Office of General Counsel and Office of the Inspector General were responsible for reviewing and monitoring the NSA's PSP operation. With the exception of the NSA, the Department of Defense (DoD) had limited involvement in the PSP.

Components of the Department of Justice (DOJ) other than the FBI also were involved in the program. Most significantly, DOJ's Office of Legal Counsel (OLC) provided advice to the White House and the Attorney General on the overall legality of the PSP. In addition, DOJ's Office of Intelligence Policy and Review (now called the Office of Intelligence in DOJ's National Security Division) worked with the FBI and the NSA to address the impact PSP-derived information had on proceedings under the Foreign Intelligence Surveillance Act (FISA). DOJ's National Security Division also handled potential discovery issues that may have involved PSP-related information in international terrorism prosecutions.

The CIA, in addition to receiving intelligence reports as PSP consumers, requested information from the program and utilized this information in its analyses. The CIA also initially prepared threat assessment memoranda that were used to support the periodic Presidential Authorizations.

Beginning in 2005, the newly-created ODNI assumed responsibility for preparing these threat assessment memoranda. In addition, NCTC analysts received program information for possible use in analytical products prepared for the President, senior policymakers, and other Intelligence Community (IC) analysts and officers.

## A.    Scope of Report

Title III of the Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008 (FISA Amendments Act) – signed into law on July 10, 2008 – required the Inspectors General of Intelligence Community agencies that participated in the PSP to conduct a comprehensive review of the program. The review required to be conducted under the Act was to examine:

---

[2] The National Counterterrorism Center was made a subcomponent of the Office of the Director of National Intelligence by the Intelligence Reform and Terrorism Prevention Act of 2004 and is charged with being the primary U.S. Government organization for analyzing and integrating counterterrorism intelligence, except for intelligence pertaining exclusively to domestic terrorists and domestic counterterrorism.

(A)     all of the facts necessary to describe the establishment, implementation, product, and use of the product of the Program;

(B)     access to legal reviews of the Program and access to information about the Program;

(C)     communications with, and participation of, individuals and entities in the private sector related to the Program;

(D)     interaction with the Foreign Intelligence Surveillance Court and transition to court orders related to the Program; and

(E)     any other matters identified by any such Inspector General that would enable that Inspector General to complete a review of the Program, with respect to such Department or element.

The Inspectors General (IGs) of the DoD, DOJ, CIA, NSA, and ODNI – collectively the "PSP IG Group" – conducted the review required under the Act. This unclassified report summarizes the portions of the collective results of the IG reviews that can be released in unclassified form. A separate classified report summarizes the classified results of the individual IG reviews. In addition, the individual IG reports that document the results of each of the participating IGs' reviews and investigations, which provide additional classified details concerning the PSP and each agency's role in the PSP, are included as attachments to the classified report.

Title III of the FISA Amendments Act required that the report of any investigation of matters relating to the PSP conducted by the DOJ Office of Professional Responsibility (OPR) be provided to the DOJ Inspector General, and that the findings and conclusions of such investigation be included in the DOJ OIG review. OPR has initiated a review of whether any standards of professional conduct were violated in the preparation of the first series of legal memoranda supporting the PSP. OPR has not completed its review.

## B.     Methodology of this Review

The PSP IG Group collectively interviewed approximately 200 government and private sector personnel as part of this review. Most of the interviews were conducted separately by the individual OIGs as part of their agency-specific reviews, although some interviews were conducted jointly. Among the interviewees were former and current senior government officials, including Director of National Intelligence (DNI) John D. Negroponte, NSA Director Keith Alexander, and DNI Michael McConnell,

NSA and CIA Director and Principal Deputy DNI (PDDNI) Michael V. Hayden, White House Counsel and Attorney General Alberto Gonzales, FBI Director Robert Mueller, and Secretary of Defense Donald Rumsfeld. Certain senior officials either declined or did not respond to our requests to be interviewed for this review, including Counsel to the Vice President David Addington, White House Chief of Staff Andrew Card, Attorney General John Ashcroft, DOJ Office of Legal Counsel Deputy Assistant Attorney General John Yoo, and former Director of Central Intelligence George Tenet.

The OIGs also interviewed many agency managers and personnel, including attorneys, NSA operational personnel, FBI special agents and analysts, and CIA officials and analysts who were responsible for the day-to-day operation of the PSP, including the legal issues associated with the program.

In addition to these interviews, the PSP IG Group reviewed thousands of documents and electronic records, including the Presidential Authorizations and Threat Assessments supporting reauthorization of the program, OLC legal memoranda, contemporaneous notes and e-mails of various senior officials describing significant events during the program, Foreign Intelligence Surveillance Court (FISC) pleadings and orders, and documents that were used to disseminate PSP-derived leads to FBI field offices and CIA stations for investigation and for other purposes related to the PSP. Finally, there were previous NSA OIG reports and supporting documentation to use as additional sources.

## II.    INCEPTION OF THE PRESIDENT'S SURVEILLANCE PROGRAM (PSP)

### A.    Expansion of NSA's Collection Activities

Prior to September 11, 2001, the Foreign Intelligence Surveillance Act of 1978 and Executive Order 12333 were generally viewed as the principal governing authorities for conducting electronic surveillance for national security purposes.[3] The Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801, *et seq.*, was enacted in 1978 to "provide legislative authorization and regulation for all electronic surveillance conducted within the United States for foreign intelligence purposes." S. Rep. No. 95-701, at 9 (1978), reprinted in 1978 U.S.C.C.A.N. 3973, 3977. Executive Order 12333 placed

---

[3] Executive Order 12333 was amended on July 30, 2008 by Executive Order 13470. This report refers to Executive Order 12333 as it existed prior to that amendment. The Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. § 1801, *et seq.* also was amended by the FISA Amendments Act of 2008. Unless otherwise indicated, this report refers to FISA as it existed prior to 2008.

restrictions on intelligence collection activities engaged in by Executive Branch agencies, including the NSA, while also seeking to foster "full and free exchange of information" among these agencies. In 2000 the NSA reported to Congress that

> (U) The applicable legal standards for the collection, retention, or dissemination of information concerning U.S. persons reflect a careful balancing between the needs of the government for such intelligence and the protection of the rights of U.S. persons, consistent with the reasonableness standard of the Fourth Amendment, as determined by factual circumstances.

> (U) In the Foreign Intelligence Surveillance Act (FISA) and Executive Order (E.O.) 12333, Congress and the Executive have codified this balancing. (Citations omitted.)[4]

As explained below, the PSP expanded the NSA's authority by allowing it to conduct electronic surveillance within the United States without an order from the FISC when certain factual conditions and legal standards were met.

## B.    Presidential Authorization of the PSP

In the days immediately after September 11, 2001, the NSA used its existing authorities to gather intelligence information in response to the terrorist attacks. When Director of Central Intelligence Tenet, on behalf of the White House, asked NSA Director Hayden whether the NSA could do more against terrorism, Hayden replied that nothing more could be done within existing authorities. When asked what he might do with more authority, Hayden said he put together information on what was operationally useful and technologically feasible. This information formed the basis of the PSP.

Shortly thereafter, the President authorized the NSA to undertake a number of new, highly classified intelligence activities.[5] All of these activities were authorized in a single Presidential Authorization that was periodically reauthorized.

The specific intelligence activities that were permitted by the Presidential Authorizations remain highly classified, except that beginning

---

[4] Legal Standards for the Intelligence Community in Conducting Electronic Surveillance, Report to Congress pursuant to Fiscal Year 2000 Intelligence Authorization Act.

[5] See Letter from Attorney General Alberto Gonzales to Senator Patrick Leahy, Chairman, Committee on the Judiciary (Gonzales Letter), August 1, 2007.

in December 2005 the President and other Administration officials acknowledged that these activities included the interception without a court order of certain international communications where there is "a reasonable basis to conclude that one party to the communication is a member of al-Qa'ida, affiliated with al-Qa'ida, or a member of an organization affiliated with al-Qa'ida."[6] The President and other Administration officials referred to this publicly disclosed activity as the "Terrorist Surveillance Program," a convention we follow in this unclassified report. We refer to other intelligence activities authorized under the Presidential Authorizations as the "Other Intelligence Activities." The specific details of the Other Intelligence Activities remain highly classified, although the Attorney General publicly acknowledged the existence of such activities in August 2007.[7] Together, the Terrorist Surveillance Program and the Other Intelligence Activities comprise the PSP.

The Presidential Authorizations were issued at intervals of approximately every 45 days. As described in the next section, with each reauthorization the CIA and later the NCTC prepared an assessment of current potential terrorist threats and a summary of intelligence gathered through the PSP and other means during the previous authorization period. The Department of Justice's Office of Legal Counsel reviewed this information to assess whether there was "a sufficient factual basis demonstrating a threat of terrorist attacks in the United States for it to continue to be reasonable under the standards of the Fourth Amendment for the President to [continue] to authorize the warrantless searches involved" in the program. The Office of Legal Counsel then advised the Attorney General whether the constitutional standard of reasonableness had been met and whether the Presidential Authorization could be certified "as to form and legality." Each of the Presidential Authorizations included a finding to the effect that an extraordinary emergency continued to exist, and that the circumstances "constitute an urgent and compelling governmental interest" justifying the activities being authorized without a court order.

Each Presidential Authorization also included a requirement to maintain the secrecy of the activities carried out under the program. The President also noted his intention to inform appropriate members of the Senate and the House of Representatives of the program "as soon as I judge that it can be done consistently with national defense needs." As discussed in Section III.B.2. below, beginning on October 25, 2001, White House

---

[6] Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence (December 19, 2005) (statement of Attorney General Gonzales).

[7] Gonzales Letter, August 1, 2007.

officials and Hayden provided briefings on the PSP to members of Congress and their staffs.

Although there was no legal requirement that the Authorizations be certified by the Attorney General or other Department of Justice official, current and former DOJ officials told us that this certification added value by giving the program a sense of legitimacy. Former Attorney General Gonzales stated that the NSA was being asked to do something it had not done before, and it was important to assure the NSA that the Attorney General had approved the legality of the program. He also stated that it was important that the cooperating private sector personnel know that the Attorney General had approved the program. In addition, Gonzales said that for "purely political considerations" the Attorney General's approval of the program would have value "prospectively" in the event of congressional or inspector general reviews of the program.

### C. Threat Assessment Memoranda Supporting Authorization of the PSP

The CIA initially prepared the threat assessment memoranda that were used to support the Presidential Authorization and periodic reauthorizations of the PSP. The memoranda documented intelligence assessments of the terrorist threats to the United States and to U.S. interests abroad from al-Qa'ida and affiliated terrorist organizations. These assessments were prepared approximately every 45 days to correspond with the President's Authorizations of the PSP.

The Director of Central Intelligence's (DCI) Chief of Staff was the initial focal point for preparing the threat assessment memoranda. According to the former DCI Chief of Staff, he directed CIA terrorism analysts to prepare objective appraisals of the current terrorist threat, focusing primarily on threats to the U.S. homeland, and to document those appraisals in a memorandum. Initially, the analysts who prepared the threat assessments were not read into the PSP and did not know how the threat assessments would be used. CIA's terrorism analysts drew upon all sources of intelligence in preparing these threat assessments.

After the terrorism analysts completed their portion of the memoranda, the DCI Chief of Staff added a paragraph at the end of the memoranda stating that the individuals and organizations involved in global terrorism (and discussed in the memoranda) possessed the capability and intention to undertake further terrorist attacks within the United States. The DCI Chief of Staff recalled that the paragraph was provided to him initially by a senior White House official. The paragraph included the DCI's recommendation to the President that he authorize the NSA to conduct surveillance activities under the PSP. CIA Office of General Counsel (OGC)

attorneys reviewed the draft threat assessment memoranda to determine whether they contained sufficient threat information and a compelling case for reauthorization of the PSP. If either was lacking, an OGC attorney would request that the analysts provide additional threat information or make revisions to the draft memoranda.

The threat assessment memoranda were then signed by the DCI. George Tenet signed most of the threat memoranda prepared during his tenure as DCI. On the few occasions when he was unavailable, the Deputy Director of Central Intelligence, John E. McLaughlin, signed the memoranda on behalf of Tenet. McLaughlin also signed the memoranda in the capacity of Acting DCI in August and September 2004.

In November 2004, Porter J. Goss became DCI and assumed responsibility for signing the memoranda. There were no occasions when the DCI or Acting DCI withheld their signatures from the threat assessment memoranda. The memoranda were co-signed by the Secretary of Defense, reviewed by the Attorney General, and delivered to the White House to be attached to the PSP Presidential Authorizations signed by the President.

Responsibility for drafting the threat assessment memoranda was transferred from the CIA to the newly established Terrorist Threat Integration Center (TTIC) in May 2003. This responsibility subsequently was retained by TTIC's successor organization, the NCTC. The DCI continued to sign the threat assessment memoranda through April 2005.

The ODNI was established in April 2005, and the NCTC became a subcomponent of the ODNI. Once Ambassador Negroponte was confirmed as the DNI, senior IC officials believed that DNI Negroponte, as the President's new senior intelligence advisor, should make the IC's recommendation to the President regarding the need to renew the PSP.

The preparation and approval of the threat assessments became the ODNI's primary role in the PSP. Beginning in April 2005, and continuing at specific intervals until the program's termination in early 2007, ODNI personnel prepared and approved threat assessments in support of the periodic renewal of the PSP.

The ODNI OIG found that the ODNI threat assessments were drafted by experienced NCTC personnel who prepared the documents in a memorandum style following an established DOJ format used in earlier PSP renewals. Throughout the ODNI preparation and approval process, the threat assessments were also subject to varying degrees of review and comment by DOJ and ODNI attorneys. Each threat assessment was designed to set forth the DNI's view regarding the current threat of an al-Qa'ida attack against the United States and to provide the DNI's

recommendation whether to renew the PSP. NCTC personnel involved in preparing the threat assessments told the ODNI OIG that the danger of a terrorist attack described in the threat assessments was sobering and "scary," resulting in the threat assessments becoming known by ODNI and IC personnel involved in the PSP as the "scary memos." During interviews, ODNI personnel said they were aware the threat assessments were relied upon by DOJ and White House personnel as the basis for continuing the PSP, and understood that if a threat assessment identified a threat against the United States the PSP was likely to be renewed. NCTC analysts also reported that on a less frequent basis they prepared a related document that set forth a list of al-Qa'ida affiliated groups that they understood were targets of the PSP. The ODNI OIG found that the threat assessments and the less frequent list of al- Qa'ida-affiliated groups underwent the same ODNI approval process.

The ODNI OIG also determined that the ODNI threat assessments were prepared using evaluated intelligence information chosen from a wide variety of IC sources. ODNI personnel told the ODNI OIG that during the period when the ODNI prepared the threat assessments, the IC had access to fully evaluated intelligence that readily supported the ODNI assessments that al-Qa'ida terrorists remained a significant threat to the United States. The ODNI OIG found that once the ODNI threat assessments were approved within NCTC and by the NCTC Director, the documents were forwarded through an established approval chain to senior ODNI personnel who independently satisfied themselves that the documents were accurate, properly prepared, and in the appropriate format.

Once the draft threat assessments were subjected to this systematic and multi-layered management and legal review, the documents were provided to the DNI or his Principal Deputy (PDDNI) for consideration and, if appropriate, approval. Overall, the ODNI OIG found that the ODNI process used to prepare and obtain approval of the threat assessments was straightforward, reasonable, and consistent with the preparation of other documents requiring DNI or PDDNI approval.

NCTC analysts involved in preparing the threat assessments told the ODNI OIG that only a portion of the PSP information was ever used in the ODNI threat assessments because other intelligence sources were available that provided more timely or detailed information about the al-Qa'ida threat to the United States. During interviews, the NCTC analysts noted that PSP information was only one of several valuable sources of intelligence information available to them. The NCTC analysts also told ODNI OIG staff that during the period when the NCTC prepared the threat memoranda, the intelligence demonstrating the al-Qa'ida threat to the United States was overwhelming and readily available to the IC.

### D. Department of Justice Office of Legal Counsel's Early Memoranda Supporting the Legality of the PSP

From the outset of the program, access to the PSP for non-operational personnel was tightly restricted. Former White House Counsel and Attorney General Alberto Gonzales told the DOJ OIG that it was the President's decision to keep the program a "close hold." Gonzales stated that the President made the decision on all requests to "read in" any non-operational persons, including DOJ officials.[8]

DOJ Office of Legal Counsel (OLC) Deputy Assistant Attorney General John Yoo was responsible for drafting the first series of legal memoranda supporting the program.[9] Yoo was the only OLC official "read into" the PSP from the program's inception in October 2001 until Yoo left DOJ in May 2003.[10] The only other non-FBI DOJ officials read into the program during this period were Attorney General Ashcroft and Counsel for Intelligence Policy James Baker.

Jay Bybee was OLC Assistant Attorney General from November 2001 through March 2003, and Yoo's supervisor. Bybee told the DOJ OIG that in early July 2001, before he was confirmed, he learned that Yoo was already under consideration for one of OLC Deputy Assistant Attorney General slots. Bybee said he was "enthusiastic" about Yoo and later agreed to Yoo's request to be assigned to the "national security portfolio" because Yoo had more national security experience than any of the other OLC deputies.

However, Bybee stated he was never read into the PSP and could shed no further light on how Yoo came to draft the OLC opinions on the program. He said that Yoo had responsibility for supervising the drafting of opinions related to other national security issues when the September 11 attacks

---

[8] Gonzales testified before the Senate Judiciary Committee on July 18, 2006, that "[a]s with all decisions that are non-operational in terms of who has access to the program, the President of the United States makes the decisions, because this is such an important program[.]"

[9] The Office of Legal Counsel (OLC) typically drafts memoranda for the Attorney General and the Counsel to the President, usually on matters involving significant legal issues or constitutional questions, and in response to legal questions raised by Executive Branch agencies. In addition, all Executive Orders proposed to be issued by the President are reviewed by the Office of Legal Counsel as to form and legality, as are other matters that require the President's formal approval.

[10] The process of being "read into" a compartmented program generally entails being approved for access to particularly sensitive and restricted information about a classified program, receiving a briefing about the program, and formally acknowledging the briefing, usually by signing a nondisclosure agreement describing restrictions on the handling and use of information concerning the program.

occurred.[11] Bybee described Yoo as "articulate and brilliant," and said he had a "golden resume" and was "very well connected" with officials in the White House. Bybee said that from these connections, in addition to Yoo's scholarship in the area of executive authority during wartime, it was not surprising that Yoo "became the White House's guy" on national security matters.

In September and early October 2001, Yoo prepared several preliminary opinions relating to hypothetical random domestic electronic surveillance activities, but the first OLC opinion explicitly addressing the legality of the PSP was not drafted until after the program had been formally authorized by President Bush in October 2001. Attorney General Ashcroft approved the first Presidential Authorization for the PSP as to "form and legality" on the same day that he was read into the program.

The first OLC opinion directly supporting the legality of the PSP was dated November 2, 2001, and was drafted by Yoo. As discussed in Section IV of this report, deficiencies in Yoo's memorandum identified by his successors in the Office of Legal Counsel and the Office of the Deputy Attorney General later became critical to DOJ's decision to reassess the legality of the program in 2003.

Yoo's November 2, 2001 memorandum focused almost exclusively on the activity that the President later publicly confirmed as the Terrorist Surveillance Program. Yoo acknowledged that FISA "purports to be the exclusive statutory means for conducting electronic surveillance for foreign intelligence," but opined that "[s]uch a reading of FISA would be an unconstitutional infringement on the President's Article II authorities." Yoo characterized FISA as merely providing a "safe harbor for electronic surveillance," adding that it "cannot restrict the President's ability to engage in warrantless searches that protect the national security." According to Yoo, the ultimate test of whether the government may engage in warrantless electronic surveillance activities is whether such conduct is consistent with the Fourth Amendment, not whether it meets the standards of FISA. Yoo wrote that "unless Congress made a clear statement in FISA that it sought to restrict presidential authority to conduct warrantless searches in the

---

[11] As noted above, Yoo, Ashcroft, Card, and Addington declined or did not respond to the DOJ OIG's request for interviews, and the DOJ OIG does not know how Yoo came to deal directly with the White House on legal issues related to the PSP. In his book "War by Other Means," Yoo wrote that "[a]s a deputy to the assistant attorney general in charge of the office, I was a Bush Administration appointee who shared its general constitutional philosophy. . . . I had been hired specifically to supervise OLC's work on [foreign affairs and national security]." "War by Other Means," by John Yoo, at 19-20.

national security area – which it has not – then the statute must be construed to avoid such a reading."[12]

Yoo's analysis of this point would later raise serious concerns for other officials in OLC and the Office of the Deputy Attorney General (ODAG) in late 2003 and early 2004. Among other concerns, Yoo did not address the section of FISA that creates an explicit exemption from the requirement to obtain a judicial warrant for 15 days following a congressional declaration of war. See 50 U.S.C. § 1811. Yoo's successors in OLC criticized this omission in Yoo's memorandum because they believed that by including this provision in FISA Congress arguably had demonstrated an explicit intention to restrict the government's authority to conduct electronic surveillance during wartime.

Yoo's memorandum also analyzed Fourth Amendment issues raised by the Presidential Authorizations. Yoo dismissed Fourth Amendment concerns regarding the PSP to the extent that the Authorizations applied to non-U.S. persons outside the United States. Regarding those aspects of the program that involved interception of the international communications of U.S. persons in the United States, Yoo asserted that Fourth Amendment jurisprudence allowed for searches of persons crossing the border and that interceptions of communications into or out of the United States fell within the "border crossing exception." Yoo further opined that electronic surveillance in "direct support of military operations" did not trigger constitutional rights against illegal searches and seizures, in part because the Fourth Amendment is primarily aimed at curbing law enforcement abuses.

Yoo also wrote that the activity described in the Presidential Authorizations was "reasonable" under the Fourth Amendment and therefore did not require a warrant. In support of this position, Yoo cited

---

[12] On March 2, 2009, DOJ released nine opinions written by OLC from 2001 through 2003 regarding "the allocation of authorities between the President and Congress in matters of war and national security" containing certain propositions that no longer reflect the views of OLC and "should not be treated as authoritative for any purpose." Memorandum for the Files from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, "Re: Status of Certain OLC Opinions Issued in the Aftermath of the Terrorist Attacks of September 11, 2001" (January 15, 2009), at 1, 11. Among these opinions was a classified February 2002 memorandum written by Yoo which asserted that Congress had not included a clear statement in FISA that it sought to restrict presidential authority to conduct warrantless surveillance activities in the national security area and that the FISA statute therefore does not apply to the President's exercise of his Commander-in-Chief authority. In Bradbury's unclassified January 15, 2009, memorandum (included among those released in March 2009), Bradbury stated that this proposition "is problematic and questionable, given FISA's express references to the President's authority" and is "not supported by convincing reasoning."

Supreme Court opinions upholding warrantless searches in a variety of contexts, such as drug testing of employees and sobriety checkpoints to detect drunk drivers, and in other circumstances "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Veronia School Dist. 47J v. Acton*, 515 U.S. 464, 652 (1995)(as quoted in November 2, 2001 Memorandum at 19). Yoo wrote that in these situations the government's interest was found to have outweighed the individual's privacy interest, and that in this regard "no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 435 U.S. 280, 307 (1981). According to Yoo, the activity authorized by the Presidential Authorizations advanced this governmental security interest.

Yoo's legal memoranda omitted any discussion of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), a leading case on the distribution of government powers between the Executive and Legislative Branches. Justice Jackson's analysis of President Truman's Article II Commander-in-Chief authority during wartime in the *Youngstown* case was an important factor in OLC's subsequent reevaluation of Yoo's opinions on the legality of the PSP.

Yoo also discussed in his memoranda the legal rationale for Other Intelligence Activities authorized as part of the PSP. To the extent that particular statutes might appear to preclude these activities, Yoo concluded that "we do not believe that Congress may restrict the President's inherent constitutional powers, which allow him to gather intelligence necessary to defend the nation from direct attack."

However, as detailed in Chapter Three of the DOJ OIG report, Yoo's discussion of some of the Other Intelligence Activities did not accurately describe the scope of these activities. Yoo's factual discussion of these activities was later identified by his successors in the Office of Legal Counsel and ODAG in late 2003 as insufficient and presenting a serious impediment to recertification of the program as to form and legality.

The President continued to reauthorize the PSP periodically during late 2001 and 2002, with some modifications of the scope of the intelligence activities being authorized. In October 2002, at Attorney General Ashcroft's request, Yoo drafted another opinion concerning the PSP. This memorandum, dated October 11, 2002, reiterated the same basic analysis contained in Yoo's November 2, 2001, memorandum in support of the legality of the PSP.

As the only OLC official read into the PSP through early 2003, Yoo consulted directly with White House officials about the PSP during this period. Because the DOJ OIG was unable to interview Yoo, it could not

determine the exact nature and extent of these consultations. The DOJ OIG was also unable to determine whether Attorney General Ashcroft was fully aware of the advice Yoo was providing directly to the White House about the PSP.

Former Attorney General Gonzales and former OLC Assistant Attorney General Bybee both told the DOJ OIG that they did not know how Yoo became responsible for analyzing the legality of the PSP. Bybee told us that he was "surprised" and "a little disappointed" to learn through media accounts that Yoo had worked on the PSP without Bybee's knowledge. Bybee said that it would not be unusual for a Deputy Assistant Attorney General such as Yoo to have direct contact with the White House for the purpose of rendering legal advice, but that the OLC Assistant Attorney General must be aware of all opinions that issue from OLC. Other senior DOJ officials also criticized the assignment of a single OLC attorney to draft the legal rationale for the program. These officials noted that OLC traditionally adheres to a rigorous peer review process for all legal memoranda it issues. They also cited the importance of having the OLC Assistant Attorney General, a Senate-confirmed official accountable for the work of that office, be aware of all OLC legal memoranda.

Gonzales told the DOJ OIG that the Yoo opinions represented the legal opinion of DOJ, and that it was Ashcroft's decision as to how to satisfy his obligations as Attorney General. Gonzales told the DOJ OIG that Ashcroft complained to the White House that it was "inconvenient" not to have the Deputy Attorney General or Ashcroft's Chief of Staff read into the PSP, but Gonzales also stated that he never got the sense from Ashcroft that this affected the quality of the legal advice about the program that DOJ provided to the White House. As noted, Ashcroft declined the DOJ OIG's request for an interview. The DOJ OIG therefore was unable to determine from Ashcroft whether he sought additional DOJ read-ins to assist in the legal analysis of the program, how hard he may have pressed for these additional read-ins, or whether he believed he was receiving adequate legal advice about the program from Yoo alone during this early phase of the PSP.

## III. IMPLEMENTATION OF THE PRESIDENT'S SURVEILLANCE PROGRAM

### A. NSA Intelligence Activities under the PSP

According to the NSA OIG report, the first Presidential Authorization was the product of discussions between former NSA Director Hayden and White House officials. Hayden also consulted with NSA senior technical experts and experienced attorneys from the NSA's Office of General Counsel. While he consulted with NSA personnel in identifying critical intelligence

gaps, only Hayden knew about and participated in the development of the Presidential Authorization by serving as a technical advisor. After the Authorization was signed, NSA attorneys supported the lawfulness of the resulting program. Hayden stated that DOJ did not participate in his early meetings about the NSA's collection activities. As noted, the Attorney General was read into the program on the same day he signed the first Authorization as to form and legality.

When the NSA received the first Presidential Authorization, Hayden noted that he was assured by the signature of the Attorney General that the program was lawful and had been reviewed by the White House and DOJ.

After Hayden received the first Authorization, he assembled 80 to 90 people in a conference room and explained what the President had authorized. Hayden said: "We're going to do exactly what he said and not one photon or electron more." The NSA's purpose in implementing the PSP was to collect foreign intelligence. According to Hayden, the activities were targeted and focused with the purpose of "hot pursuit" of communications entering or leaving the United States involving individuals believed to be associated with al-Qa'ida, not to intercept conversations between people in the United States. The intercepted communications had to be reasonably believed to be al-Qa'ida communications, one end of which was in the United States.

According to the NSA OIG, the PSP had standards for targeting al-Qa'ida. There were several layers of review, starting with an NSA management review, and the NSA OIG conducted a review of target folders to ensure compliance with program standards and additional management controls.[13] A sample of target folders was tested to determine whether targeting decisions were adequately supported. Any ambiguities were discussed with analysts and adequately resolved.

The NSA OIG reported that the NSA's conduct of the PSP was reviewed and monitored by the NSA Office of General Counsel and the NSA OIG. According to the NSA OIG, NSA employees involved in the program received tailored training and their work was overseen to ensure that all activities were consistent with the letter and intent of the Authorization and with the protection of civil liberties. The NSA OIG report concluded that it found no evidence of intentional misuse of the PSP.

---

[13] Internal control, or management control, comprises the plans, methods, and procedures used to meet missions, goals, and objectives. It provides reasonable assurance that an entity is effective and efficient in its operations, reliable in its reporting, and compliant with applicable laws and regulations.

Hayden stated that although he understood that the PSP activities were more aggressive than those available traditionally under FISA, he believed that the PSP was less intrusive because the period of time in which collection was conducted was, in most cases, far less than was authorized in a typical FISC order. Additionally, the sole purpose of the overall PSP was to detect and prevent terrorism against the United States. According to Hayden, the program was designed to provide the NSA with the operational agility to cover terrorism-related targets.

## B.    Access to the PSP

### 1.    Executive Branch Personnel

Knowledge of the PSP was strictly controlled and limited at the express direction of the White House. Further information about the number of Executive Branch employees who were read into the program is provided in the classified report.

As discussed below and in more detail in the DOJ OIG report, the DOJ OIG found that overly restrictive limitations on the number of DOJ personnel read into the program created several problems. Among other things, these limitations prevented DOJ from adequately reviewing the PSP's legality during the earliest phase of the program's operation. The subsequent identification of what DOJ officials perceived to be serious factual and legal flaws in Yoo's early legal analysis of the PSP also precipitated a major dispute between DOJ and the White House over reauthorization of the program that nearly led to the resignations of several senior DOJ and FBI officials in March 2004. In addition, the ODNI OIG found that the opportunity for ODNI oversight components to participate in oversight of the PSP was limited by ODNI oversight personnel not being granted timely access to the PSP.

### 2.    Congressional Briefings

On October 25, 2001, White House officials and Hayden conducted a briefing on the PSP for the Chairman and Ranking Member of the House Permanent Select Committee on Intelligence, Nancy P. Pelosi and Porter J. Goss; and the Chairman and Vice Chairman of the Senate Select Committee on Intelligence, D. Robert Graham and Richard J. Shelby. According to the NSA, between October 25, 2001, and January 17, 2007, Hayden and current NSA Director Keith Alexander, sometimes supported by other NSA personnel, conducted approximately 49 briefings to members of Congress and their staff, 17 of which took place before the December 2005 media reports regarding what was called the "Terrorist Surveillance Program." Hayden told us that during the many PSP briefings to members of Congress no one ever suggested that NSA should stop the program.

### 3. Foreign Intelligence Surveillance Court Briefings

From January 2002 to January 2006, only FISC Presiding Judge Royce Lamberth, followed by Presiding Judge Colleen Kollar-Kotelly, were read into the PSP. The classified report and the full DOJ OIG report describe the circumstances under which the Presiding Judge was notified of the existence of the PSP and read into the program, and the measures subsequently taken to address the effect of the PSP on the government's relationship with the FISC.

### 4. FBI Participation in the PSP

The DOJ OIG report also describes the FBI's participation in the PSP, particularly as a recipient of intelligence collected under the program. The DOJ OIG addresses the challenges the FBI faced in disseminating this information to FBI field offices for investigation without revealing the source of the information, as well as the efforts the FBI made to improve cooperation with the NSA to enhance the usefulness of PSP-derived information to FBI agents. Further details about these topics are classified and therefore cannot be discussed here. The DOJ OIG generally found that the FBI implemented reasonable procedures for expeditiously disseminating PSP-derived information to FBI field offices for investigation while protecting the sources and methods by which the information was obtained. However, the DOJ OIG also found that the highly compartmented nature of the PSP created obstacles for the FBI's process for handling program-derived information and understandably frustrated FBI agents responsible for investigating the information.

### 5. CIA Participation in the PSP

The CIA OIG report describes the CIA's participation in the PSP. CIA officials, as PSP consumers, requested information from the program and utilized this information in their analyses. The CIA OIG found that CIA officials appeared to have had an adequate understanding of the justification needed to request PSP-derived information, and that CIA requests were adequately justified.

Senior CIA officials, including former Directors of Central Intelligence (DCI) Hayden and Goss, and former Acting Director McLaughlin, stated that the PSP addressed a gap in intelligence collection. Following the terrorist attacks on September 11, 2001, there was concern that additional acts of terrorism would be perpetrated by terrorist cells already inside the United States. Senior IC officials believed that providing IC analysts access to increased signals intelligence could lead to the discovery of terrorists in the U.S. and planned terrorist attacks. However, collection of such communications required authorization under FISA, and there was