**EXHIBIT A**

ZELDES & HAEGGQUIST, LLP
HELEN I. ZELDES (220051)
ALREEN HAEGGQUIST (221858)
AARON M. OLSEN (259923)
625 Broadway, Suite 906
San Diego, CA 92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878
helenz@zhlaw.com
alreenh@zhlaw.com

STEVEN A. SKALET (admitted *pro hac vice*)
CRAIG L. BRISKIN (admitted *pro hac vice*)
MEHRI & SKALET, PLLC
1250 Connecticut Avenue., NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
sskalet@findjustice.com
cbriskin@findjustice.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE MAGSAFE APPLE POWER ADAPTER LITIGATION | Case No.: 5:09-CV-01911-JW<br><br>DECLARATION OF HELEN I. ZELDES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND INCENTIVE AWARDS<br><br>Date: February 27, 2012<br>Time: 9:00 a.m.<br>Location: San Francisco Courthouse<br>Courtroom 9, 19th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Judge: Honorable James Ware |

ZELDES & HAEGGQUIST, LLP

Page

I. HISTORY OF THE LITIGATION ................................................................... 1

    A. The Consolidated Actions and Appointment as Lead Counsel ........................ 1

    B. Plaintiffs' Engaged in Extensive Discovery ................................................ 3

II. SETTLEMENT NEGOTIATIONS ............................................................... 4

III. FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD ......................................................................... 6

    A. Skill and Experience of Plaintiffs' Counsel ................................................ 6

    B. The Nature, Complexity and Risks of the Litigation ................................. 6

    C. The Process for Determining the Attorneys' Fees Was Designed to Protect the Class and Ensure Fairness ....................................................... 9

    D. The Results Obtained Are Exceptional ..................................................... 10

        1. Value of the Refund Program .............................................................. 10

        2. Value of the Replacement Program ..................................................... 10

    E. Extent of Litigation and Plaintiffs' Counsel's Reasonable Lodestar ................. 11

IV. THE CLASS REPRESENTATIVES DESERVE A SERVICE AWARD ................... 12

V. CONCLUSION ........................................................................................ 13

ZELDES & HAEGGQUIST, LLP

I, Helen I. Zeldes, declare as follows:

1.    I am an attorney duly licensed to practice before all courts of the State of California and admitted to this Court.  I am a partner with the law firm of Zeldes & Haeggquist, LLP, Counsel for Plaintiffs in the above-captioned matter (the "Litigation") and Interim Lead Counsel for the Class.

2.    I have personal knowledge of the matters set forth in this declaration, and those specified to be on information or belief I believe to be true based upon my role in this case, and if called as a witness, I could and would testify competently thereto.

3.    I submit this declaration in support of Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards.  All capitalized terms not defined herein have the same meaning as set forth in the Settlement Agreement and Release ("Agreement") filed with this Court on August 8, 2011 (Dkt. No. 70-1).

4.    This declaration sets forth the nature of the claims asserted, the principal proceedings to date, the legal services provided by Plaintiffs' Counsel, the settlement negotiations, and why the fees and expenses set forth in the Agreement are reasonable and should be approved by the Court.

## I.    HISTORY OF THE LITIGATION

### A.    The Consolidated Actions and Appointment as Lead Counsel

5.    In 2009, my firm, along with the Washington DC law firm of Mehri & Skalet, PLLC and the Los Angeles based law firms of Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor, McNicholas & McNicholas, and Jacobson, Russell, Saltz & Fingerman, (collectively, "Plaintiffs' Counsel") were retained by consumers who had purchased Apple, Inc. ("Apple") MacBook or MacBook Pro computers that shipped with a 60W or 85W MagSafe MPM-1 ("T") Power Adapter ("Subject Computers") and purchasers of a standalone T Power Adapter ("Adapter").  These consumers' Adapters spark, fray, overheat, catch on fire and/or otherwise prematurely failed (the "Defect").

6.    Plaintiffs' Counsel worked carefully and extensively to investigate and evaluate the significance and consequences of the complained of Defect, by, among other things,

locating and interviewing numerous potential witnesses, reviewing hundreds of online complaints, analyzing the Subject Computers and Adapters, and analyzing Apple's business practices throughout the relevant time period.

7.     My law firm and the law firm of Mehri & Skalet began working with Class Representatives Naotaka Kitigawa Jr. (from California), Timothy Broad (from Ohio) and Jesse Reisman (from Maryland) (collectively, the "Kitigawa Plaintiffs").   In addition, the Los Angeles based law firms mentioned above began working with Class Representatives Tracey Hackwith (from California), Michael Martin (from Wisconsin), and Maxx Scholten (from Texas) (collectively, the "Hackwith Plaintiffs").

8.     After conducting a thorough investigation, Plaintiffs' Counsel carefully evaluated potential theories of liability and various potential jurisdictions in which the Class Representatives' respective claims arose.

9.     On May 1, 2009, the Kitigawa Plaintiffs filed their action in the Northern District of California, titled *Kitigawa, et al. v. Apple Computer, Inc.,* Case No. 09-01911 (the "*Kitigawa* Action").  (Dkt. No. 1.)  Unbeknownst to the Kitigawa Plaintiffs, on May 15, 2009, the Hackwith Plaintiffs filed their action in the Central District of California, titled *Hackwith, et al. v. Apple Computer, Inc.,* Case No. 09-03482 (the "*Hackwith* Action").

10.     Each group of Plaintiffs' Counsel met separately with counsel for Apple for their FRCP Rule 26 conference and in preparing their respective early disclosures.

11.     After the Kitigawa Plaintiffs were notified of the *Hackwith* Action, the Parties agreed to coordinate their efforts, maximize resources, and minimize duplication of effort.  On September 4, 2009, Apple moved to have the two cases related (Dkt. No. 18) and this Court ordered the cases so related on September 24, 2009 (Dkt. No. 24).  On October 19, 2009, the Kitigawa and Hackwith Plaintiffs jointly moved to consolidate their cases, and, to facilitate the orderly and efficient prosecution of this matter, appoint Zeldes & Haeggquist, LLP and Mehri & Skalet, PLLC as Interim Co-Lead Counsel.  (Dkt Nos. 38-41.)  The Court granted both motions on November 16, 2009.  (Dkt. No. 43.)

12.     On January 19, 2010, Plaintiffs' filed a consolidated amended class action complaint.  (Dkt. No. 44.)  Apple answered the consolidated amended complaint on February 5, 2010 (Dkt. No. 51), which was followed by extensive discovery.

**B.     Plaintiffs' Engaged in Extensive Discovery**

13.     Plaintiffs served Requests for Production of Documents, multiple sets of Interrogatories, Requests for Admission, a FRCP Rule 30(b)(6) deposition notice on multiple topics, and notices of depositions of key fact witnesses.

14.     Plaintiffs' document requests led to extensive negotiations with Apple's counsel regarding the appropriate scope of production and the disclosure of confidential internal financial, proprietary, and private information for which special protection from public disclosure was necessary, requiring the Parties to, among other things, negotiate the terms of a protective order.  The Parties eventually came to an agreement on the terms of the protective order, which was entered by this Court on February 12, 2010.  (Dkt. No. 55.)

15.     In addition to reviewing voluminous documents obtained from Plaintiffs' Counsel's own internal investigations, Plaintiffs' Counsel received, reviewed and analyzed tens of thousands of documents produced by Apple, reviewing in total over 80,000 pages of documents that included design schematics, drawings, testing and specification reports, internal memorandums, repair and replacement data, sales data, failure rates, complaints, and customer reviews regarding the Adapters.  A large percentage of the documents contained technically complex information relating to the internal composition of the Adapters and testing related thereto, which Plaintiffs' Counsel carefully and diligently analyzed.

16.     The Parties also engaged in extensive informal discovery, with Plaintiffs' Counsel serving informal interrogatories and conferring multiple times regarding the facts and evidence in this case.  In particular, after this case was filed, Apple placed into the market a redesigned adapter known as the "L" or "toothbrush" style adapter, of which spawned a second round of written discovery and extensive negotiations regarding the scope of the same.

17.     Through discovery, Plaintiffs' Counsel learned that there are over 11 million subject Adapters in the marketplace.  Given this number, the pervasive risk of ongoing damage

to the Class, and the technically complex nature of Plaintiffs' claims, Plaintiffs' Counsel necessarily devoted hundreds of hours of detailed and intricate engineering review, research and investigation.

18. My firm endeavored throughout the Litigation to delegate and coordinate the efforts of Plaintiffs' Counsel so as to maximize the impact of their collective resources, while minimizing duplication of efforts and streamlining the prosecution of the case. Interim Co-Lead Counsel carefully supervised and managed the efforts of the other Plaintiffs' Counsel, consulted with all counsel concerning litigation strategies and positions, assigned tasks to various Plaintiffs' Counsel and kept Plaintiffs and Plaintiffs' Counsel abreast of all developments in the Litigation. Plaintiffs' Counsel utilized a coding system to review thousands of documents relevant to this Litigation, creating an efficient and comprehensive document review.

19. Given the technically complex issues involved, Plaintiffs retained two separate engineering experts to investigate, test and analyze the design of the subject Adapters to prove the extent, nature and source of the Defect. Neither expert knew nor spoke to the other, yet the two experts came up with substantially similar analyses of the Defect and its cause. Both experts prepared detailed reports for Plaintiffs and helped prepare Plaintiffs to counter the analysis and arguments of Apple's expert.

20. All the while, Plaintiffs' Counsel continued to locate and interview potential witnesses, monitor online complaints, and consult with the mechanical and electrical engineering experts. These investigative efforts were indispensable to helping Plaintiffs' Counsel to target discovery early on in the litigation, allowing them to achieve efficiencies and timely obtain impactful information.

## II. SETTLEMENT NEGOTIATIONS

21. Plaintiffs' Counsel's expertise, time, effort and analysis laid the foundation for opening settlement negotiations with Apple, a process that was hard-fought. After preparing detailed mediation statements, supported by extensive experts' reports, on August 31, 2010, the Parties participated in their first full-day mediation session with the Honorable Fern M.

Smith (Ret.), a former federal judge of this Court and well-respected mediator. The first mediation session lasted over nine hours, with the Parties arguing late into the evening. The Parties debated the merits of the case and exchanged offers and counter-offers. While the initial mediation did not result in a settlement, the framework for the ultimate settlement emerged. The Parties agreed to continue to discuss settlement, and the dialogue continued with Judge Smith's assistance.

22. The Parties continued their efforts to resolve the matter after mediation, but after several months of discussion, came to an impasse. During settlement negotiations, Plaintiffs' Counsel made it clear that while we were prepared to fairly assess the strengths and weaknesses of Plaintiffs' case, we would continue to litigate (and in fact did so), rather than settle for less than fair value. The Parties continued to litigate and meet and confer about discovery.

23. The Parties continued to conduct discovery, and also agreed to a second mediation session before Judge Smith, held on November 11, 2010. Although the Parties began the process very far apart in their views on the case, Judge Smith assisted the Parties in bridging the gap. When discussions hit another impasse, Judge Smith made a mediator's proposal, which formed the basis of the Parties' Agreement. The Parties continued to negotiate the details of settlement for an additional month before finally agreeing to a term sheet on December 13, 2010.

24. The Parties continued to vigorously debate the details of the term sheet, including the specifics of the cash refund, replacement program and all other aspects of the notice program, and finalized the details and signed the Agreement on July 1, 2011.

25. The Agreement was the result of extensive arm's-length negotiations by sophisticated counsel based on an advanced understanding of the strengths and weaknesses of the case, including the risks for both sides and the nature and result obtained for the Class. Importantly, at all times during the settlement discussions, the Parties refrained from discussing attorneys' fees or expenses until after they had finalized all material terms of the relief to the settlement Class. Plaintiffs' Counsel not only waited until they had secured

ZELDES & HAEGGQUIST, LLP

ZELDES DECL ISO MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND INCENTIVE AWARDS - Case No. 5:09-CV-01911-JW

5

benefits for the Class before discussing attorneys' fees with Apple, but they also used the same mediated negotiation process with Judge Smith for settlement of attorneys' fees that led to the agreement on the substantive terms of the Agreement.

26.     Though the negotiations were hard-fought, with the assistance of Judge Smith, Apple agreed to pay up to $3.1 million in attorneys' fees and expenses and service payments to Plaintiffs of $5,000 each, separate and apart from the relief to the Class.     *See* Agreement § V (A) (Dkt. No. 70-1).  The Parties structured the fee and expense award such that it would not delay relief to the Class.  *Id.*

## III.    FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

### A.    Skill and Experience of Plaintiffs' Counsel

27.     Plaintiffs' Counsel are well-respected leaders in the fields of complex consumer class action litigation.  The identification and background of my firm and its partners is contained in my firm's resume, a true and correct copy of which is attached hereto as Exhibit 1.  Plaintiffs' Counsel's skills in developing evidence, technical expertise, working with experts, and understanding the strengths and weaknesses of their respective cases were critical to the results achieved for the settlement Class.  Plaintiffs' Counsel was in a position to properly evaluate the risks and expenses of continued litigation, including the possibility that a class would not be certified, or liability not established.

### B.    The Nature, Complexity and Risks of the Litigation

28.     This Litigation was undertaken by Plaintiffs' Counsel on a wholly contingent basis.  From the outset, Plaintiffs' Counsel understood that we were embarking on an expensive and lengthy litigation with no guarantee of compensation for the enormous investment of time, money and effort the case would (and did) require.  The nature of our contingent practice involving complex class actions involves undertaking cases lasting several years, during which time the firm must not only pay regular overhead, but also advance the substantial expense of the litigation.  The financial burden on our firm in such cases is far greater than on a firm that is paid on an ongoing basis.  And there is never any guarantee of

success. Indeed, there are cases where Plaintiffs' Counsel in high-stakes contingent cases, after the expenditure of thousands of hours, received no compensation.

29. The specific risks involved in filing and prosecuting this case were significant. I knew that obtaining a recovery would be far from easy. When Plaintiffs' Counsel analyzed the risk of filing this lawsuit, it was known that legal and factual issues involving class certification and damages would be complex and difficult, and would require a substantial investment of time and money to review and extract critical data from Apple's records, as well as analyze the same using expert consultants. In undertaking that responsibility, Plaintiffs' Counsel were obligated to assure that sufficient resources of attorneys were dedicated to the prosecution of the litigation and that funds were available to compensate staff and for the considerable out-of-pocket costs a case such as this would entail. Moreover, in committing to prosecute this case to the fullest, Plaintiffs' Counsel sacrificed work on other matters.

30. Based on my investigation and many years of experience, I believed that Apple would be a formidable defendant, and it was. Indeed, Apple has a proven track record of vigorously defending consumer suits. From the inception of this case, and throughout the negotiations, Apple adamantly denied any liability, and categorically rejected Plaintiffs' allegations that the Adapter was defective, that Plaintiffs' could certify a class, or prevail on their claims under the Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq.*, the False Advertising Law, Cal. Bus. & Prof. Code §§17500, *et seq.*, or the Consumer Legal Remedies Act, Cal. Civ. Code §§1750, *et seq.* To defend against Plaintiffs' claims, Apple retained Morrison & Foerster LLP, a well-respected international law firm with attorneys at offices worldwide, to represent it in this Litigation. This firm has a well-deserved reputation for aggressively representing its clients, and did so in this Litigation.

31. Although Plaintiffs and Plaintiffs' Counsel firmly believed that the claims asserted against Apple have merit, in light of the risks Plaintiffs' faced, success was far from guaranteed. Indeed, this Litigation involved a number of complex factual issues on the merits, including proving the extent, nature and source of the alleged Defect, which required detailed analysis of complex concepts relating to, *inter alia*, the Adapter's electrical capacity, the DC

ZELDES & HAEGGQUIST, LLP

1  cable's inner conductor, insulation material, the Adapter's strain relief, the type of connection

2  points used to transfer electricity within the Adapter, the testing conditions of the Adapter, the

3  failure and replacement rate, the redesign of the Adapter, and the scope of the Class.

4       32.     This case also entailed a number of complex legal issues on the merits,

5  including, *inter alia*: (a) proving Plaintiffs' warranty claims on a class-wide basis considering

6  the involved elements such as satisfying the provisions of notice, an opportunity to cure, and

7  reliance; (b) whether inclusion of an unsuitable part constitutes the "manifestation" of the

8  defect under California law for purposes of warranty durational limits; and (c) satisfying

9  Plaintiffs' burdens of certifying a Class under their remaining state law claims.  Assuming

10  Plaintiffs' successfully certified a nationwide class and survived Apple's inevitable motion for

11  summary judgment, these complex legal, technical and other issues posed a particular risk to

12  Plaintiffs' hopes for success at trial.

13       33.     Plaintiffs could not be certain that there would be a factual determination in

14  their favor.  Indeed, because Plaintiffs' claims are premised on problems with the design

15  features of the Adapter, litigation through trial would entail extensive (and expensive) proof of

16  Apple's procedures for design and manufacturing, quality and performance testing, product

17  development, marketing and other relevant determinations.  The evaluation and development

18  of these complex factual issues would require substantial expert testimony.  Yet, the

19  acceptance of expert testimony by a jury is always far from certain, regardless of how

20  distinguished the source.  Settlement of this action avoids the risks and costs of competing

21  experts that could result in a dispositive finding or ruling against Plaintiffs and the Class.

22       34.     Moreover, taking into account the likelihood of appeal, absent the settlement

23  Agreement, this action likely would have continued for years.  This case, however, called for

24  immediate relief because the Adapters allegedly spark, fray, overheat, and prematurely fail and

25  consumers needed to be notified of the same.  Moreover, as the years continue to pass, Class

26  members would continue to incur economic loss to replace and repair the Adapters, and the

27  need for a replacement Adapter diminishes as the Adapters and Subject Computers are

28  outdated and replaced with other products.

ZELDES & HAEGGQUIST, LLP

35.     Given all this, courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the consumer protection statutes and represent classes of the general public.  If this important public policy is to be carried out, the courts must award fees that will adequately compensate private plaintiffs' counsel, taking into account the risks undertaken with a clear view of the economics of a large contingent consumer class action.

36.     Since the inception of this case, Plaintiffs' Counsel have not been paid anything for their efforts in this Litigation.  Rather, in aggregate, Plaintiffs' Counsel have invested $97,937.83 thousands in expert consultant fees and other necessary expenses to obtain the settlement on behalf of the Class.

**C.     The Process for Determining the Attorneys' Fees Was Designed to Protect the Class and Ensure Fairness**

37.     As discussed in paragraphs 5 through 20, prior to entering into a settlement, Plaintiffs' Counsel became fully conversant with the strengths and weaknesses of this action through extensive pre- and post-filing investigation, including investigative interviews of several witnesses, consultation with experts and extensive document review, and fairly evaluated the risks associated with the continued litigation, as well as the fairness of its resolution at this time.

38.     As discussed in paragraphs 21 through 26 above, the principal terms of the Agreement were fairly, honestly and aggressively negotiated by counsel for all Parties over an extended period of time while the case was simultaneously actively litigated. Fees were negotiated only after the merits agreement was concluded, and a well-respected mediator and former federal judge present at the negotiations provided assurance that the fee was not the result of collusion or sacrifice of the interest of the Class.  All Parties were represented by sophisticated counsel with extensive experience in consumer class action litigation.

39.     After hard-fought negotiations, Apple has agreed to pay Plaintiffs' requested attorneys' fees and expenses and requested service payments separate and apart from the relief provided to the Class.   Conversely, any reduction in the fee will not increase benefits to the Class, it will simply revert to Apple.

**D.** **The Results Obtained Are Exceptional**

40. The Agreement provides an outstanding and truly exceptional recovery for the entire Class. It has two components. First is a ***cash refund*** for those Class members who purchased an Adapter to replace one that prematurely failed. Second is a three-year replacement program for the Adapter which provides for a free replacement adapter to consumers whose adapters show signs of strain relief damage up to three years from the date of purchase or until May 21, 2012, whichever is later. This includes Adapters that are still in use that have yet to show signs of strain relief damage. Class members with such faulty Adapters are entitled to receive, at no cost, a redesigned replacement adapter. Apple agreed to provide comprehensive notice of this replacement program to the Class (Agreement, §§II(A)-(C), (F)), and has already begun the notice program, and class members have begun to request and receive replacement adapters.

**1.** **Value of the Refund Program**

41. The Agreement provides that each Class member may submit claims for up to ***three*** Adapters under the first prong of the settlement, a value of up to $237 per member. Agreement §II(D). Of the 11 million Class members, it has been verified that over 1.3 million have purchased replacement adapters from Apple directly. Thus, the cash value of this prong alone is quite significant.

**2.** **Value of the Replacement Program**

42. Under the Replacement Program, Apple will provide in-warranty and out-of-warranty replacements for Adapters that manifest the Defect ("the Adapter Replacement Program"). Pursuant to the terms of the Agreement, Apple will honor replacement requests under the Adapter Replacement Program for three years after purchase, or until May 21, 2012, whichever is later, and it will continue the Adapter Replacement Program until December 31, 2012. *See* Agreement §§(F)(1)-(2). In addition, Apple will and has provided a comprehensive and robust notice program to ensure consumers are notified of the Adapter Replacement Program. *Id.* This is a significant achievement for consumers

ZELDES & HAEGGQUIST, LLP

43.     The original Adapters that came with the Subject Computers was covered by only a one year warranty, a true and correct copy of which is attached hereto as <u>Exhibit 2</u>. Any standalone replacement Adapter, purchased after the original computer was bought, was covered only by a 90-day warranty, a true and correct copy of which is attached hereto as <u>Exhibit 3</u>.  Notably, all 11 million Class members will benefit from this part of the settlement, because they will have a three year replacement period which is three to nine times longer than warranty Apple originally gave them.  Importantly, Class members are being made aware of the Adapter Replacement Program because of the comprehensive notice campaign.  By comparison, Apple sells "AppleCare" two-year extended warranties for products in this price range (up to $80) for $39.  *Id.*  For example, a two-year AppleCare extended warranty for the iPod Shuffle 2GB (which sells for $49) costs $39.  *Id.*  Clearly, the value of this component of the Agreement to all 11 million class members is substantial.

44.     Apple has redesigned the MagSafe power adapter since the institution of this lawsuit.  Thus, consumers who receive a replacement under the Adapter Replacement Program will not receive the same product that failed, but a newly designed product.

**E.      Extent of Litigation and Plaintiffs' Counsel's Reasonable Lodestar**

45.     As discussed in paragraphs 5 through 26, this case was settled because of Plaintiffs' Counsel's expertise, time, effort and analysis spent in this Litigation.  The total number of hours expended on this litigation by my firm is 1,329.40 hours.  The total lodestar for my firm is $678,531.75.  Attached hereto as <u>Exhibit 4</u> is a breakdown by timekeeper of the time spent on this Litigation by my firm through December 19, 2011, and each timekeeper's hourly rate.  All of the work reflected therein was reasonable and necessary.  There was no excessive performance of work or billing.

46.     Plaintiffs' Counsel's hourly rates do not reflect any contingent-fee risk.  Plaintiffs' Counsel's rates are comparable to the rates of California law firms in the 2010 *National Law Journal* Billing Survey.

47.     The rates do not include charges for expense items.  Expense items are billed separately and such charges are not duplicated in my firm's billing rates.  In addition, the

lodestar does not include all post-approval work such as claims administration, class member communications, any claims disputes, appeals, and any other issues that may arise under the Agreement. This future work is substantial and could last for years. I expect my firm to spend at least an additional 50 hours, which have not be included in Exhibit 4, preparing for and attending the final approval hearing, addressing member opt-outs and objections, and consulting with the claims administrator and opposing counsel to facilitate settlement administration.

48.    Plaintiffs' Counsel expended unreimbursed expenses in connection with the prosecution of this Litigation in the aggregate amount of $108,937.83. Total expenses incurred are based on the information set forth below and contained in Plaintiffs' Counsel's declarations submitted concurrently herewith, and corresponding exhibits attached thereto.

49.    As detailed in Exhibit 5, my firm has incurred a total of $14,710.90 in unreimbursed expenses in connection with the prosecution of this Litigation. These expenses are reflected in the books and records of my firm. These books and records are prepared from expense vouchers, check records and other source materials and represent an accurate record of the expenses incurred.

## IV.    THE CLASS REPRESENTATIVES DESERVE A SERVICE AWARD

50.    Under the terms of the Agreement, Apple has agreed to pay a service award of $5,000 to each Class Representative (total service awards not to exceed $30,000). *See* Agreement, §V(A). Apple voluntarily agreed to pay this service award, separate and apart from the relief provided to the Class, and payment of the same will not reduce or otherwise impact any monetary or other benefit provided to the Class.

51.    The requested amounts are based on time Plaintiffs' expended dealing with Apple on the issues that are the subject of the Litigation, gathering documents, assisting counsel in gathering facts, consulting for mediation, reviewing court documents, providing declarations, and considering the settlement to ensure it was reasonable.

ZELDES & HAEGGQUIST, LLP

ZELDES & HAEGGQUIST, LLP

V.     **CONCLUSION**

52.     For the reasons set forth above, I respectfully submit that the agreed-upon fees and expenses is reasonable and should be granted.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.  Executed this 19th day in December, 2011, in San Diego, California.

_____
HELEN I. ZELDES

EXHIBIT 1


Zeldes & Haeggquist

## 2011 FIRM RESUME

**Zeldes & Haeggquist, LLP** is a San Diego, California based law firm dedicated to representing clients throughout California and the nation in complex consumer, employment, securities, insurance and human rights class action litigation, as well as individual business and employment litigation matters. Zeldes & Haeggquist, LLP bring more than 20 years business experience to the table and more than 15 years of litigation experience to their practice.

Zeldes & Haeggquist, LLLP is committed to excellence and integrity. We built our reputation in consumer protection and securities fraud class action cases, taking on large corporations that had wronged individuals or smaller businesses. Whether we are vindicating the rights of consumers and shareholders that were defrauded, representing employees who were wrongfully terminated, advocating on behalf of victims of human rights violations and human trafficking or helping business owners run their business or resolve disputes, we are thorough, meticulous and passionate about our work.

We believe in giving back to our community and sit on the boards of several nonprofit organizations. Aireen Haeggquist is a founding advisory board member and Helen Zeldes is a current board member of the Girl's Think Tank, which takes on issues ranging from homelessness, to trafficking of young women, to youth empowerment to carbon emissions. Amber is a volunteer with Genesis, which assists orphanages in Baja and is a Sunday school teacher and former deacon at her church.

The partners at Zeldes & Haeggquist, LLP have played instrumental roles in litigating cutting edge nationwide consumer, securities, insurance, antitrust and human rights class actions and have successfully advocated for consumers and against the largest corporations in America. They have played instrumental roles in class actions brought against corporations for a wide range of unlawful practices, including, but not limited to deceptive advertising, product defect, senior annuities fraud, securities fraud, wage/hour violations, employment discrimination based on race, religion, age and disability, race discrimination in insurance underwriting, and price-fixing.

### PRACTICE AREAS
**CONSUMER**

Zeldes & Haeggquist, LLP represents consumers in class action lawsuits against some of the nation's largest corporations seeking to uphold consumer rights. We have played instrumental roles in claims involving product defects, false advertising, mortgage lending, banking, insurance fraud, discriminatory underwriting and senior fraud.

> ► Serving as co-lead counsel for a nationwide consumer class of Trump University seminar purchasers in a class action against **Trump University, LLC**

**and Donald Trump** for violations of California consumer protection statutes and material misrepresentations regarding its seminars. *Makaeff v. Trump University, LLC, et al.,* Case No. 3:10-CV-00940-IEG-WVG (S.D. Cal.).

► Serving as co-lead counsel for a nationwide putative consumer class action against **Apple, Inc.** representing a class of laptop owners alleging product defect claims that Apple's power adapter is defectively designed. *In Re Magsafe Apple Power Adapter Litigation,* Case No. 5:09-CV-01911-JW (N.D. Cal).

► Serving as co-lead counsel for a nationwide consumer class action against **Sony Electronics, Inc.** alleging fundamental flaws in the design and/or manufacturing process in the VAIO Touchpad Notebooks. *In Re Sony Vaio Computer Notebook Trackpad Litigation,* Case No. 09-CV-02109-AJB-MDD (S.D. Cal.).

► Serving as co-lead counsel for a statewide class action on behalf of customers against **U.S. TelePacific Corp.** alleging that its Early Termination Fees are improper and unlawful. *Brennan v. U.S. TelePacific Corp.,* Case No. 2010-00422317-CU-MC0CXC (Orange County Super. Ct.).

► Served as co-lead counsel for a nationwide class of over two million purchasers of an alleged defective power adapter in a consumer product defect class action against **Apple, Inc.** *Gordon v. Apple, Inc.,* Case No. 5:06-CV-05358-JW. A nationwide settlement was approved (Helen Zeldes appointed co-lead counsel for the settlement class), wherein eligible class members received $25 - $79 each.


## EMPLOYMENT

► Serving as co-lead counsel for over twenty employees who were improperly classified as independent contractors, rather than employees, by their timeshare company employer. *Heller v. Grand Pacific Resorts, Inc.,* Case No. 37-2010-57252-CU-OE-NC (San Diego Super. Ct.).

► Serving as co-lead counsel for a nationwide employment wage and hour action against **Tommy Bahama** alleging, *inter alia*, failure to reimburse for business expenses and failure to provide meal and rest breaks. *Enrique Madrigal, et al v. Tommy Bahama Group, Inc., et al,* Case No. 2:09-CV-08924-SJO-MAN (C.D. Cal).

► Represented a California class of employees in a wage/hour class action against **3 Weiss Guys** alleging failure to pay overtime and rest and meal breaks. *Jones v. 3 Weiss Guys, Inc.,* Case No. 37-2008-00095231-CU-OE-CTL (San Diego Super. Ct.).

Zeldes & Haeggquist, LLP also represents individual plaintiffs in cases involving wage disputes, sexual harassment, and discrimination or wrongful termination based on age, race, disability, gender and or/religion. Zeldes & Haeggquist, LLP has recovered hundreds of thousands of dollars in damages for our individual employee clients.

## SECURITIES FRAUD AND SHAREHOLDER DERIVATIVE LITIGATION

Zeldes & Haeggquist, LLP represents individual and institutional investors that have suffered from corporate fraud through securities class actions and shareholder derivative litigation. The firm's lead securities partner, Amber Eck, has worked for over 14 years on a wide range of securities fraud cases across the United States, recovering millions of dollars for her clients. She has also prosecuted numerous shareholder derivative actions against the executives of companies charged with violating the nation's environmental, labor, health and safety and securities laws, conferring millions of dollars in added shareholder value through tailored corporate governance reforms designed to prevent future harm.

Some of the securities class actions and derivative cases in which Zeldes & Haeggquist, LLP attorneys are lead or named counsel are:

► *West Palm Beach Police Pension Fund v. CardioNet, Inc.*, No. 37-2010-00086836-CU-SL-CTL (San Diego Super. Ct.). Zeldes & Haeggquist, LLP is co-lead counsel in a securities class action against CardioNet, Inc. on behalf of the public purchasers in CardioNet, Inc.'s $82 million March 25, 2008 initial public offering and $152 million August 6, 2008 secondary public offering, alleging that CardioNet issued false and misleading offering documents that misstated and/or omitted known business trends and reimbursement uncertainties that were required to be disclosed by the federal securities laws.

► *Dulgarian v. Cinnamon (Akeena Solar, Inc. Derivative Litigation)*, No. 1:10-CV-173351 (Santa Clara Super. Ct.). Zeldes & Haeggquist, LLP are sole lead counsel in this action alleging breach of fiduciary duty and insider trading by Akeena's founder and CEO Barry Cinnamon and the Akeena Board.

► *Morgan v. Sporns (HQ Sustainable Consolidated Derivative Litigation)*, No. 11-2-16742-9 SEA (King County Sup. Ct.) – a shareholder derivative case alleging substantial breaches of fiduciary duty by the HQ Board which resulted in the American Stock Exchange to stop HQ's stock from trading on April 1, 2011, and it has not resumed since.

## BUSINESS LITIGATION

Zeldes & Haeggquist, LLP has represented numerous individuals and small businesses in business disputes, including regarding employment or partnership agreements, allocation of assets, defamation or misappropriation of trade secrets.

***Spot Water Management, Inc. v. Kevin Plageman, et al.***, Case No. 37-2009-00052285-CU-JR-NC (San Diego Super. Ct.) – Zeldes & Haeggquist, LLP took this case, alleging misappropriation of trade secrets, to trial in August, 2010 and obtained a defense verdict. The court found that the employer plaintiff brought the action in bad faith and awarded Zeldes & Haeggquist LLP's client's damages, attorneys' fees and costs.

## HUMAN RIGHTS

Zeldes & Haeggquist, LLP represent victims of human rights abuses and human trafficking, including:

> ▶ ***In re South Africa Apartheid Litigation***, Case No. 02 MDL 1499 (JES) (S.D.N.Y). Representing victims of international human rights abuses and trafficking in numerous pro bono and contingency cases.

## ATTORNEYS

### AMBER L. ECK, PARTNER

Amber Eck is an experienced lawyer who has been litigating all aspects of complex individual and class actions for the past 16 years, with an emphasis on securities and derivative litigation, consumer fraud, employment law, and general business litigation. She is currently serving as class counsel in a nationwide consumer fraud class action against **Trump University and Donald Trump,** interim co-lead counsel in a nationwide consumer fraud class action against **Sony Electronics**, co-counsel in a securities fraud Section 11 class action against **CardioNet**, co-lead counsel in a consumer class action against **TelePacific** regarding its early termination fees in telecommunications contracts, lead counsel in a shareholder derivative action against the officers and directors **Akeena Solar, Inc.**, and co-lead counsel in a derivative case involving **HQ Sustainable.**

Before joining Zeldes & Haeggquist, LLP, Ms. Eck was a partner at the nation's largest plaintiff's class action firm, Robbins Geller Rudman & Dowd (formerly "Lerach Coughlin" and "Milberg Weiss"). During her 12 years there, Ms. Eck litigated cases alleging improper fees in workers' compensation insurance, improper fees in home mortgage contracts, violations of the ADA, and improper searches of the homes of welfare applicants. Ms. Eck was also instrumental in litigating numerous shareholder class actions on behalf of defrauded investors, which resulted in substantial recoveries for the investors, and extensive corporate governance changes, including: $80 million settlement against Hanover Corp. (and unprecedented corporate governance reforms); $50 million settlement against Sprint (and adoption of 60+ new corporate governance provisions); $42.3 million settlement against Fruit of the Loom, Inc.; and $29.5 million settlement against Plains All American Pipeline.

Amber Eck also worked as a defense attorney for two years at Chapin Fleming & Winet, specializing in complex civil litigation, and served as a Law Clerk to the Honorable Jan M. Adler, United States Magistrate Judge for the Southern District of California. Before law school, she was a writer and photographer for two years for the Los Angeles legal newspaper, the Metropolitan News Enterprise.

Ms. Eck has written articles for publication, including recently "Lessons Learned from Mentors of the Past," which was published in the national American Inn of Court magazine, *The Bencher*, in January, 2011. She has also lectured to law school students and attorneys, including recently at the Lawyers Club and Thomas Jefferson School of Law sponsored symposium regarding Small Law Firms and Sole Practitioners in 2010. Ms. Eck is currently serving as a Barrister in the William B. Enright American Inn of Court, and as a Barrister in the Louis M. Welsh American Inn of Court. She is also a member of the Lawyers Club, San Diego County Bar Association and Federal Bar Association, and formerly served on the Board of Directors for the San Diego Barristers Club. Ms. Eck is admitted to practice in California and Nevada.

**Education:** B.A., Pepperdine University, 1990 (*magna cum laude*); JD., Boston University School of Law, 1995 (*magna cum laude*).

**Honors/Awards:** Distinguished Service Award for pro bono service in *Sanchez v. County of San Diego* (2002), which was the subject of a "Colbert Report" feature; Wiley W. Manuel Pro Bono Service Award for *Badua v. City of San Diego* (1999); International Law Journal, Case & Notes Editor (1993-1995); Giles S. Rich Intellectual Property Moot Court Team, Best Brief, Northeast Region (1995); Grant recipient, Harvard School of Public Health (1993).

## ALREEN HAEGGQUIST, PARTNER

Alreen Haeggquist, a founding member of Zeldes & Haeggquist, LLP, has spent her entire legal career litigating consumer fraud and antitrust class actions. Before starting Zeldes & Haeggquist, LLP, LLP, Ms. Haeggquist practiced law at the nation's largest plaintiff's class action firm, Robbins Geller Rudman & Dowd (formerly "Lerach Coughlin" and "Milberg Weiss"), where she litigated numerous nationwide consumer and antitrust class actions. Ms. Haeggquist participated and played an instrumental role in the successful prosecution and settlement of numerous antitrust and unfair competition cases, including the Rubber Chemicals indirect purchaser cases, which resulted in significant cy pres funds to non-profit groups advocating for competition and the Bank Privacy Cases (S.F. Sup. Ct.), which resulted in better bank privacy policies, funding to non-profit groups advocating for privacy rights, and benefits to credit cardholders. Ms. Haeggquist has also been involved in several multi-district antitrust class actions pending in federal courts around the country, including *In re Payment Card Interchange Fee, Merch. Disc. Antitrust Litig.* (E.D.N.Y.); *In re Carbon Black Antitrust Litig.* (D. Mass.); and *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.* (Carbon Fiber Antitrust Litigation) (C.D. Cal.), which resulted in a $675 million settlement for a class of purchasers that purchased allegedly price-fixed carbon fiber.

Ms. Haeggquist was also a major part of the team that obtained judgment of over $115 million against Farmers Insurance Exchange and against the Automobile Club for not disclosing the total premium to policyholders as required by law. Ms. Haeggquist also has been involved in a number of precedent-setting appellate decisions, including *McKell v. Washington Mutual*, 142 Cal. App. 4th 1457 (2006), *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) and *Lorix v. Crompton Corp*, 736 N.W.2d 619 (Minn. 2007).

Ms. Haeggquist has published numerous articles for the annual publication of *California Litigation Review* regarding recent developments in class action and discovery law.

**Education:** B.A., University of California, 1999; J.D., California Western School of Law, 2002 (*magna cum laude*).

**Honors/Awards:** Editor-in-Chief, California Western Law Review and International Law Journal; Honors Instructor and Academic Tutor, International L.L.M. Students; Dean's List All Semesters; California Innocence Project Distinguished Alumni Award; Nominated Top Labor/Employment Attorney 2011 by the San Diego Daily Transcript.

Ms. Haeggquist is licensed to practice in all state and federal courts in California and is a member of the San Diego County Bar Association, Consumer Attorneys of San Diego, California Employment Lawyers Association, and the Litigation Section of the California Bar Association.

## HELEN I. ZELDES, PARTNER

Ms. Zeldes is a founding member of Zeldes & Haeggquist, LLP whose practice focuses on class action litigation, employment discrimination, general business litigation and human rights. Ms. Zeldes has extensive experience litigating complex consumer class actions with an emphasis on actions brought by policyholders against life, auto and other insurers for deceptive sales practices, mortgage lending and banking fraud, product defect claims, wage/hour violations, and human rights, civil rights and antitrust violations.

Ms. Zeldes also has more than 20 years small business experience: from retail and manufacturing to importing and wholesaling to e-commerce, Ms. Zeldes has owned and operated eight businesses over the past two decades. Ms. Zeldes brings a business owner's sensibilities to the table in her litigation practice.

Ms. Zeldes is currently serving as co-lead counsel in a nationwide putative class action against Apple, Inc. representing a class alleging product defect and consumer claims that Apple's power adapter is defectively designed. *In Re Magsafe Apple Power Adapter Litigation*, Case No. 5:09-CV-01911-JW (N.D. Cal). Ms. Zeldes is also representing a putative class of consumers in a product defect and consumer class action against Sony Electronics, Inc. alleging that fundamental flaws in the design

and/or manufacturing process in the VAIO Touchpad Notebooks render it almost impossible to use because the touchpad is prone to cause the onscreen cursor to track in reverse, freeze; and/or engage in erratic behavior. Plaintiff alleges that Sony knew or should have known about this defect since at least the first quarter of 2007, but has continued to manufacture, market and sell the defective VAIO Touchpad Notebooks, which are unsuitable for the purposes for which they are ordinarily purchased. *In Re Sony Vaio Computer Notebook Trackpad Litigation*, Case No. 09-CV-02109-AJB-MDD (S.D. Cal.). Ms. Zeldes also litigated a nationwide consumer product defect class action against Apple, Inc. on behalf of a class of over two million purchasers of an alleged defective power adapter. *Gordon v. Apple, Inc.*, Case No. 5:06-cv-05358-JW (N.D. Cal). A nationwide settlement was reached wherein eligible class members received $25 - $79 each.

Prior to starting Zeldes & Haeggquist, LLP, Ms. Zeldes worked for many years at the nation's largest plaintiff's class action firm, Robbins Geller Rudman & Dowd (formerly "Lerach Coughlin" and "Milberg Weiss") in its consumer and insurance fraud class action practice group. There, Ms. Zeldes was instrumental in litigating a series of nationwide senior annuities fraud class actions in which her former firm was appointed Co-Lead Counsel.[1] Other nationwide class actions Ms. Zeldes litigated at her former firm included: a wage/hour overtime action against Cintas, one of the nation's largest commercial laundries for violations of the Fair Labor Standards Act for misclassifying truck drivers as salesmen to avoid payment of overtime wages; race discrimination underwriting class actions against large insurance companies for their practice of intentionally charging African-Americans and other minorities more for life insurance than similarly situated Caucasians (cases that collectively recovered over $400 million for African-Americans and other minority class members as redress for the civil rights abuses they were subject to); race discrimination underwriting class actions against insurance companies based upon the improper use of credit scoring or geographical redlining to charge minorities higher premiums against insurance giants like Allstate and State Farm; a statewide consumer class action over the propriety of a private contractor operating "red light camera" systems throughout California, *Red Light Photo Enforcement Cases*, JCCP No. 4305, a case which Ms. Zeldes co-chaired at trial; a multi-state antitrust action entitled *In re Medical Waste Services Antitrust Litigation*, MDL No. 1546 (D. Utah), in which plaintiffs brought claims for defendants' alleged conspiracy to allocate customers and territories in the market for the collection, transportation and disposal of medical waste, as well as for unlawful monopolization. Ms. Zeldes was also involved in the *Carbon Fiber Antitrust Litigation*, Case No. CV-99-7796 (C.D. Cal), in which a class of purchasers alleged that the major producers of

---

[1]     *Buhs v. American International Group*, No. CGC 04-435919 (S.F. Super. Ct. Oct. 24, 2004); *Bacon v. American International Group*, No. 05-04979 MMC (N.D. Cal. Dec. 2, 205)(originally filed July 15, 2005 in San Francisco Superior Court, No. CGC 05-443149); *Kaiser v. Midland National Life Insurance Co.*, No. 05-00972-HLA-TEM (M.D. Fla. Sept. 20, 2005); *Healey v. Allianz Life Insurance Co. of North America*, No. 05-8908 (C.D. Cal. Dec. 22, 2005); *Anagnostis v. American Equity Investment Life Insurance Co.*, No. CV-06-388 MMM (C.D. Cal. Jan. 20, 2006); *Edwards v. AmerUs Group Co.*, No. 8:05-1590 (M.D. Fla.); and *Petry v. National Western Life Insurance Co.*, No. 05CV-2336J (S.D. Cal.).

carbon fiber fixed the price of carbon fiber from 1993 to 1999. The case ultimately settled for $675 million.

Ms. Zeldes is licensed to practice law in the States of California and Hawaii and is admitted to practice before all the federal district courts in both states.

**Education:** B.A., University of California at Davis,1988; J.D., University of Hawaii, William S. Richardson School of Law, Honolulu, Hawaii, 2002 (*cum laude*).

**Honors/Awards:** University of Hawaii Law Review, Outside Articles Editor, Editorial Board Recipient, Edward H. Nakamura Memorial Public Interest/Service Scholarship; CALI Award for Highest Grade in Domestic Ocean & Coastal Law

## AARON M. OLSEN, ASSOCIATE

Nominated as one of San Diego's Outstanding Young Attorneys in 2011, Aaron M. Olsen is an associate in the consumer, business and employment law litigation departments of Zeldes & Haeggquist, LLP, where he represents plaintiffs and defendants in federal and state court. Mr. Olsen's practice is focused on prosecuting complex class action suits, including consumer fraud actions, product defect cases, antitrust litigation, wage & hour actions, and unfair competition and false advertising claims, among others.

Mr. Olsen's practice is also dedicated to representing clients in general business litigation matters, particularly small to medium size businesses seeking assistance with contractual disputes, interference with business relations, partnership issues, and all aspects of labor and employment litigation representing both employees and employers.

### Notable Past Cases

Mr. Olsen's notable past cases and accomplishments include:

- Obtained a successful defense verdict at trial on behalf of clients in misappropriation of trade secrets and breach of contract action. Mr. Olsen not only helped obtain a defense verdict, but persuaded the Court to find that the plaintiff brought the action in bad faith and award Mr. Olsen's clients' damages, attorneys' fees and costs.

- Obtained favorable defense settlement and dismissal of claims on behalf of dental service provider client in unfair competition action.

- Successfully resolved a number of wage and hour cases, wherein Mr. Olsen not only recovered substantial economic damages on behalf of his clients and the class of employees they represented, but he brought about significant positive changes to the subject employers' labor practices, thereby positively influencing the lives of thousands of workers.

- Obtained over 40 settlements for individual employee clients in labor and employment lawsuits, including among others, wrongful termination, harassment, retaliation, and misclassification matters. In doing so, Mr. Olsen has recovered millions in damages on behalf of his clients, for, among other things, past and future wages, emotional distress, punitive damages, and attorneys' fees and costs.

## Notable Current Cases

Mr. Olsen's notable current cases and accomplishments include:

- Serving as co-lead counsel for a nationwide consumer class of Trump University seminar purchasers in a class action against **Trump University, LLC and Donald Trump** for violations of California consumer protection statutes and material misrepresentations regarding its seminars. *Makaeff v. Trump University, LLC, et al.,* Case No. 3:10-CV-00940-IEG-WVG (S.D. Cal.).

- Serving as co-lead counsel for a nationwide consumer class action against **Sony Electronics, Inc.** alleging fundamental flaws in the design and/or manufacturing process in the VAIO Touchpad Notebooks. *In Re Sony Vaio Computer Notebook Trackpad Litigation,* Case No. 09-CV-02109-AJB-MDD (S.D. Cal.).

- Serving as co-lead counsel for a statewide class action on behalf of customers against **U.S. TelePacific Corp.** alleging that its Early Termination Fees are improper and unlawful. *Brennan v. U.S. TelePacific Corp.,* Case No. 2010-00422317-CU-MC0CXC (Orange County Super. Ct.).

**Education:** J.D., California Western School of Law, 2008 (Editor-in-Chief, California Western School of Law Commentary; Student Bar Association, Executive Board Member); B.A., University of Utah, David Eccles School of Business, 2002 (Business Finance).

## Past Employment Positions

- Nicholas Boylan, APC, Associate
- Robbins Geller Rudman & Dowd (formerly "Lerach Coughlin" and "Milberg Weiss"), Law Clerk
- San Diego County Office of the Public Defender, Law Clerk

## Admissions

- The State Bar of California
- The United States District Court for the Southern, Central and Northern Districts of California

## Professional Associations and Memberships

- American Association for Justice, 2010 Member
- Consumer Attorneys for San Diego, Member
- San Diego County Bar Association, Member
- William B. Enright Chapter, American Inns of Court, 2010 Associate

## Publications/Appearances

- 2010 California State Bar Litigation Review, Discovery Update (to be published)
- 2010 San Diego Regional Chamber of Commerce, Small Business Award Judge
- 2010 USD School of Law Appellate Moot Court Competition Judge
- Guest Writer, San Diego Lawyer Magazine

## RICKY MAVEETY, OF COUNSEL

Ricky Maveety has more than twenty years of experience in estate planning, business formation, and transactional matters. Before joining Zeldes & Haeggquist, LLP, Ms. Maveety was a solo practitioner with a well-respected practice in transactional law, including revocable, irrevocable, charitable and insurance trusts, charitable giving, business entity formation, purchases and sales of professional practices, premarital and marital property agreements, employee agreements, and shareholder agreements. Prior to her solo practice, Ms. Maveety was an associate at both the firms of Gray, Cary, Ames & Frye and Duckor & Spradling, specializing in estate planning and charitable giving at the former, and estate planning, and business transactions at the latter.

Ms. Maveety is admitted to practice in the State of California and is a member of the Trusts and Estates, Law Practice Management and Technology, and Solo and Small Firm sections of the California Bar Association.

**Education:** B.A., UCLA, 1974; J.D., Loyola Law School, 1988 (*cum laude*).

**Honors/Awards:** Saint Thomas More Law Honor Society; Law Journal: International Law Journal, Production Editor;



**EXHIBIT 2**

English

Apple One (1) Year Limited Warranty
For Apple Branded Products Only

CONSUMER RIGHTS AND RESTRICTIONS. FOR CONSUMERS, WHO ARE
COVERED BY CONSUMER PROTECTION LAWS OR REGULATIONS IN THEIR
COUNTRY OF PURCHASE OR, IF DIFFERENT, THEIR COUNTRY OF RESIDENCE,
THE BENEFITS CONFERRED BY THIS WARRANTY ARE IN ADDITION TO ALL
RIGHTS AND REMEDIES CONVEYED BY SUCH CONSUMER PROTECTION LAWS
AND REGULATIONS. THIS WARRANTY DOES NOT EXCLUDE, LIMIT OR
SUSPEND ANY RIGHTS OF CONSUMERS ARISING OUT OF NON-CONFORMITY
WITH A SALES CONTRACT. HOWEVER, AS DESCRIBED BELOW, APPLE
DISCLAIMS STATUTORY AND IMPLIED WARRANTIES TO THE EXTENT
PERMITTED BY LAW, AND IN SO FAR AS SUCH WARRANTIES CANNOT BE
DISCLAIMED, ALL SUCH WARRANTIES SHALL TO THE EXTENT PERMITTED BY
LAW BE LIMITED IN DURATION TO THE DURATION OF THE EXPRESS
WARRANTY DESCRIBED BELOW AND TO THE REPAIR OR REPLACEMENT
SERVICE AS DETERMINED BY APPLE IN ITS SOLE DISCRETION. SOME STATES
(COUNTRIES AND PROVINCES) DO NOT ALLOW LIMITATIONS ON HOW LONG
AN IMPLIED WARRANTY OR CONDITION MAY LAST, SO THE LIMITATIONS
DESCRIBED ABOVE MAY NOT APPLY TO YOU. THIS WARRANTY GIVES YOU
SPECIFIC LEGAL RIGHTS, AND YOU MAY ALSO HAVE OTHER RIGHTS THAT
VARY FROMSTATE TO STATE (OR BY COUNTRY OR PROVINCE). THIS LIMITED
WARRANTY IS GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE
COUNTRY IN WHICH THE PRODUCT PURCHASE TOOK PLACE. APPLE, THE
WARRANTOR UNDER THIS LIMITED WARRANTY, IS IDENTIFIED AT THE END
OF THIS DOCUMENT ACCORDING TO THE COUNTRY OR REGION IN WHICH
THE PRODUCT PURCHASE TOOK PLACE.

WARRANTY. Apple's warranty obligations for this hardware product are limited to the terms
set forth herein. Apple, as defined in the table below, warrants this Apple-branded hardware
product against defects in materials and workmanship under normal use for a period of ONE (1)
YEAR from the date of retail purchase by the original end-user purchaser ("Warranty Period"). If
a hardware defect arises and a valid claim is received within the Warranty Period, at its option
and to the extent permitted by law, Apple will either (1) repair the hardware defect at no charge,
using new or refurbished parts that are equivalent to new in performance and reliability, (2)
exchange the product with a product that is new or refurbished that is equivalent to new in
performance and reliability and is at least functionally equivalent to the original product, or (3)
refund the purchase price of the product. Apple may request that you replace defective parts with
user-installable new or refurbished parts that Apple provides in fulfillment of its warranty
obligation. A replacement product or part, including a user-installable part that has been installed
in accordance with instructions provided by Apple, assumes the remaining warranty of the
original product or ninety (90) days from the date of replacement or repair, whichever provides
longer coverage for you. When a product or part is exchanged, any replacement item becomes
your property and the replaced item becomes Apple's property. Parts provided by Apple in
fulfillment of its warranty obligation must be used in products for which warranty service is
claimed. When a refund is given, the product for which the refund is provided must be returned to
Apple and becomes Apple's property.

EXCLUSIONS AND LIMITATIONS. TO THE EXTENT PERMITTED BY LAW, THIS WARRANTY AND THE REMEDIES SET FORTH ABOVE ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, REMEDIES AND CONDITIONS, WHETHER ORAL, WRITTEN, STATUTORY, EXPRESS OR IMPLIED. AS PERMITTED BY APPLICABLE LAW, APPLE SPECIFICALLY DISCLAIMS ANY AND ALL STATUTORY OR IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES AGAINST HIDDEN OR LATENT DEFECTS. **IF APPLE CANNOT LAWFULLY DISCLAIM STATUTORY OR IMPLIED WARRANTIES THEN TO THE EXTENT PERMITTED BY LAW, ALL SUCH WARRANTIES SHALL BE LIMITED IN DURATION TO THE DURATION OF THE EXPRESS WARRANTY AND TO THE REPAIR OR REPLACEMENT SERVICE AS DETERMINED BY APPLE IN ITS SOLE DISCRETION. SOME STATES (COUNTRIES AND PROVINCES) DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY OR CONDITION MAY LAST, SO THE LIMITATIONS DESCRIBED ABOVE MAY NOT APPLY TO YOU.** No Apple reseller, agent, or employee is authorized to make any modification, extension, or addition to this warranty. If any term is held to be illegal or unenforceable, the legality or enforceability of the remaining terms shall not be affected or impaired.

This Limited Warranty applies only to hardware products manufactured by or for Apple that can be identified by the "Apple" trademark, trade name, or logo affixed to them. The Limited Warranty does not apply to any non-Apple hardware products or any software, even if packaged or sold with Apple hardware. Manufacturers, suppliers, or publishers, other than Apple, may provide their own warranties to the end user purchaser, but Apple, in so far as permitted by law, provides their products "as is". Software distributed by Apple with or without the Apple brand name (including, but not limited to system software) is not covered under this Limited Warranty. Refer to the licensing agreement accompanying the software for details of your rights with respect to its use.
Apple does not warrant that the operation of the product will be uninterrupted or error-free. Apple is not responsible for damage arising from failure to follow instructions relating to the product's use.

**This warranty does not apply: (a) to consumable parts, such as batteries, unless damage has occurred due to a defect in materials or workmanship; (b) to cosmetic damage, including but not limited to scratches, dents and broken plastic on ports; (c) to damage caused by use with non-Apple products; (d) to damage caused by accident, abuse, misuse, liquid contact, fire, earthquake or other external causes; (e) to damage caused by operating the product outside the permitted or intended uses described by Apple; (f) to damage caused by service (including upgrades and expansions) performed by anyone who is not a representative of Apple or an Apple Authorized Service Provider ("AASP"); (g) to a product or part that has been modified to alter functionality or capability without the written permission of Apple; (h) to defects caused by normal wear and tear or otherwise due to the normal aging of the product or (i) if any Apple serial number has been removed or defaced.**

EXCEPT AS PROVIDED IN THIS WARRANTY AND TO THE EXTENT PERMITTED BY LAW, APPLE IS NOT RESPONSIBLE FOR DIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM ANY BREACH OF WARRANTY OR CONDITION, OR UNDER ANY OTHER LEGAL THEORY, INCLUDING BUT NOT LIMITED TO LOSS OF USE; LOSS OF REVENUE; LOSS OF ACTUAL OR ANTICIPATED PROFITS (INCLUDING LOSS OF PROFITS ON CONTRACTS); LOSS OF THE USE OF MONEY; LOSS OF ANTICIPATED SAVINGS; LOSS OF BUSINESS; LOSS OF

OPPORTUNITY; LOSS OF GOODWILL; LOSS OF REPUTATION; LOSS OF, DAMAGE TO, COMPROMISE OR CORRUPTION OF DATA; OR ANY INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE HOWSOEVER CAUSED INCLUDING THE REPLACEMENT OF EQUIPMENT AND PROPERTY, ANY COSTS OF RECOVERING, PROGRAMMING, OR REPRODUCING ANY PROGRAM OR DATA STORED OR USED WITH APPLE PRODUCTS AND ANY FAILURE TO MAINTAIN THE CONFIDENTIALITY OF DATA STORED ON THE PRODUCT. THE FOREGOING LIMITATION SHALL NOT APPLY TO DEATH OR PERSONAL INJURY CLAIMS, OR ANY STATUTORY LIABILITY FOR INTENTIONAL AND GROSS NEGLIGENT ACTS AND/OR OMISSIONS. APPLE DISCLAIMS ANY REPRESENTATION THAT IT WILL BE ABLE TO REPAIR ANY PRODUCT UNDER THIS WARRANTY OR MAKE A PRODUCT EXCHANGE WITHOUT RISK TO OR LOSS OF THE PROGRAMS OR DATA. SOME STATES (COUNTRIES AND PROVINCES) DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

OBTAINING WARRANTY SERVICE. Please access and review the online help resources described below before requesting warranty service. If the product is still not functioning properly after making use of these resources, please contact the Apple representatives or, if applicable, an Apple owned retail store ("Apple Retail") or AASP using the information provided below. When contacting Apple via telephone, other charges may apply depending on your location. When calling, an Apple representative or AASP will help determine whether your product requires service and, if it does, will inform you how Apple will provide it. You must assist in diagnosing issues with your product and follow Apple's warranty processes.
Apple will provide warranty service either (i) at an Apple Retail or AASP location, where service is performed at the location, or the Apple Retail or AASP may send the product to an Apple repair service location for service, (ii) by sending you prepaid way bills (and if you no longer have the original packaging, Apple may send you packaging material) to enable you to ship the product to Apple's repair service location for service, or (iii) by sending you customer installable new or refurbished replacement product or parts to enable you to service or exchange your own product ("DIY Service"). Upon receipt of the replacement product or part, the original product or part becomes the property of Apple and you agree to follow instructions, including, if required, arranging the return of original product or part to Apple in a timely manner. When providing DIY Service requiring the return of the original product or part, Apple may require a credit card authorization as security for the retail price of the replacement product or part and applicable shipping costs. If you follow instructions, Apple will cancel the credit card authorization, so you will not be charged for the product or part and shipping costs. If you fail to return the replaced product or part as instructed or the replaced product or part is not eligible for warranty service, Apple will charge the credit card for the authorized amount.
Service options, parts availability and response times may vary according to the country in which service is requested. Service options are subject to change at any time. You may be responsible for shipping and handling charges if the product cannot be serviced in the country in which service is requested. If you seek service in a country that is not the country of purchase, you will comply with all applicable import and export laws and regulations and be responsible for all custom duties, V.A.T. and other associated taxes and charges. For international service, Apple may repair or exchange defective products and parts with comparable products and parts that comply with local standards. In accordance with applicable law, Apple may require that you furnish proof of purchase details and/or comply with registration requirements before receiving warranty service. Online information with more details on obtaining warranty service is provided below.

PRIVACY. Apple will maintain and use customer information in accordance with the Apple Customer Privacy Policy available at www.apple.com/legal/warranty/privacy.

DATA BACKUP. If your product is capable of storing software programs, data and other information, you should make periodic backup copies of the information contained on the product's hard drive or other storage media to protect the contents and as a precaution against possible operational failures. Before you deliver your product for warranty service it is your responsibility to keep a separate backup copy of the contents, remove all personal information and that you want to protect and disable any security passwords. IT IS POSSIBLE THAT THE CONTENTS OF YOUR HARD DRIVE WILL BE LOST OR REFORMATTED IN THE COURSE OF WARRANTY SERVICE, AND APPLE AND ITS AGENTS ARE NOT RESPONSIBLE FOR ANY DAMAGE TO OR LOSS OF PROGRAMS, DATA OR OTHER INFORMATION CONTAINED ON THE MEDIA OR ANY PART OF THE PRODUCT SERVICED. Your product or a replacement product will be returned to you configured as your product was when originally purchased, subject to applicable updates. You will be responsible for reinstalling all other software programs, data and passwords. Recovery and reinstallation of software programs and user data are not covered under this Limited Warranty.

ONLINE INFORMATION. More information of the following is available online:

| International Support Information | www.apple.com/support/country |
|---|---|
| | |
| Apple Authorized Service Providers | http://support.apple.com/kb/HT1434 |
| Apple Retail Store | http://www.apple.com/retail/storelist/ |
| Apple Support and Service | http://www.apple.com/support/contact/phone_contacts.html |
| Apple Complimentary Support | http://www.apple.com/support/country/index.html?dest=complimentary |



**EXHIBIT 3**

# Apple Parts – Ninety (90) Days Limited Warranty

## WARRANTY COVERAGE

Apple's warranty obligations are limited to the terms set forth below:

Apple, as defined below, warrants this Apple-branded hardware part against defects in materials and workmanship under normal use for a period of NINETY (90) DAYS from the date of retail purchase by the original end-user purchaser ("Warranty Period"). If a hardware defect arises and a valid claim is received within the Warranty Period, at its option, Apple will either (1) exchange the part with a new, used or refurbished part that is at least functionally equivalent to the original part, or (2) refund the purchase price of the part. A replacement part assumes the remaining warranty of the original part or ninety (90) days from the date of replacement, whichever provides longer coverage for you. When a part is exchanged, any replacement item becomes your property and the replaced item becomes Apple's property. When a refund is given, the part for which the refund is provided becomes Apple's property.

## EXCLUSIONS AND LIMITATIONS

This Limited Warranty applies only to hardware parts manufactured by or for Apple that may be identified by the "Apple" trademark, trade name, or logo affixed to them. The Limited Warranty does not apply to any non-Apple hardware part or any software, even if packaged or sold with Apple hardware. Manufacturers, suppliers, or publishers, other than Apple, may provide their own warranties, but Apple, in so far as it is permitted by law, provides its parts "as is". Software distributed by Apple with or without the Apple brand name (including, but not limited to system software) is not covered under this Limited Warranty. Refer to the licensing agreement accompanying the software for details of your rights

with respect to its use.

Apple does not warrant that the operation of the part will be uninterrupted or error-free. Apple is not responsible for damage arising from failure to follow instructions relating to the part's use.

This warranty does not apply: (a) to damage caused by non-Apple products; (b) to damage caused by accident, abuse, misuse, flood, fire, earthquake or other external causes; (c) to damage caused by operating the part outside the permitted uses described by Apple; (d) to damage caused by service (including upgrades and expansions) performed by anyone who is not a representative of Apple or an Apple Authorized Service Provider authorized to perform service; (e) to a part that has been modified to significantly alter functionality or capability without the written permission of Apple; (f) to consumable parts, such as batteries, unless damage has occurred due to a defect in materials or workmanship; or (g) if any serial number has been removed or defaced.

TO THE EXTENT PERMITTED BY LAW, THIS WARRANTY AND REMEDIES SET FORTH ABOVE ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, REMEDIES AND CONDITIONS, WHETHER ORAL OR WRITTEN, STATUTORY, EXPRESS OR IMPLIED. AS PERMITTED BY APPLICABLE LAW, APPLE SPECIFICALLY DISCLAIMS ANY AND ALL STATUTORY OR IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES AGAINST HIDDEN OR LATENT DEFECTS. IF APPLE CANNOT LAWFULLY DISCLAIM STATUTORY OR IMPLIED WARRANTIES THEN TO THE EXTENT PERMITTED BY LAW, ALL SUCH WARRANTIES SHALL BE LIMITED IN DURATION TO THE DURATION OF THIS EXPRESS WARRANTY AND TO REPAIR OR REPLACEMENT SERVICE AS DETERMINED BY APPLE IN ITS SOLE DISCRETION. No Apple reseller, agent, or employee is authorized to make any modification, extension, or addition to this warranty.

TO THE EXTENT PERMITTED BY LAW APPLE IS NOT RESPONSIBLE FOR DIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM ANY BREACH OF WARRANTY OR CONDITION, OR UNDER ANY

OTHER LEGAL THEORY, INCLUDING BUT NOT LIMITED TO LOSS OF
REVENUE; LOSS OF ACTUAL OR ANTICIPATED PROFITS (INCLUDING LOSS
OF PROFITS ON CONTRACTS); LOSS OF THE USE OF MONEY; LOSS OF
ANTICIPATED SAVINGS; LOSS OF BUSINESS; LOSS OF OPPORTUNITY; LOSS
OF GOODWILL; LOSS OF REPUTATION; LOSS OF, DAMAGE TO OR
CORRUPTION OF DATA; OR ANY INDIRECT OR CONSEQUENTIAL LOSS OR
DAMAGE HOWSOEVER CAUSED INCLUDING THE REPLACEMENT OF
EQUIPMENT AND PROPERTY, ANY COSTS OF RECOVERING,
PROGRAMMING, OR REDUCING ANY PROGRAM OR DATA STORED OR USED
WITH APPLE PARTS AND ANY FAILURE TO MAINTAIN THE
CONFIDENTIALITY OF DATA STORED ON THE PART. THE FOREGOING
LIMITATION SHALL NOT APPLY TO DEATH OR PERSONAL INJURY CLAIMS.
APPLE SPECIFICALLY DOES NOT REPRESENT THAT IT WILL BE ABLE TO
REPAIR ANY PART UNDER THIS WARRANTY OR MAKE A PART EXCHANGE
WITHOUT RISK TO OR LOSS OF THE PROGRAMS OR DATA.

## CONSUMER PROTECTION LAWS

FOR CONSUMERS WHO HAVE THE BENEFIT OF CONSUMER PROTECTION
LAWS OR REGULATIONS IN THEIR COUNTRY OF PURCHASE OR, IF
DIFFERENT, THEIR COUNTRY OF RESIDENCE, THE BENEFITS CONFERRED BY
THIS WARRANTY ARE IN ADDITION TO ALL RIGHTS AND REMEDIES
CONVEYED BY SUCH CONSUMER PROTECTION LAWS AND REGULATIONS.
Some countries, states and provinces do not allow the exclusion or
limitation of incidental or consequential damages or exclusions or
limitations on the duration of implied warranties or conditions, so the
above limitations or exclusions may not apply to you. This warranty gives
you specific legal rights, and you may also have other rights that vary by
country, state or province.

This Limited Warranty is governed by and construed under the laws of the
country or state in which the part purchase took place. Apple, the
warrantor under this Limited Warranty, is identified at the end of this
document according to the country or region in which the purchase took
place.

## OBTAINING WARRANTY SERVICE

Please review the online help resources referred to in the documentation posted at "http://www.apple.com/support" before seeking warranty service. If the part is still not functioning properly after making use of these resources, please return the part to the place where the original retail purchase took place. An Apple authorized service technician will help determine whether the part is defective, and if so, will assist in providing warranty service. Warranty service applies to parts that are tendered or presented for service during the Warranty Period, as permitted by law. Subject to applicable law, you will be required to furnish proof of purchase details before receiving warranty service. Warranty service may be restricted to the country where purchased. Service options, parts availability and response times will vary according to country, and you may be responsible for shipping and handling charges if the part cannot be serviced in the country it is in. In accordance with applicable law, certain countries may require that you furnish proof of purchase details and/or comply with registration requirements before receiving warranty service.

If your part is capable of storing data or software programs, you should make periodic backup copies of the data and programs contained thereon as a precaution to possible operational failures. Before you deliver your part for warranty service it is your responsibility to keep a separate backup copy of the system software, application software and data, and disable any security passwords. You will be responsible for reinstalling all such software, data and passwords. Apple and its agents are not liable for any damage to or loss of any programs, data, or other information stored on any media, or any non-Apple product or part not covered by this warranty. Recovery and reinstallation of system and application software and user data are not covered under this Limited Warranty.

**Warranty Obligor for Region or Country of Purchase**

| Region/Country of Purchase | Apple | Address |
|---|---|---|
|  |  |  |
| Americas |  |  |

| | | |
|---|---|---|
| Brazil | Apple Computer Brasil Ltda | Av. Cidade Jardim 400, 2 Andar, Sao Paulo, SP Brasil 01454-901 |
| Canada | Apple Canada Inc. | 7495 Birchmount Rd.; Markham, Ontario, Canada; L3R 5G2 Canada |
| Mexico | Apple Operations Mexico, S.A. de C.V. | Av. Paseo de la Reforma 505, Piso 33, Colonia Cuauhtemoc, Mexico DF 06500 |
| United States and Other Americas Countries | Apple Inc. | 1 Infinite Loop; Cupertino, CA 95014, U.S.A. |
| | | |
| Europe, Middle East and Africa | | |
| | | |
| All Countries | Apple Sales International | Hollyhill Industrial Estate Hollyhill, Cork, Republic of Ireland |
| | | |
| Asia Pacific | | |
| | | |
| Australia; New Zealand; Fiji, Papua New Guinea; Vanuatu | Apple Pty. Limited. | PO Box A2629, South Sydney, NSW 1235, Australia |
| Hong Kong | Apple Asia Limited | 2401 Tower One, Times Square, Causeway; Hong Kong |
| India | Apple India Private Ltd.. | 19th Floor, Concorde Tower C, UB City No 24, Vittal Mallya Road, Bangalore 560-001, India |
| Japan | Apple Japan Inc. | 3-20-2 Nishishinjuku, Shinjuku-ku, Tokyo, Japan |
| Korea | Apple Computer Korea Ltd.. | 3201, ASEM Tower; 159, Samsung-dong, Kangnam-gu; Seoul 135-090, Korea |
| Afghanistan, Bangladesh, Bhutan, Brunei, Cambodia, Guam, Indonesia, Laos, Singapore, Malaysia, Nepal, Pakistan, Philippines, Sri Lanka,, Vietnam | Apple South Asia Pte. Ltd. | 7 Ang Mo Kio Street 64<br><br>Singapore 569086 |
| People's Republic of China | Apple Computer Trading (Shanghai) Co. Ltd. | B Area, 2/F, No. 6 Warehouse Building, No. 500 Bing Ke Road, Wai Gao Qiao Free Trade Zone, Shanghai, P.R.C. |
| Thailand | Apple South Asia (Thailand) Limited | 25th Floor, Suite B2, Siam Tower,989 Rama 1 Road, Pataumwan, Bangkok, 10330 |
| Taiwan | Apple Asia LLC | 16A, No. 333 Tun Hwa S. Road. Sec. 2, Taipei, Taiwan 106 |

| Other Asian Pacific Countries | Apple Inc. | 1 Infinite Loop; Cupertino, CA 95014, U.S.A. |
|---|---|---|



**EXHIBIT 4**

# EXHIBIT 4

*In re MagSafe Apple Power Adapter Litigation*, Case No. 5:09-cv-01911-JW



## TIME REPORT -- Inception through December 19, 2011

| Name | Total Hrs. | Hourly Rate | Total Lodestar |
|------|-----------:|------------:|---------------:|
| **Partners** | | | |
| Helen I. Zeldes | 803.25 | $599.00 | $481,146.75 |
| Alreen Haeggquist | 29.75 | $560.00 | $16,660.00 |
| Amber Eck | 3.50 | $609.00 | $2,131.50 |
| | | | |
| **Attorneys** | | | |
| Aaron M. Olsen | 455.25 | $374.00 | $170,263.50 |
| Janice Yuen | 8.75 | $374.00 | $3,272.50 |
| | | | |
| **Professional Support Staff** | | | |
| Winky Cameron | 28.90 | $175.00 | $5,057.50 |
| | | | |
| **TOTAL LODESTAR** | **1,329.40** | | **$678,531.75** |

EXHIBIT 5

# EXHIBIT 5

*In re MagSafe Apple Power Adapter Litigation*, Case No. 5:09-cv-01911-JW



**EXPENSE REPORT -- Inception through December 19, 2011**

| Categories | Amount |
|---|---|
| Photocopies/Reproduction | $ 1,634.95 |
| Postage | $    456.59 |
| Messengers/Express Services | $    443.20 |
| Filing/Witness Fees | $    865.95 |
| Lexis/Westlaw Research | $ 6,620.81 |
| Meals, Hotels, Transportation & Travel Expenses | $ 4,689.40 |
| | |
| **TOTAL EXPENSES:** | **$14,710.90** |