THEODORE H. FRANK (SBN 196332)
Email: tfrank@gmail.com
**CENTER FOR CLASS ACTION FAIRNESS LLC**
1718 M Street NW
No. 236
Washington, DC 20036
Voice: (703) 203-3848

(additional counsel listed in signature block)

*Attorneys for Class Member Marie Gryphon*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| | Case No. C 09-01911 JW |
| IN RE MAGSAFE APPLE POWER ADAPTER LITIGATION | **OBJECTION TO PROPOSED SETTLEMENT** |
| | Date: February 27, 2012<br>Time: 9:00 a.m.<br>Courtroom: 9<br>Judge: Hon. James Ware |
| | **CLASS ACTION** |
| Marie Gryphon,<br>        *Objector.* | |

OBJECTION TO PROPOSED SETTLEMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES.........................................................................................iv

INTRODUCTION ........................................................................................................ 1

I.      THE OBJECTOR IS A MEMBER OF THE CLASS. .................................... 1

II.     THE COURT HAS A FIDUCIARY DUTY TO THE UNREPRESENTED
        MEMBERS OF THE CLASS. ....................................................................... 2

III.    THIS CLAIMS-MADE SETTLEMENT IS POTENTIALLY UNFAIR BECAUSE IT
        IS DESIGNED TO ARTIFICIALLY LIMIT CLAIMS AND SHIELD ATTORNEYS'
        FEES. ............................................................................................................ 4

        A.      The Claims Process Is Unduly Burdensome. ....................................... 5

        B.      Setting the Claims Period Deadline After the Fairness Hearing Deprives
                Class Members and This Court of Critical Information. ........................ 9

        C.      The Settlement Contains Every *Bluetooth* Indicia of Impermissible Self-
                Dealing. .............................................................................................. 12

IV.     A LAWFUL CLASS DEFINTION REQUIRES AN END-DATE. .................. 18

V.      THE SETTLEMENT ARBITRARILY DISCRIMINATES AGAINST LATE-
        ENTERING CLASS MEMBERS ................................................................. 20

        A.      Because the Adapter Replacement Program Preceded the Settlement, and
                Because the Class Relief Ends in 2012, the Settlement Offers Recent
                Purchasers Nothing If Their Adapter Has Not Yet Malfunctioned. ...... 20

        B.      Rule 23(a)(4) Is Violated If These Recent Purchasers Are Not Separately
                Represented. ........................................................................................ 21

VI.     THE COURT SHOULD APPLY THE *ALI PRINCIPLES* IN DETERMINING THE
        FAIRNESS OF THIS SETTLEMENT ......................................................... 23

        A.      The ALI Principles Are Consistent With *Churchill Village*. ................... 24

        B.      Public Policy Reasons Mean That the Court Should Not Infer Settlement
                Approval From a Low Number of Objectors, Especially Because the Parties
                Have Artificially Reduced the Number of Objections. .......................... 24

VII.    THIS OBJECTION IS BROUGHT IN GOOD FAITH....................................... 28

CONCLUSION ........................................................................................................................... 29

OBJECTION TO PROPOSED SETTLEMENT

# TABLE OF AUTHORITIES

**Cases**

*Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.,*
  52 F.R.D. 373 (D. Kan. 1971)................................................................. 26

*Boeing v. Van Gemert,*
  444 U.S. 572 (1980); .....................................................................10, 11

*Buchet v. ITT Consumer Fin. Corp.,*
  845 F. Supp. 684 (D. Minn. 1994) ............................................................ 8

*Churchill Village v. General Elec.,*
  361 F.3d 566 (9th Cir. 2004) ................................................................ 23

*Diaz v. Trust Territory of Pacific Islands,*
  876 F.2d 1401 (9th Cir. 1989). ............................................................... 3

*Ellis v. Edward D. Jones & Co.,*
  527 F. Supp. 2d 439 (W.D. Pa. 2007) ..................................................... 25

*Fears v. Wilhelmina Model Agency,*
  2009 U.S. Dist. LEXIS 85252 (S.D.N.Y. Sept. 15, 2009) ........................ 12

*Grove v. Principal Mut. Life Ins. Co.,*
  200 F.R.D. 434 (S.D. Iowa 2001) .......................................................... 24

*In re Classmates.com Consolidated Litig.,*
  No. 09-cv-0045-RAJ (W.D. Wash 2011) ............................................ 6, 27

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*
  370 F.Supp.2d 320 (D. Me. 2005) ........................................................... 8

*In re General Motors Corp. Engine Interchange Litigation,*
  594 F.2d 1106 (7th Cir. 1979) .............................................................. 25

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*
  55 F. 3d 768 (3d. Cir. 1995) ......................................................2, 25, 26

*In re HP Inkjet Printer Litig.,*
  No. 5:05-cv-3580 JF, 2011 WL 1158635, at *10 (N.D. Cal. Mar. 29, 2011)................................ 10

*In re Mercury Interactive Corp. Sec. Litig.,*
  618 F.3d 988 (9th Cir. 2010) ................................................................. 9

*In re Relafen Antitrust Litigation,*
  360 F.Supp.2d 166 (D. Mass. 2005) ........................................................ 2

*In re Veritas Software Corp. Sec. Litig.,*
  496 F.3d 962 (9th Cir. 2007) ................................................................. 9

*In re Wal-Mart Stores, Inc.*,
    No. 06-02069, 2008 U.S. Dist. LEXIS 109446 (N.D. Cal. May 2, 2008) .................................... 18

*In re Wells Fargo Loan Processor Overtime Pay Litig.*,
    2011 U.S. Dist. LEXIS 84541 (N.D. Cal. Aug. 2, 2011) ............................................... 12

*International Precious Metals Corp v. Waters*,
    530 U.S. 1223 (2000) ........................................................................................... 11

*Lopez v. Youngblood*,
    2011 U.S. Dist. LEXIS 99289 (E.D. Cal. Sept. 1, 2011) ............................................... 11

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*,
    834 F.2d 677 (7th Cir. 1987) ................................................................................. 25

*Mueller v. CBS, Inc.*,
    200 F.R.D. 227 (W.D. Pa. 2001) ............................................................................ 18

*Nilsen v. York County*,
    400 F.Supp.2d 266 (D. Me. 2005) .......................................................................... 24

*Parker v. Time Warner Entm't Co., L.P.*,
    631 F. Supp. 2d 242 (E.D.N.Y. 2009) ..................................................................... 12

*Petruzzi's, Inc. v. Darling-Delaware Co.*,
    880 F. Supp. 292 (M.D. Pa. 1995) ......................................................................... 25

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ................................................................................... 2

*Saur v. Snappy Apple Farms, Inc.*,
    203 F.R.D. 281 (W.D. Mich. 2001) ........................................................................ 18

*Silber v. Mabon*,
    957 F.2d 697 (9th Cir. 1992) ................................................................................... 3

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003). .................................................................................. 3

*Sylvester v. Cigna Corp.*,
    369 F. Supp. 2d 34 (D. Me. 2005) ........................................................................... 7

*Tarlecki v. Bebe Stores, Inc.*,
    2009 U.S. Dist. LEXIS 102531 (N.D. Cal. Nov. 3, 2009) .......................................... 10

*True v. American Honda Co.*,
    749 F. Supp. 1052 (C.D. Cal. 2010) ......................................................................... 3

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ................................................................................. 3

*Wike v. Vertrue, Inc.*,
    2010 U.S. Dist. LEXIS 96700 (M.D. Tenn. Sept. 15, 2010) ....................................... 18

*Williams v. MGM-Pathe Communs. Co.*,
    129 F.3d 1026 (9th Cir. 1997) ..........................................................................10, 11

*Yeagley v. Wells Fargo & Co.,*
2008 WL 171083 at *1 (N.D. Cal.)................................................................................ 8

**Rules and Statutes**

Fed. R. Civ. P. 23(a)(4)...................................................................................14, 18

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................ 16

Fed. R. Civ. P. 23(e)(1) ..................................................................................... 16

Fed. R. Civ. P. 23(e)(5).................................................................................16, 25

N.D. Cal. LR 23-2 ............................................................................................. 24

**Other Authorities**

2 Newberg on Class Actions, § 8.04.............................................................. 9, 16

7B Charles Alan Wright et al., *Federal Practice and Procedure*, § 1787 (2d ed.1986)................... 9, 16

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05 ..............20, 21, 23

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(a)
    (2010) ......................................................................................................... 20

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(b)
    (2010) ......................................................................................................... 21

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c)
    (2010) ........................................................................................................... 3

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.13
    (2010) ........................................................................................................... 9

Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness
    Guarantors*, 2003 U.CHI. LEGAL F. 403 (2003)................................................. 26

Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class
    Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529 (2004) ..................... 23

Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71(2004) .............................. 10

Allison Frankel, "Legal Activist Ted Frank Cries Conflict of Interest, Forces
    O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action
    Deal," AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010). ......................................... 26

Ashby Jones, "A Litigator Fights Class-Action Suits," WALL ST. J. (Oct. 31, 2011). ...................... 26

Paul Karlsgodt & Raj Chohan, "Class Action Settlement Objectors: Minor
    Nuisance or Serious Threat to Approval," BUREAU OF NAT. AFFAIRS: CLASS
    ACTION LITIG. REPORT (Aug. 12, 2011)........................................................... 26

Robert H. Klonoff, *Making Class Actions Work: The Untapped Potential of the Internet*,
    69 U. PITT. L. REV. 727 (2008)....................................................................... 8

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71 (2007)............................................................. 22

Pamela A. MacLean, "Dealing for Dollars," CALIFORNIA LAWYER (June 2011) ............................ 8

Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 13:20 (4th ed. 2002)....................................................................................................................................... 2

Notes of Advisory Committee on 2003 Amendments to Rule 23(h) ........................................ 9, 10

Charles Silver, *Due Process And The Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV. 1809 (2000)....................................................................................... 14

Rachel M. Zahorsky, "Unsettling Advocate," ABA J. (Apr. 2010) ............................................... 26

### INTRODUCTION

This settlement suffers from multiple infirmities: it creates a conflict between class members by treating some of them better than others, and it appears likely to unfairly treat class counsel best of all. However, these problems are not irreparable. Minor amendments to the class definition and scope as well as to the relief offered to recent purchasers would remedy most of the intra-class infirmities that currently hamper the settlement. Inserting an end date in the class definition would protect class members' right to notice and to object or opt-out. Extending Apple's adapter replacement program, so that all class members' adapters are guaranteed for three years, would ameliorate the unfairness to recent purchasers.

Beyond these infirmities, the settlement is potentially fair, as long as the class attorneys are compensated on the basis of the benefits they bring to the class. The burdensome structure of the claims process creates a significant possibility of a disproportionate attorneys' fee award that would be unworthy of approval. Under no circumstances should the fee be more than 25% of what the class receives in cash benefits, and those benefits cannot be known until March. Normally, a judge could approve the settlement and wait until the expiration of the claims period to award attorneys' fees; in this case, however, the settling parties would first need to amend the settlement to remove the "kicker" clause and allow any excess fee amount to revert to class members rather than the defendant. As of now, the parties have succeeded only in concealing the true value of this settlement from class members and the Court alike, rather than protecting the interests of the entire class.

## I.   THE OBJECTOR IS A MEMBER OF THE CLASS.

Objector Marie Gryphon purchased a Macbook subject computer in August of 2006; its serial number is 4H6301YGWBV. In August of 2010, she purchased a replacement adapter. Gryphon is a member of the settlement class; she therefore has standing to object to the settlement. Through her *pro bono* counsel, Gryphon intends to appear at the fairness hearing on February 27, 2012.

OBJECTION TO PROPOSED SETTLEMENT

Gryphon has filed a separate, contemporaneous motion with this court giving notice of her intention to appear at the fairness hearing; in that motion, she requested the opportunity for counsel to be heard as well as the opportunity to cross-examine any witnesses who testify at the hearing in support of settlement approval.

Gryphon's mailing address is 33 Hall St. Apt. 1, Jamaica Plain, Massachusetts, 02130. Her telephone number is (808) 772-0044.

## II.   THE COURT HAS A FIDUCIARY DUTY TO THE UNREPRESENTED MEMBERS OF THE CLASS.

A district court must act as a "fiduciary for the class," "with 'a jealous regard' " for the rights and interests of absent class members. *In re Mercury Interactive Corp.*, 618 F.3d 988, 994–95 (9th Cir. 2010) (quoting *In re Washington Pub. Power Supply Sys. Lit.*, 19 F.3d 1291, 1302 (9th Cir. 1994)). "Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166, 192–94 (D. Mass. 2005), citing *inter alia Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'"); *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279–80 (7th Cir. 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F. 3d 768, 785 (3d. Cir. 1995) (quoting *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975)). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 13:20 (4th

ed. 2002). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon,* 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members").

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. American Honda Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (*citing* 4 NEWBERG ON CLASS ACTIONS § 11:42 (4th ed. 2009)). *Accord* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ("*ALI Principles*").

Where a court is confronted with a settlement-only class certification, the court must look to factors "designed to protect absentees." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003). "Settlements that take place prior to formal class certification require a higher standard of fairness." *Molski*, 318 F.3d at 953 (quoting *Dunleavy v. Nadler*, 213 F.3d 454, 458 (9th Cir. 2000)). "These concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties; because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. "While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." *Bluetooth*, 654 F.3d at 948 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003)). "Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (quoting *In Re Washington Public Power Supply Syst.*

*Lit.*, 19 F.3d 1291 (9th Cir. 1994)). "Accordingly, fee applications must be closely scrutinized." *Vizcaino*, 290 F. 3d at 1052.

## III.   THIS CLAIMS-MADE SETTLEMENT IS POTENTIALLY UNFAIR BECAUSE IT IS DESIGNED TO ARTIFICIALLY LIMIT CLAIMS AND SHIELD ATTORNEYS' FEES.

The settling parties have arranged for tangible benefits to go to class counsel, the class representatives, and the defendant: the Settlement Agreement ("SA") licenses class counsel to seek, unopposed, $3.1 million in fees (SA § V.A) and expenses; licenses each class representative to seek a service award of $5,000 (*Id.*); and permits the defendant to obtain a broad release (SA § VI.B). However, only a fraction of class members are eligible to receive a cash payment through claims process: namely, only those class members who decided to give Apple a second chance to expose their home or office to the risk of fire. Only those class members who purchased replacement adapters—and did so within three years of initial purchase—after their initial adapters malfunctioned are entitled to participate in the burdensome postal mail claims process to claim a cash payment.[1] Those class members who experienced defects, but decided to buy another laptop instead of an $80 replacement adapter, receive no benefit from this settlement. Those class members who have acquired Magsafe Adapters so recently that the adapter has not yet manifested the impairments at issue in this lawsuit will receive no benefit either. Apple's pre-existing adapter replacement program—instituted in 2008—cannot be conceived of as a settlement benefit, as the Settlement Agreement acknowledges. SA § II.F.1.  Nevertheless, those portions of the class that are denied settlement benefits remain subject to the broad release of the Settlement Agreement.

The structure of the settlement is even more alarming than the intra-class inequity. Its structure limits class claims, shields attorneys' fees, and conceals the true value of this settlement to the class. Its failure to implement an online claims process for a class that would

---

[1] An eligible claimant's cash payment is the purchase price of her replacement up to a maximum of either $79, $50, or $35, depending on the time between the initial purchase and the subsequent purchase. SA § II A-C.

be uniquely receptive to it (the class, by definition, is composed of computer users) artificially lowers the participation rate. Because the claims period does not culminate until late March and the fairness hearing is scheduled for late February, both the Court and objecting class members will be deprived of actual knowledge of the benefit to the class — an indispensable component in analyzing whether the requested attorneys' fee award is reasonable. The "clear-sailing" and "kicker" provisions insulate the fee awards from searching inquiry; in the event that the Court decides to reduce counsel's fees, these provisions thwart any reciprocal class benefit that could be gained from the reduction. In concert, these mechanisms work make the class benefit remote and speculative: simultaneously, they make class counsel's and defendant's benefits all the more concrete.

### A.   The Claims Process Is Unduly Burdensome.

The parties have created obstacles to class recovery that increase the expense of administration.  *See* Notes of Advisory Committee on 2003 Amendments to Rule 23(h) ("Settlement regimes that provide for future payments, for example, may not result in significant actual payments to class members. In this connection, the court may need to scrutinize the manner and operation of any applicable claims procedure.") Their design enables class counsel and defendants to reduce class recovery so as to benefit themselves, an arrangement that can be made at arm's length without any explicit collusion, so long as class counsel looks the other way when defendants insist upon conditions on class recovery.

*First*, there is no reason to require that most class-member recovery could not occur through a direct-check-mailing opt-out process, rather than the opt-in claims process. Presumably, Apple maintains—or could, without much trouble, compile—a registry of subject computer purchasers who later purchased replacement adapters, as well as those who purchased a standalone adapter. Furthermore, since the notice program involved postcard notice, Apple must also maintain address information for class members. There is no reason why a direct compensation check-mailing method was not used as the primary means of directing benefits to class members, leaving in place a claims-made process for those whose information is out of date or those who received a subject computer as a gift, other than to

OBJECTION TO PROPOSED SETTLEMENT

reduce the number of claims and payouts. A claims-made process alone maximizes the perception of class benefit; in reality, the beneficiaries are class counsel and the defendant. Apple is not *required* to pay every class member as a condition of settlement, but when it structures the settlement to avoid doing so, the settlement (or fee request) should not be evaluated as if Apple had.

This is not a hypothetical concern. The history of American class action law is littered with examples of parties agreeing to settlements where the claims process resulted in the class recovering a small fraction of what the attorneys collected. *See e.g., Ford Explorer Cases*, J.C.C.P Nos 4266 & 4270, (Cal. Sup. Ct., Sacramento County 2008) (approximately $37,500 class recovery versus $20 million in attorneys' fees); *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139 (S.D. N.Y. 2008) ($26,000 class recovery versus $1 million fee request) (class decertified on other grounds); *Moody v. Sears, Roebuck & Co.*, 2007 NCBC 13 (Cook County settlement resulted in $2,402 benefit to class and $1 million in attorneys' fees). This Court can certainly draw an adverse inference from class counsel's failure to identify the number of claims made so far in their fee request.

*Second,* this settlement's failure to tailor the claims process to the class, which consists of Apple computer owners, is a glaring structural deficiency. In the year 2011, electronic communication is the norm; claims-made settlements routinely allow class members the option of submitting claims online, even when eligibility calculations are far more complex than those involving this settlement's three cash-payment subgroups. *E.g., In re Mattel, Inc.*, MDL No. 1897 (C.D. Cal. 2010), *available at* http://www.mattelsettlement.com/prod/. Moreover, in settlements involving internet-savvy classes, it is doubtful that the settling parties can even point to one recent claims-made settlement that did not permit the submission of claim forms online. *See contra e.g., The NVIDIA GPU Litig.*, No. C 08-04312 JW (N.D. Cal. 2011), *available at* http://nvidiasettlement.com/index.html; *Ferrington v. McAfee, Inc.*, No. 10-cv-01455-LHK (N.D. Cal 2011), *available at* http://www.arpumcafeepopupad.info; *Brazil v. Dell*, No. 07-cv-01700-RMW (N.D. Cal. 2011), *available at* http://www.discountsettlement.com; *In re Classmates.com Consolidated Litig.*, No. 09-cv-0045-RAJ (W.D. Wash 2011), *available at*

http://www.cmemailsettlement.com; *In re Online DVD Rental Antitrust Litig.*; No 09-md-2029-PJH (N.D. Cal. 2011), *available at* https://onlinedvdclass.com/Home.aspx; *Johnson v. Apple Inc.*, No 09-CV-146501 (Sup. Ct. Cal. Santa Clara County 2011), *available at* https://www.johnsonitunessettlement.com; *In re HP Inkjet Litig.*, No 05-3580 JF (N.D. Cal 2011), *available at* https://www.hpinkjetprintersettlement.com.

Because the settlement administrator, Kurtzman Carson Consultants LLC, is routinely the administrator of settlements which utilize online claims submission, the failure to permit electronic submission in this settlement is especially notable. *E.g., The NVIDIA GPU Litigation, supra*; *Kurihara v. Best Buy Co., Inc.*, No. C-06-01884-MHP (N.D Cal. 2010), *available at* http://bestbuysettlement.com/; *Over the Rainbow Adult Family Care Home v. Verizon Northwest Inc.*, No. 02-2-34943-9 SEA, (Wash. Sup. Ct. King County 2010), *available at* http://www.star69litigationsettlement.com/index.asp. To put it another way, this particular settlement defect cannot be blamed on technical limitations.

There is no apparent reason for the settling parties' failure to establish a direct-compensation method of relief or an online claims submission procedure. As Judge Conti recently wrote when rejecting a settlement with a postal-mail-only claims process, "There are many ways the parties could improve the claim submission procedure, such as by allowing class members to make claims using an online form or by mailing settlement checks to each class member who... satisfies the requirements for such a claim. For unknown reasons, the parties have opted for an unnecessarily taxing claims procedure over these alternatives." *Walter v. Hughes Communs., Inc.*, No. 09-2136 SC, 2011 U.S. Dist. LEXIS 72290, 40–41 (N.D. Cal. July 6, 2011). Given the size of the electronic footprint that the settling parties have created as part of the settlement process, it is hard to see any reason that claims couldn't have been made electronically, except for a desire to artificially lower the number of claims made.

The rate of response to any claims-made settlement cannot be predicted precisely, but in general a very low rate is reasonably certain. One settlement administrator who had been involved in over 175 class action settlements nationwide reported that response rates are "10 percent or less in the vast majority of settlements that require filing a notice of claim." *Sylvester*

OBJECTION TO PROPOSED SETTLEMENT

*v. Cigna Corp.*, 369 F. Supp. 2d 34, 44 (D. Me. 2005). In a recent federal case, a response rate below 1% led the San Francisco court to label the outcome "a virtually worthless settlement of a meritless case," *Yeagley v. Wells Fargo & Co.*, No. C 05-03403 CRB, 2008 U.S. Dist. LEXIS 5040 at *1 (N.D. Cal. Jan. 18, 2008), *rev'd on other grounds*, 365 Fed.Appx. 886 (9th Cir. 2010). Response rates under 5% are routine: *see, e.g.*, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F.Supp.2d 320, 321 (D. Me. 2005) (2% response rate); *Buchet v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684, 695 (D. Minn. 1994), *as amended* 858 F. Supp. 944 (rejecting settlement after related settlement produced response rates between one-tenth of 1% and 3.2%); *Strong v. Bellsouth Telecomm., Inc.*, 173 F.R.D. 167, 169 (W.D.La. 1997), *aff'd*, 137 F.3d 844 (5th Cir. 1998) (4.3% response rate); *Union Life Fidelity Ins. Co. v. McCurdy*, 781 So. 2d 186, 188 (Ala. 2000) (one-tenth of 1% response rate). *See generally* Pamela A. MacLean, "Dealing for Dollars," CALIFORNIA LAWYER (June 2011), at 12, 50.

It has been recognized for more than a decade that employing an electronic claims process ameliorates this problem. *In re Nasdaq Market-Makers Antitrust Litig.*, 2000 U.S. Dist. LEXIS 304, at *14 (S.D.N.Y. Jan. 18, 2000) (recognizing that using "electronic claim forms is likely to contribute to a far larger number of claims"). Because online claims processes increase class response rates, they are becoming pervasive. Robert H. Klonoff, *Making Class Actions Work: The Untapped Potential of the Internet*, 69 U. PITT. L. REV. 727, 751 (2008). Class counsel cannot feign ignorance of the fact that people are "unhappy with mail-in forms and prefer online submissions" and that if given an online option, "more absent class members will choose to participate in the settlements to which they are entitled." *Id.* at 751, 752. Instead, by relying on paper communication rather than incorporating electronic means, the parties actually *increased* administrative costs. The only reason for Apple to agree to that is because they believe that the increase in administration costs is outweighed by the number of claims deterred.

**B.      Setting the Claims Period Deadline After the Fairness Hearing Deprives Class Members and This Court of Critical Information.**

Class members' claim forms are due on March 21, 2012, while the fairness hearing is scheduled for February 27, 2012. This schedule is legally problematic: it deprives class members of material information in deciding whether to submit to, object to, or opt out from the settlement. The objection deadline is January 6, 2012, more than two months prior to the claims deadline.

The central function of notice is to give each class member the opportunity to evaluate the settlement and reach an informed decision. *In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 969 (9th Cir. 2007) ("It is clear that the purpose of the notice requirement is to allow class members to evaluate a proposed settlement."). Notice gives class members the opportunity to assess the strengths and weaknesses of the case as well as the merits and demerits of the settlement. 7B Charles Alan Wright et al., *Federal Practice and Procedure,* § 1787 at 220 (2d ed. 1986); 2 Newberg on Class Actions, § 8.04 at 8–17 ("[T]he purpose [of notice is] allowing the parties to make conscious choices that affect their rights in a litigation context."). But the date of this deadline leads unavoidably to the question of whether it satisfies Rule 23: in particular, is the class entitled to know how many valid claims were submitted, and is that information material to the fairness of the overall settlement or the attorneys' fee request? If so, then the motion schedule must not deprive objectors of the information they need to make an informed decision. *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010). Furthermore, scheduling the claims deadline after the fairness hearing deprives those who do object of any opportunity to discuss that data at the hearing; unless the Court orders the parties to submit this data as a status report after the deadline passes, the Court itself will lack important information needed to evaluate the fairness of the settlement.

Fed. R. Civ. Proc. 23(h) governs the determination of attorneys' fees in a federal class action. *Shady Grove Orthopedic Assoc. v. Allstate Ins. Co..*, 130 S.Ct. 1431 (2010) dictates this result. In *Shady Grove*, defendants attempted to defeat Rule 23 certification of a class action by arguing that state substantive law specifically precluded class-action treatment of the complaint's cause

of action. The Supreme Court disagreed: state law could not override the procedural commands of Rule 23, even though the effect was to create a substantive qualitative shift in the balance of power between plaintiffs and defendants that upended the state legislative compromise. Plaintiffs' argument to apply California state law to a nationwide class must be rejected. *Cf. Phillips Petroleum v. Shutts*, 472 U.S. 797, 822 (1985).

Because the Ninth Circuit requires cross-checks whether this Court decides to award fees under the percentage-of-recovery method or the lodestar method, the number of claims made is relevant in either case. When assessing a percentage-of-recovery analysis in a settlement like this, where there is no firm maximum or minimum outlay to the class, knowledge of the number of valid claims that are made is essential to any evaluation of the proportionality of the $3 million fee request.[2] The fee award should be measured against the value of the claims actually made. The "key consideration in determining a fee award is reasonableness in light of the benefit *actually conferred*" (emphasis in original). *In re HP Inkjet Printer Litig.*, No. 5:05-cv-3580 JF, 2011 WL 1158635, at *10 (N.D. Cal. Mar. 29, 2011) (quoting *Create-A-Card Inc., v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920, at * 3 (N.D. Cal. Sept. 22, 2009)). *See also ALI Principles* § 3.13; Notes of Advisory Committee on 2003 Amendments to Rule 23 ( "it may be appropriate to defer some portion of the fee award until actual payouts to class members are known"); *id.* ("fundamental focus is the result actually achieved for class members").

Admittedly, some courts that have awarded fees on a percentage-of-recovery basis have made this calculation on the basis of the entire fund, not just the amount of the fund that is claimed by the class. *Boeing v. Van Gemert*, 444 U.S. 572 (1980); *Williams v. MGM-Pathe Communs.*

---

[2] Class counsel makes the outlandish claim that the extended care program should be valued at $39 multiplied by 11 million (the number of potential class members). Motion for fees (Dkt. No. 83) at 24. This valuation is objectionable for myriad reasons. To reiterate the most significant: the replacement program is not a product of this lawsuit. Moreover, large swaths of the class will not benefit from it.

*Co.,* 129 F.3d 1026 (9th Cir. 1997).[3] Nonetheless, this Court should find *Boeing* and *Williams* inapplicable for at least two reasons.

First, the holdings of *Boeing* and *Williams* were superseded by the 2003 amendments to Federal Rule of Civil Procedure 23. *See* Notes of Advisory Committee on 2003 Amendments to Rule 23; *accord* Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71(2004) ("the fee awards should be based only on the benefits actually delivered.") The amendments reflect common-sense intuitions: attorneys' fees should be tied directly to what clients receive, and permitting a class member to fill out a claim form (or jump through even more labor-intensive hoops) in order to receive a check simply is not equal to sending that class member a check directly. A class member is not indifferent between a $10 million common fund that pays $10 million to the class and one that pays $500,000 to the class. *See International Precious Metals Corp v. Waters,* 530 U.S. 1223 (2000) (O'Connor, J) (denying writ of certiorari but noting that fund settlements that allow attorney fees to be based upon the total fund may "potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class" and, in turn, "could encourage the filing of needless lawsuits").

Second, to whatever extent they remain valid,[4] *Boeing* and *Williams* never applied to a constructive common fund like the one at issue here, where there is no discernible maximum or minimum monetary relief that will go to class members. *See Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at * 32 (E.D. Cal. Sept. 1, 2011) ("[I]n claims made or class reversion cases *where there is a maximum fund*, and unclaimed funds revert to the defendant, it is appropriate to award

---

[3] As a threshold matter, even if *Boeing* or *Williams* did apply in full, it would not render the data regarding the number of claims made irrelevant. For example, a court may choose to depart downward from the 25% benchmark, due to the class' apathetic reaction that is demonstrated by the absence of claims. *Tarlecki v. Bebe Stores, Inc.*, 2009 U.S. Dist. LEXIS 102531, at *12 (N.D. Cal. Nov. 3, 2009).

[4] If this Court determines that *Boeing* and *Williams* are still good law, Gryphon wishes to preserve that issue for appeal: she believes that they have been legislatively superseded and that they should, ideally, be judicially reversed.

class fund attorneys' fees based on the gross settlement fund.") (emphasis added). It is therefore not appropriate to award fees based on a speculative, maximized estimate of potential claims. It is in class counsel's interest to inflate this hypothetical number of claims as much as possible, of course, so as to ensure itself the maximum recovery from which to draw its fee.[5]

Even if this Court exercises its discretion so as to award fees based on a lodestar, the number of claims made remains relevant. As the Ninth Circuit recently concluded in *Bluetooth* when discussing the court's appropriate use of the lodestar method, a central judicial consideration must be "the benefit obtained for the class." 654 F.3d 935, 942 (9th Cir. 2011). Under both lodestar and common-fund approaches, it is incumbent upon a district court to determine that "the amount awarded [is] not unreasonably excessive in light of the results achieved." *Id.* at 943. In this case, the benefit obtained and the results achieved must be a function of the number of valid claims submitted.

As noted *supra*, the possibility of a mismatch between class recovery and attorneys' fees is far from a hypothetical concern. To prevent class counsel's receipt of a similar windfall, courts routinely consider the actual amount of funds claimed. *See, e.g., In re Wells Fargo Loan Processor Overtime Pay Litig.*, 2011 U.S. Dist. LEXIS 84541, at * 20 (N.D. Cal. Aug. 2, 2011); *Fears v. Wilhelmina Model Agency*, 2009 U.S. Dist. LEXIS 85252, at * 37 (S.D.N.Y. Sept. 15, 2009); *Parker v. Time Warner Entm't* Co., L.P., 631 F. Supp. 2d 242, 258 (E.D.N.Y. 2009). Notably absent from the plaintiffs' Motion for Attorneys' Fees was any indication of how many claims had been submitted at the time of its filing, approximately halfway through the claims period.

## C.      The Settlement Contains Every *Bluetooth* Indicia of Impermissible Self-Dealing.

This settlement carries all of the indicia of self-dealing that caused the Ninth Circuit warned about in *Bluetooth,* 654 F.3d at 947. That decision's dishonor roll of "warning signs" of self-dealing is controlling. Courts "must be particularly vigilant not only for explicit collusion,

---

[5] Note how this complements the defendant's interest in erecting barriers to actual claims. *See supra* § III.A.

but also for more subtle signs that class counsel have allowed pursuit of their own self-interests

… to infect the negotiations." *Id.* at 947. The *Bluetooth* decision suggests a non-exclusive[6] list of

three possible signs of self-dealing. As in *Bluetooth*, all three of these "multiple indicia" of

unfairness are present in this settlement. *Id.*

First, unless the claims-take rate is unusually high, counsel will "receive a

disproportionate distribution of the settlement." *Id.* (quoting *Hanlon*, 150 F.3d at 1021). A

proportionate distribution is one in line with the Ninth Circuit's 25% benchmark. *See, e.g., Six*

*(6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). To produce a

$3 million fee request that complies with the benchmark, class members will need to submit $9

million worth of claims — an extremely improbable outcome, given the obstacles that the

settling parties have erected.

Second, the settlement has a "clear sailing" arrangement that provides for the payment

of attorneys' fees separate and apart from class funds without challenge from the defendants.

SA § V.A; *Bluetooth*, 654 F.3d at 947. A clear sailing clause stipulates that attorney awards will

not be contested by opposing parties. "Such a clause by its very nature deprives the court of the

advantages of the adversary process." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518,

525 (1st Cir. 1991). The clause "suggests, strongly," that its associated fee request should go

"under the microscope of judicial scrutiny." *Id*. The clear sailing clause lays the groundwork for

lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange

for red-carpet treatment on fees." *Id*. at 524; accord *Bluetooth,* 654 F.3d at 947. Here, class

counsel put its own fees ahead of the interests of the class by negotiating a provision that

insulates those fees from challenge by the defendant.

Third, the "parties arrange[d] for fees not awarded to revert to defendants rather than be

added to the class fund." *Id*. The structure of this settlement does that by designating the

attorneys' fees and expenses as "separate from all other consideration and remedies available

to the Settlement Class" (SA § V.A), thereby creating the unattractive consequence that any

---

[6] The unduly burdensome claims procedure and the termination of the claims period well after
the fairness hearing are two other red flags.

reduction in fees cannot redound to the class' benefit. A "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Id*. at 949. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id*.

Normally, the best practice for a Court confronting an onerous claim process that does not terminate until after the fairness hearing is to hold any evaluation of the reasonableness of fees in abeyance until after claims intake is complete. Notes of Advisory Committee on 2003 Amendments to Rule 23(h) ("[I]t may be appropriate to defer some portion of the fee award until actual payouts to class members are known."); *In re Giant Interactive Group, Inc.*, 2011 U.S. Dist. LEXIS 127634, at *32 (S.D.N.Y. Nov. 2, 2011); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 378 (D. Mass. 1997). However, here the "kicker" will simply shift the remainder back into the pockets of the defendants. This is wrong. "If the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is ***no apparent reason*** the class should not benefit from the excess allotted for fees." *Bluetooth*, 654 F.3d at 949 (emphasis added). The reversion of an oversized fee request to the defendant is *per se* self-dealing that makes the settlement inherently unfair under Rule 23(e).

The argument that the reversion of fees to the defendant is appropriate because class members have already been fully compensated is not serious. For multiple reasons, it is clear that the class is not getting complete compensation here. *First*, those class members who did not buy a replacement get nothing, even if their adapter experienced the prototypical symptoms of defect within 3 years. *See True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1067–69 (C.D. Cal. 2010) (finding patently unfair a settlement that offered preferential relief to class members who manifest their grievances in the preferred way). *Second,* those who did buy replacement adapters in years 2 or 3 get only a fraction of the replacement cost. *Third,* those, like Ms. Gryphon, who bought a replacement after year 3 get nothing. *Fourth*, there are theories of damages, espoused by the plaintiffs in their consolidated complaint, beyond refund

for the cost of the replacement adapter. *See* Consolidated Complaint (Dkt. No. 44) at 33, Prayer for Relief B. To clarify, this is not meant to suggest that the size of the settlement is insufficient; nor is it a claim that the settlement was required to fully compensate class members no matter how long they have owned their adapter; rather, it underscores that removing the "kicker" would not create a windfall for class members.

In addition, a "kicker" will likely have the additional self-serving effect of protecting class counsel by deterring scrutiny of the fee award. Both courts and potential objectors have less incentive to scrutinize a fee with a kicker attached to it, because any reversion will only go to the defendant that has already agreed to pay that amount. Charles Silver, *Due Process and the Lodestar Method*, 74 TULANE L. REV. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack").

In the Ninth Circuit, the fairness of the attorneys' fees in a common fund settlement is measured against a 25% benchmark. *Torrisi v. Tucson Elec. Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). While there is no common fund here, this is a technicality: the parties could have chosen to create one. Instead, it appears likely that the settling parties decided to construct a settlement that sets aside an overlarge share of the benefit for themselves.

There is, unfortunately, one material difference when there is no common fund: the district court cannot rewrite the settlement agreement to ensure that the class gets its fair share of the award. If the district court reduces the attorneys' fee request in any way, the *Bluetooth* kicker means that the money reverts to the defendants, rather than to the class. The design of this settlement, which lacks a common fund, suggests that plaintiffs' attorneys were putting their own interests ahead of those of the mass of class members; it thus fails to meet Rule 23(a)(4) standards for adequacy.

This design has two consequences: (1) to inflate the fee at the class's expense; and (2) to reduce the court's incentive to carefully scrutinize the fee for unreasonableness, since any reduction *only* benefits the defendant. Any fee that a defendant agrees to pay directly to class counsel is an amount that it presumably would have been willing to include as part of the payment to the class. Moreover, because the fee thus negotiated is likely to be higher than the

amount that class counsel could reasonably seek by way of a percentage of the common fund, the arrangement reduces the recovery that the class would have received. *Bluetooth*, 654 F.3d at 947.

Therefore the agreed attorneys' fees must be scrutinized when evaluating whether the settlement is fair, reasonable, and adequate. "There is no exception in Rule 23(e) for fee provisions contained in proposed class action settlement agreements. Thus, to avoid abdicating its responsibility to review the agreement for the protection of the class, a district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003). Provisions for attorneys' fees are contained in the settlement agreement, so this Court has a responsibility to review them rather than "sever" these disproportionate fees from consideration. There is good reason for this: "If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Id*. at 964.

"That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement does not detract from the need carefully to scrutinize the fee award." *Id*. A "defendant is interested only in disposing of the total claim asserted against it." *Id*. "The rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source." *In re General Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 820-21 (3rd Cir. 1995). "[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case." *Id*. at 821. *See also id. at* 820 (severable fee structure "is, for practical purposes, a constructive common fund").

"[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal." *Johnson v. Comerica*, 83 F.3d 241 (8th Cir. 1996). "If an agreement is reached on the amount of a settlement fund and a

separate amount for attorney fees" then "the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." *Manual for Complex Litigation* (4th ed. 2008), § 21.71, p. 525.

The Ninth Circuit has recognized that "such an agreement has the potential to enable a defendant to pay class counsel excessive fees and costs, in exchange for counsel accepting an unfair settlement on behalf of the class." *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2002). Even where, as here, there is no explicit collusion against the class, "[e]ven if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 266 (1985).

Even if this court is willing to condone the act of attorneys putting their own interests ahead of their putative clients, the failure to create a common fund hardly means that a district court should ignore the 25% benchmark. If regular settlements are treated differently than common-fund settlements, plaintiffs' attorneys will simply evade the benchmark by never again creating common-fund settlements in the future. Settling parties should not be permitted to ignore the substance of the benchmark rule by playing games with the form of the settlement agreement.

Moreover, if "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal., Inc.,* 222 F.3d 1142, 1147 (9th Cir. 2000). When class counsel bring class litigation to benefit themselves, rather than their putative class clients, they cannot meet the adequacy requirements of Rule 23(a)(4), and the class should not be certified. *In re Aqua Dots Prods. Liab. Litig.,* 654 F.3d 748 (7th Cir. 2011).

## IV.    A LAWFUL CLASS DEFINTION REQUIRES AN END-DATE.

In its preliminary approval order (Dkt. No. 82) ("Order"), this Court conditionally certified a settlement class of "All United States residents who (1) are the original owners of an Apple MacBook or MacBook Pro computer that shipped with a 60W or 85W MPM-1 ("T") Power Adapter ("Subject Computers") and/or (2) purchased a standalone… Power Adapter." Order, at 1. This definition is flawed, because it does not establish a firm end-date for class membership. It thereby impermissibly includes those who purchase adapters after the notice program ends and after any opportunity to opt out or object has passed.

'An implied prerequisite to certification is that the class must be sufficiently definite." *Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*, No. C 05-2320 SBA, 2006 U.S. Dist. LEXIS 69193, at *10 (N.D. Cal. 2006). This means that, at the very least, every class definition should include: (1) a specification of a particular group at a particular time frame and location who were harmed in a particular way; and (2) a method of definition that allows the court to ascertain its membership. *Rowe v. E.I. Dupont De Nemours & Co.,* 262 F.R.D. 451, 455 (D.N.J. 2009) (citing *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 477 (S.D. Ohio 2004)). These principles are violated by a class definition that has no definite end date and is only bounded *de facto* by the issuance of a final approval order at an indeterminate future date.

Courts rigorously analyzing the issue have reached the same conclusion: proposed classes with no fixed end date must be denied certification. *See In re Wal-Mart Stores, Inc. Wage & Hour Litig.,*  No. 06-02069, 2008 U.S. Dist. LEXIS 109446, at * 15–16 (N.D. Cal. May 2, 2008); *Cruz v. Dollar Tree Stores, Inc.,* No. 07-2050 2009 U.S. Dist. LEXIS 62817, at *3–5 (N.D. Cal. July 2, 2009); *Mueller v. CBS, Inc.,* 200 F.R.D. 227, 236 (W.D. Pa. 2001); *Saur v. Snappy Apple Farms, Inc.,* 203 F.R.D. 281, 285–86 (W.D. Mich. 2001); *Vickers v. GMC,* 204 F.R.D. 476, 478 (D. Kan. 2001); *Wike v. Vertrue, Inc.,* No. 3:06-00204, 2010 U.S. Dist. LEXIS 96700 (M.D. Tenn. Sept. 15, 2010); *see also Zeisel v. Diamond Foods, Inc.,* No. C 10-01192 JSW, 2011 U.S. Dist. LEXIS 113550, at *5 (N.D. Cal. Oct. 3, 2011); *Bafus v. Aspen Realty, Inc.,* No. CV-04-121-S-BLW, 2007 U.S. Dist. LEXIS 18922, at *5 (D. Idaho Mar. 14, 2007); *Ansoumana v. Gristede's Operating Corp.,* 201 F.R.D. 81, 85 n.2 (S.D.N.Y. 2001).

The reasons that a definite temporal boundary is required are at least threefold. First, Fed. R. Civ. P. 23(c)(2)(B) requires that the court direct "the best notice that is practicable under the circumstances, including individual notice to all class members who are identifiable through reasonable effort" when there is a pending certification of a (b)(3) class. *See also* Fed. R. Civ. P. 23(e)(1) (requiring the court to direct reasonable notice of the settlement to all members of the class who would be bound by the settlement). Notice serves the function of allowing class members a sound platform for assessing the strengths and weaknesses of the case, the merits and demerits of the settlement in deciding whether to object or opt-out.[7] Those who purchase Power Adapters after the completion of the notice program will be deprived of their rightful notice.

Second and third, even if the late-purchasing class members were somehow to learn of the settlement, the objection and opt-out deadline may well have passed by that time. Individuals who enter the class after that deadline will be deprived of their Fed. R. Civ. P. 23(e)(5) right of objection and their Fed. R. Civ. P. 23(c)(2)(B) right to exclude themselves. Class members have these rights, but for a substantial number of class members, the class definition obliterates them. The settling parties should therefore amend the class definition to clarify that the settlement only binds those who owned MacBooks in advance of the notice program, so that the program would be capable of targeting them and they would have an opportunity to object or opt-out if they wished.

---

[7] *See* 7B Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE, § 1787 at 220 (2d ed.1986); 2 NEWBERG ON CLASS ACTIONS, § 8.04 at 8-17 ("[T]he purpose [of notice is] allowing the parties to make conscious choices that affect their rights in a litigation context.").

## V.   THE SETTLEMENT ARBITRARILY DISCRIMINATES AGAINST LATE-ENTERING CLASS MEMBERS

### A.   Because the Adapter Replacement Program Preceded the Settlement, and Because the Class Relief Ends in 2012, the Settlement Offers Recent Purchasers Nothing If Their Adapter Has Not Yet Malfunctioned.

Since August of 2008, Apple has offered to replace, free of charge, Magsafe adapters that experienced fraying, discoloration, or deformation.  A simple Google search reveals the three-year-long history of the replacement program and its continuation through the time of settlement.[8] Because the initial complaint was not filed in this case until May 1, 2009, the ongoing replacement program cannot be conceived of as a benefit of this suit or settlement.[9] *See In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) ("Plaintiffs want relief that duplicates a remedy that most buyers already have received, and that remains available to all members of the putative class. A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests.").

Moreover, as far as Gryphon can discern, Apple's original replacement program had no time limitation. But the current settlement agreement makes it quite clear that Apple has no obligation to replace adapters beyond December 31, 2012, a provision which indisputably disfavors recent purchasers of adapters like Gryphon, who purchased her adapter replacement in August of 2010. There is no reason why someone like Gryphon, who purchased her adapter in 2010 rather than in 2009, should not be entitled to the same three years of replacement

---

[8]   *See   e.g.*,   http://www.tuaw.com/2008/08/20/apple-replacing-frayed-magsafe-power-cables/; http://apcmag.com/apple_announces_magsafe_recall.htm; http://blog.smalldog.com/article/magsafe-power-adapter-exchange-program/; http://www.geeksugar.com/Apples-Defective-MagSafe-Adapters-Get-Replaced-Free-1879926; http://forums.macrumors.com/archive/index.php/t-1226198.html

[9] Nor should class notice of the replacement program be considered a benefit: the second listed result of a Google search of "Apple power adapter" leads to an Apple webpage with information about the replacement program (website last visited Nov. 17, 2011).

coverage. This settlement is therefore unfair to late-purchasing class members: they are entitled to no cash reimbursement, assuming their adapter has not malfunctioned and then been replaced in a short time; furthermore, they are denied the full three-year replacement window afforded to those who purchased adapters or subject computers at an earlier date.

**B.     Rule 23(a)(4) Is Violated If These Recent Purchasers Are Not Separately Represented.**

Fed. R. Civ. P. 23(a)(4) requires that the named plaintiffs fairly and adequately protect the interests of the class. Examination of potential conflicts of interest in settlement agreements "has long been an important prerequisite to class certification. That inquiry is especially critical when [] a class settlement is tendered along with a motion for class certification." *Hanlon,* 150 F.3d at 1020.

When class members with identical claims are treated disparately, that inherently indefensible practice creates an uncertifiable settlement. *In re Joint Eastern and Southern Dist. Asbestos Litig.,* 982 F.2d 721, 741–43 (2d Cir. 1992) (decertifying class under Rule 23(a)(4) because of conflicts of interest between different segments of class), *modified on reh'g on other grounds sub nom. In re Findley,* 993 F.2d 7 (2d Cir. 1993); *Mirfahisi v. Fleet Mortgage Corp.,* 356 F.3d 781, 786 (7th Cir. 2004). *See also Acosta v. Trans Union, LLC,* 243 F.R.D. 377, 385 (C.D. Cal. 2007) (named plaintiffs who receive economic relief cannot adequately represent class members who do not); *True,* 749 F. Supp. 2d at 1065 (same). This settlement treats identically-situated class members differently—and only because some purchased in 2010 or 2011 and others purchased earlier—thus, "the interests of those within the single class are not aligned." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626 (1997); *contrast with Browning v. Yahoo! Inc.,* No. C04-01463 HRL, 2007 U.S. Dist. LEXIS 86266 (N.D. Cal. Nov. 16, 2007) ("Importantly, the settlement makes all class members eligible for the same relief.") *and Hanlon,* 150 F.3d at 1021 ("[T]he proposed settlement does not propose different terms for different class members; on the contrary, treatment of each class member is identical.").[10] The settlement contains "no structural

---

[10] If all class members were eligible for identical relief as in *Browning* or *Hanlon,* separate subclasses arguably would not be required.

assurance of fair and adequate representation for the diverse groups and individuals affected." *Id.* at 627.

At the very least, this intra-class conflict requires that there be a named plaintiff who has purchased an adapter in calendar years 2010 or 2011. *See generally In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (explaining how there can be conflicts of interest between late purchasers and early purchasers, although the Ninth Circuit found the particular conflict illusory in that case because of the PSLRA). The Consolidated Complaint was filed in December 2009; it is unclear whether the class representatives subsequently purchased further replacement adapters. Even if they have done so, it may not be enough; there may be a need for distinct and independent representation from a late-entering class member. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("[I]t is obvious after Amchem that a class divided between holders of present and future claims (some of the latter involving no physical injury and to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel."); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251–52 (2d. Cir. 2011).

In short, the parties have provided no justification for the way that the settlement prejudices two distinct categories of class members: those who entered the class in 2010 or 2011[11] and those who chose not to replace their broken adapters.[12] These individuals have

---

[11] This unfairness could be remedied by stipulating that all class members (regardless of the date they entered the class) are entitled to a three-year warranty, even if that warranty extends beyond December 31, 2012.

[12] This unfairness could be remedied by permitting class members to submit alternate forms of proof that their power adapter experienced a genuine malfunction. For example, the parties could permit the customary practice of accepting a sworn affidavit as proof of defect. Alternatively, they could accept as proof of defect that the class member purchased another computer in the relevant time period. And if the parties demanded stronger assurances of legitimacy, permitting class members to submit hard evidence of the defect is not unprecedented.  The virtue of each of these remedies is that they do not arbitrarily reward those class members who continued to buy Apple products. In contrast, the method of the settlement unduly favors repeat customers; it therefore can be understood as a "retrospective" coupon settlement.

claims just as strong as their fellow class members who will be compensated respectively with what amount to at least three-year warranties[13] and with cash payments. The settlement's inequitable terms have revealed this latent inadequacy of representation, and it must be rectified before this settlement can be approved.[14]

## VI.   THE COURT SHOULD APPLY THE *ALI PRINCIPLES* IN DETERMINING THE FAIRNESS OF THIS SETTLEMENT

Standards for reviewing settlements differ from circuit to circuit: the "current case law on the criteria for evaluating settlements is in disarray." *ALI Principles* § 3.05, cmt. a at 205. The Ninth Circuit has asked courts to follow an eight-factor test. *E.g.*, *Churchill Village v. General Elec.*, 361 F.3d 566, 575–76 (9th Cir. 2004). But the Ninth Circuit has also reversed settlement approvals without reference to the eight-factor test. *Molski*, 318 F.3d 937 (reversing settlement approval without reference to eight-factor test).

Some of the *Churchill Village* factors are not helpful in evaluating a settlement, not least because the cases give no guidance to how to weigh the various factors. One possible method of resolving this concern and rationalizing the law would be for courts to follow § 3.05 of the American Law Institute's *Principles of the Law of Aggregate Litigation*. The ALI *Principles* provide more than an indeterminate balancing test of multiple factors; rather, they suggest that courts should examine settlements to see if they pass several specific tests of fairness. Under § 3.05(a), there is an initial four-part test that all settlements must meet: the court must consider whether

(1) the class representatives and class counsel have been and currently are adequately representing the class;

(2) the relief offered to the class… is fair and reasonable given the costs, risks, probability of success, and delays of trial and appeal;

---

[13] Class members who bought a subject computer in early 2006, for instance, have until May 21, 2012 to claim a replacement adapter; in effect, they have attained a six-year warranty.

[14] The "right of parties to opt out does not relieve the court of its duty to safeguard the interests of the class and to withhold approval from any settlement that creates conflicts among the class." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 809 (3d Cir. 1995).

(3) class members are treated equitably (relative to each other) based on their facts and

circumstances and are not disadvantaged by the settlement considered as a whole;

and

(4) the settlement was negotiated at arm's length and was not the product of collusion.

In addition to these four requirements, a "settlement may also be found to be unfair for any

other significant reason that may arise from the facts and circumstances of the particular case."

*Id.* § 3.05(b).

### A.   The ALI Principles Are Consistent With *Churchill Village*.

It is within this court's discretion to use the § 3.05 standards as a consistent complement

to the *Churchill Village* eight-factor test — which also asks courts to examine the risks of the case

and the reasonableness of the settlement fund in relation to those risks — and to *Molski v.

Gleich*, which supplied more general standards of fairness. Ninth Circuit precedent on the

question is compatible with the use of ALI's *Principles* § 3.05 in evaluating this settlement;

furthermore, appropriate use of the *Principles* could rationalize the somewhat untethered

*Churchill Village* factors, thus solving the problem of a multi-factor test that provides little

guidance in distinguishing good settlements from bad ones. (*Cf.* the discussion of judicial fee-

setting in *Nilsen v. York County,* 400 F.Supp.2d 266, 277 (D. Me. 2005) (a multi-factor approach

"offers little predictability" to lawyers and judges. and its "highly subjective approach" "allows

uncabined discretion").) That said, this settlement demands even more heightened scrutiny

than the typical settlement requires because of its "clear sailing" clause.

### B.   Public Policy Reasons Mean That the Court Should Not Infer Settlement
### Approval From a Low Number of Objectors, Especially Because the Parties
### Have Artificially Reduced the Number of Objections.

Any given class action settlement, no matter how much it betrays the interests of the

class, will produce only a small percentage of objectors. The predominating response will

always be apathy, because objectors—unless they can obtain *pro bono* counsel—must expend

significant resources on an enterprise that will create little direct benefit for themselves.

Another common response from non-lawyers will be the affirmative avoidance, whenever

possible, of anything involving a courtroom. Class counsel may argue that this understandable tendency to ignore notices or free-ride on the work of other objectors is best understood as acquiescence in or evidence of support for the settlement. This is wrong. Silence is simply *not* consent. *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001) (*citing In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 789.). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007).

Without *pro bono* counsel to look out for the interests of the class, filing an objection is economically irrational for any individual. "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 812 (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir. 1981)); *cf. Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995) ("'[T]he silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the proposed settlement . . . . '"). "[A] low number of objectors is almost guaranteed by an opt-out regime, especially one in which the putative class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439, 446 (W.D. Pa. 2007). "[W]here notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a *fait accompli*." *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 680–681 (7th Cir. 1987). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement).

When class members have little at stake, the rate of response will be predictably low. As such, the response from class members cannot be seen as something akin to an election or a public opinion poll. *See In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 813 (finding that "class reaction factor" does not weigh in favor of approval, even when low number of objectors in large class, when "those who did object did so quite vociferously"); Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529, 1532 (2004). It is typically not worth the average citizen's time or money to object: the slight likelihood that one additional objection will be decisive, when multiplied by the slight increase in an individual class member's payout that such an objection would produce, makes individually-funded objections a losing proposition.

The Court must act as a guardian for *all* class members—whether or not they have formally entered the case by registering an objection. "[T]he absence or silence of class parties does not relieve the judge of his duty and, in fact, adds to his responsibility." *Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373, 375 (D. Kan. 1971). The Court should draw no inference in favor of the settlement from the number of objections, especially given the vociferousness of the objectors. *In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 812–13; *ALI Principles* § 3.05, *comment a* at 206.

Silence of absent class members will be all the more pronounced in cases like the one at hand, in which the settling parties have artificially reduced the number of objections in various ways. First, the notice misleads class members into thinking that the adapter replacement program is a settlement benefit, by categorizing the replacement adapter under the heading "What does the settlement provide?" Notice para. 9. Because misleading notice is not informative, such notice is also inadequate. *Molski v. Gleich,* 318 F.3d at 952; *Lightfoot v. District of Columbia*, 355 F. Supp. 2d 414, 427 (D.D.C. 2005) ("Inaccurate notice is equivalent to no notice at all"). By making a non-settlement benefit appear to be a product of the settlement, the notice wrongly inflates the value of the settlement and wrongly discourages would-be objections.

Second, the settlement website fails to provide basic information about the case, even omitting the settlement agreement as well as many other important court documents (e.g., the

Court's preliminary approval order, the motion for preliminary approval, and the amended complaint). Instead, the notice contemplates that class members, who are widely dispersed around the country, will travel to the courthouse in San Francisco to examine the settlement agreement and other pleadings. This is unacceptable, given the inexpensive alternative of scanning the documents and uploading them to the website, an alternative that is nearly universally employed in settlements today. *See, e.g., The NVIDIA GPU Litigation, supra*; *Kurihara v. Best Buy Co., Inc., supra*; *Over the Rainbow Adult Family Care Home v. Verizon Northwest Inc., supra* (all administered by Kurtzman Carson Consultants LLC). *Cf. also* N.D. Cal. LR 23-2 (requiring Internet posting of filings in PSLRA cases). The website's failure to provide basic settlement information to class members provides an additional reason to discount any notion that silence equals consent.

Third, even if class members manage to inform themselves, the process of objection and opting out is unnecessarily burdensome. The requirement that objectors print and mail multiple copies of their objection is both expensive and outdated in 2011. Other courts permit the relatively efficient (indeed, close to costless) method of transmitting objections by email; *see In re Motor Fuel Temperature Sales Practices Litig.*, No 2:07-md-01840-KHV-JPO, Order (Dkt. No. 3019), at 2 (D. Kan. Nov. 10, 2011) ("If Costco plans to proceed with email notification, it must allow class members to opt out of the class and object to the settlement electronically"); Class Notice, *In re Classmates.com Consolidated Litig.*, No. 09-cv-0045-RAJ (W.D. Wash 2011), *available at* http://www.cmemailsettlement.com/docs/notice.pdf. Notably, the settlement administrator provides an email contact form on its own website for its own customers; for some reason, the settlement administrator never made this method of communication available to class members.

Furthermore, the settlement requires objectors who have objected on more than three occasions to list all the cases in which they have filed an objection. SA § IV.F; Notice, para. 20. In a now-vacated federal district court opinion, the judge once noted that the plaintiff before him had participated in multiple class action lawsuits; according to the judge, this indicated that the plaintiff was "merely seeking the 'quick buck'" and was "not truly interested in

1  vindicating any of the rights of the proposed class members." *Murray v. GMAC Mortgage Corp.*,

2  434 F.3d 948, 954 (7th Cir. 2006). But this judgment was vacated: as the appellate court noted,

3  "The district judge did not cite a single decision supporting the proposition that someone

4  whose rights have been violated by 50 different persons may sue only a subset of the

5  offenders." *Id.*

6      If the settlement agreement required the disclosure of past judicial sanctions (for, e.g.,

7  vexatious litigation or other abuse of the legal process), requiring such disclosure could be

8  reasonable. But simply requiring objectors to list all the circumstances in which they have been

9  so victimized by flawed settlements that they have chosen to pursue legal remedies seems to

10  serve no legitimate purpose. Rather, this requirement seems unduly burdensome and

11  impermissibly designed to deter legitimate objections.

12      Of course, the settling parties are free to compile their own research dossiers on

13  objectors who have demonstrated the temerity to object to other settlements in the past. Such

14  information is a matter of public record. If the settling parties' curiosity about objectors must be

15  indulged, this avenue is superior, at least in part because the settling parties are the entities

16  who should bear the cost of discovering this essentially irrelevant information.

17      Put together, these hurdles can and should be viewed by the Court as a systematic effort

18  to impede class members' Fed. R. Civ. P. 23(e)(5) right to object to the settlement. If they do not

19  constitute an independent reason to reject the settlement in this case, at the very least they

20  provide an added reason to discredit any argument that the lack of objectors in any way signals

21  the class' approval of the settlement.

22  **VII.   THIS OBJECTION IS BROUGHT IN GOOD FAITH**

23      Gryphon's counsel are representing her *pro bono*. It is perhaps relevant to distinguish

24  this objection from the agenda of those who are often styled "professional objectors." It is

25  understood that "professional objectors" are for-profit attorneys who attempt or threaten to

26  disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees;

27  thus, some courts presume that the objector's legal arguments are not made in good faith.

28  Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U.

CHI. LEGAL F. 403, 437 n. 150 (2003) . This is not the business model of Gryphon's counsel. *See* Paul Karlsgodt & Raj Chohan, "Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval," BUREAU OF NAT. AFFAIRS: CLASS ACTION LITIG. REPORT (Aug. 12, 2011) (distinguishing Gryphon's counsel from professional objectors). While Gryphon's counsel have brought several objections to unfair class action settlements, they refuse to engage in *quid pro quo* settlements and does not extort attorneys; they have never withdrawn an objection in exchange for payment, and have won millions of dollars for class members since its founding in 2009. *See, e.g.*, Ashby Jones, "A Litigator Fights Class-Action Suits," WALL ST. J. (Oct. 31, 2011); Rachel M. Zahorsky, "Unsettling Advocate," ABA J. (Apr. 2010); Allison Frankel, "Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal," AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010).

Nonetheless, it is the experience of Gryphon's counsel, based on the conduct of class counsel in other cases, that some attorneys will falsely and unjustifiably accuse Gryphon's counsel of seeking to extort class counsel. If this Court has any doubt whether Gryphon's objection is brought in good faith, Gryphon and her counsel are willing to stipulate to an injunction prohibiting them from accepting a cash payment in exchange for the settlement of this objection.

## CONCLUSION

This settlement is potentially unfair if the attorneys' fees are disproportionate to the class relief. But the settling parties have asked this court for action on the fee award before the benefits to the class can be determined, which gives the class insufficient notice. The settling parties have created burdensome and inefficient procedures, which inevitably reduce participation in the settlement. The settling parties have included a clear sailing agreement and a reversionary kicker, which benefit class counsel and defendant but unfairly prejudice the class's interests. The settling parties have created a settlement that benefits the class representatives and other early purchasers as well as those who continued to do business with Apple after they experienced the defect, which is unfair to (and at the expense of) recent purchasers and those who withheld further patronage. For these reasons, this Court should

reject this settlement as it currently stands, or at least defer ruling until the number of claims is known. Any ruling on the fee request should be continued until class counsel submits an accurate number, rather than an estimate, of claims; any fee award should be proportionate to the amount the class has actually received.

Dated: January 5, 2012

Respectfully submitted,

/s/ *Theodore H. Frank*
Theodore H. Frank (SBN 196332)
**CENTER FOR CLASS ACTION FAIRNESS LLC**
1718 M Street NW
No. 236
Washington, DC 20036
Tedfrank@gmail.com
(703) 203-3848

/s/ *Daniel Greenberg*
Daniel Greenberg (AR BAR 2007-193)
**GREENBERG LEGAL SERVICES**
55 Fontenay Circle
Little Rock, AR 72223
Dngrnbrg@gmail.com
(501) 588-4245
(*pro hac vice* status pending)

/s/ *Kyle F. Graham*
Kyle F. Graham (SBN 218560)
1009 Portola Road
Portola Valley, CA 94028
Kylefgraham@hotmail.com
(650) 530-2330

Attorneys for
Objector Marie Gryphon

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I filed the foregoing with the Clerk of the Court, and served true and correct copies upon class counsel and defendants' counsel via Federal Express at the addresses below, per the instructions of the Settlement Notice.

Clerk of the Court
United States District Court
for the Northern District of California
San Francisco Division
450 Golden Gate Avenue
San Francisco, CA 94102

Helen I. Zeldes
Zeldes & Haeggquist, LLP
625 Broadway, Suite 906
San Diego, CA 92101

Penelope A. Preovolos
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482

DATED this 5th day of January, 2012.

_(s) Theodore H. Frank_
Theodore H. Frank