ZELDES HAEGGQUIST & ECK, LLP
HELEN I. ZELDES (220051)
AARON M. OLSEN (259923)
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878
helenz@zhlaw.com
aarono@zhlaw.com

STEVEN A. SKALET (admitted *pro hac vice*)
CRAIG L. BRISKIN (admitted *pro hac vice*)
MEHRI & SKALET, PLLC
1250 Connecticut Avenue., NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
sskalet@findjustice.com
cbriskin@findjustice.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE MAGSAFE APPLE POWER ADAPTER LITIGATION | Case No.:   5:09-CV-01911-EJD |
| | **DECLARATION OF CRAIG L. BRISKIN IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND FEES AND COSTS** |
| | Date:      November 6, 2014 |
| | Time:      9:00 a.m. |
| | Judge:      Honorable Edward J. Davila |
| | Courtroom:  4, 5th Floor |

ZELDES HAEGGQUIST & ECK, LLP

1    I, Craig L. Briskin, declare as follows:

2        1.    I am an attorney duly licensed to practice before all courts of the States of New

3    York, Massachusetts and the District of Columbia, and I am admitted to this Court *pro hac*

4    *vice*.  I am a partner with the law firm of Mehri & Skalet, PLLC, one of Plaintiffs' counsel in

5    the above-captioned matter (the "Litigation") and have been appointed Class Counsel in this

6    matter (Dkt. No. 82).

7        2.    I have personal knowledge of the matters set forth in this declaration, and those

8    specified to be on information or belief I believe to be true based upon my role in this case,

9    and if called as a witness, I could and would testify competently thereto.

10       3.    I submit this declaration in support of Plaintiffs' Renewed Motion for Final

11   Approval of Class Action Settlement and Fees and Costs.  All capitalized terms not defined

12   herein have the same meaning as set forth in the Stipulation of Settlement ("Agreement") filed

13   with this Court on August 8, 2011 (Dkt. No. 70-1), and attached hereto as **Exhibit 1**.[1]  The

14   Agreement, attached as Exhibit 1, includes the class notice materials as Exhibits A-F to the

15   Agreement.  Exhibits A-F, respectively, are:

16       Exhibit A: Notice of Pendency and Proposed Settlement of Class Action;

17       Exhibit B: Summary Notice of Settlement;

18       Exhibit C: Postcard Notice of Settlement;

19       Exhibit D: Claim Form;

20       Exhibit E: [Proposed] Order Granting Conditional Certification of a Settlement

21       Class, Approval of Forms and Methods of Notice, and Preliminary Approval of

22       Settlement Agreement and Release; and

23       Exhibit F: [Proposed] Final Judgment and Order Approving Settlement and

24       Dismissing Claims of Settlement Class Members with Prejudice.

25

26

27   [1]    Note, my office has redacted the ECF electronic file stamp located at the top of the
28   Exhibits that were previously filed with the court so that the ECF file stamp for the current filing does not re-stamp over the old stamp making it illegible.

MEHRI & SKALET, PLLC

4.     This declaration sets forth the nature of the claims asserted, the principal proceedings to date, the legal services provided by Plaintiffs' Counsel, the settlement negotiations, why the settlement is fair, reasonable, and adequate, and why the fees and expenses set forth in the Agreement are reasonable and should be approved by the Court.

## I.     HISTORY OF THE LITIGATION LEADING UP TO SETTLEMENT

### A.     The Consolidated Actions and Appointment as Lead Counsel

5.     In 2009, my firm, along with the San Diego law firm of Zeldes Haeggquist & Eck, LLP and the Los Angeles based law firms of Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor, McNicholas & McNicholas, and Jacobson, Russell, Saltz & Fingerman, (collectively, "Plaintiffs' Counsel") were retained by consumers who had purchased Apple, Inc. ("Apple") MacBook or MacBook Pro computers that shipped with a 60W or 85W MagSafe MPM-1 ("T") Power Adapter ("Subject Computers") and purchasers of a standalone T Power Adapter ("Adapter").  These consumers' Adapters spark, fray, overheat, catch on fire and/or otherwise prematurely failed (the "Defect").

6.     Plaintiffs' Counsel worked carefully and extensively to investigate and evaluate the significance and consequences of the complained of Defect, by, among other things, locating and interviewing numerous potential witnesses, reviewing hundreds of online complaints, analyzing the Subject Computers and Adapters, and analyzing Apple's business practices throughout the relevant time period.

7.     My law firm and the law firm of Zeldes Haeggquist & Eck began working with Class Representatives Naotaka Kitigawa Jr. (from California), Timothy Broad (from Ohio) and Jesse Reisman (from Maryland) (collectively, the "Kitigawa Plaintiffs").  In addition, the Los Angeles based law firms mentioned above began working with Class Representatives Tracey Hackwith (from California), Michael Martin (from Wisconsin), and Maxx Scholten (from Texas) (collectively, the "Hackwith Plaintiffs").

MEHRI & SKALET, PLLC

8.      After conducting a thorough investigation, Plaintiffs' Counsel carefully evaluated potential theories of liability and various potential jurisdictions in which the Class Representatives' respective claims arose.

9.      On May 1, 2009, the Kitigawa Plaintiffs filed their action in the Northern District of California, titled *Kitigawa, et al. v. Apple Computer, Inc.,* Case No. 09-01911 (the "*Kitigawa* Action").  (Dkt. No. 1.)  Unbeknownst to the Kitigawa Plaintiffs, on May 15, 2009, the Hackwith Plaintiffs filed their action in the Central District of California, titled *Hackwith, et al. v. Apple Computer, Inc.,* Case No. 09-03482 (the "*Hackwith* Action").

10.      Each group of Plaintiffs' Counsel met separately with counsel for Apple for their FRCP Rule 26 conference and in preparing their respective early disclosures.

11.      After the Kitigawa Plaintiffs were notified of the *Hackwith* Action, the Parties agreed to coordinate their efforts, maximize resources, and minimize duplication of effort.  On September 4, 2009, Apple moved to have the two cases related (Dkt. No. 18) and this Court ordered the cases so related on September 24, 2009 (Dkt. No. 24).  On October 19, 2009, the Kitigawa and Hackwith Plaintiffs jointly moved to consolidate their cases, and, to facilitate the orderly and efficient prosecution of this matter, appoint Zeldes Haeggquist & Eck, LLP and Mehri & Skalet, PLLC as Interim Co-Lead Counsel.  (Dkt Nos. 38-41.)  The Court granted both motions on November 16, 2009.  (Dkt. No. 43.)

12.      On January 19, 2010, Plaintiffs' filed a consolidated amended class action complaint.  (Dkt. No. 44.)  Apple answered the consolidated amended complaint on February 5, 2010 (Dkt. No. 51), which was followed by extensive discovery.

**B.      Plaintiffs' Engaged in Extensive Discovery**

13.      Plaintiffs served Requests for Production of Documents, multiple sets of Interrogatories, Requests for Admission, a FRCP Rule 30(b)(6) deposition notice on multiple topics, and notices of depositions of key fact witnesses.

14.      Plaintiffs' document requests led to extensive negotiations with Apple's counsel regarding the appropriate scope of production and the disclosure of confidential

MEHRI & SKALET, PLLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

internal financial, proprietary, and private information for which special protection from public disclosure was necessary, requiring the Parties to, among other things, negotiate the terms of a protective order.  The Parties eventually came to an agreement on the terms of the protective order, which was entered by this Court on February 12, 2010.  (Dkt. No. 55.)

15.    In addition to reviewing voluminous documents obtained from Plaintiffs' Counsel's own internal investigations, Plaintiffs' Counsel received, reviewed and analyzed tens of thousands of documents produced by Apple, reviewing in total over 80,000 pages of documents that included design schematics, drawings, testing and specification reports, internal memorandums, repair and replacement data, sales data, failure rates, complaints, and customer reviews regarding the Adapters.  A large percentage of the documents contained technically complex information relating to the internal composition of the Adapters and testing related thereto, which Plaintiffs' Counsel carefully and diligently analyzed.

16.    The Parties also engaged in extensive informal discovery, with Plaintiffs' Counsel serving informal interrogatories and conferring multiple times regarding the facts and evidence in this case.  In particular, after this case was filed, Apple placed into the market a redesigned adapter known as the "L" or "toothbrush" style adapter, of which spawned a second round of written discovery and extensive negotiations regarding the scope of the same.

17.    Through discovery, Plaintiffs' Counsel learned that there are around 10 million subject Adapters in the marketplace.  Given this number, the pervasive risk of ongoing damage to the Class, and the technically complex nature of Plaintiffs' claims, Plaintiffs' Counsel necessarily devoted hundreds of hours of detailed and intricate engineering review, research and investigation.

18.    My firm endeavored throughout the Litigation to delegate and coordinate the efforts of Plaintiffs' Counsel so as to maximize the impact of their collective resources, while minimizing duplication of efforts and streamlining the prosecution of the case.  Interim Co-Lead Counsel carefully supervised and managed the efforts of the other Plaintiffs' Counsel, consulted with all counsel concerning litigation strategies and positions, assigned tasks to

MEHRI & SKALET, PLLC

various Plaintiffs' Counsel and kept Plaintiffs and Plaintiffs' Counsel abreast of all developments in the Litigation.  Plaintiffs' Counsel utilized a coding system to review thousands of documents relevant to this Litigation, creating an efficient and comprehensive document review.

19.     Given the technically complex issues involved, Plaintiffs retained two separate engineering experts to investigate, test and analyze the design of the subject Adapters to prove the extent, nature and source of the Defect. Neither expert knew nor spoke to the other, yet the two experts came up with substantially similar analyses of the Defect and its cause. Both experts prepared detailed reports for Plaintiffs and helped prepare Plaintiffs to counter the analysis and arguments of Apple's expert.

20.     All the while, Plaintiffs' Counsel continued to locate and interview potential witnesses, monitor online complaints, and consult with the mechanical and electrical engineering experts.  These investigative efforts were indispensable to helping Plaintiffs' Counsel to target discovery early on in the litigation, allowing them to achieve efficiencies and timely obtain impactful information.

## II.     SETTLEMENT NEGOTIATIONS

21.     Plaintiffs' Counsel's expertise, time, effort and analysis laid the foundation for opening settlement negotiations with Apple, a process that was hard-fought.  After preparing detailed mediation statements, supported by extensive experts' reports, on August 31, 2010, the Parties participated in their first full-day mediation session with the Honorable Fern M. Smith (Ret.), a former federal judge of this Court and well-respected mediator. The first mediation session lasted over nine hours, with the Parties arguing late into the evening.  The Parties debated the merits of the case and exchanged offers and counter-offers.  While the initial mediation did not result in a settlement, the framework for the ultimate settlement emerged.  Specifically, the parties ended the day with an agreement in principle setting forth the two main prongs of the Agreement: a cash refund and the replacement program. The

MEHRI & SKALET, PLLC

Parties agreed to continue to discuss settlement, and the dialogue continued with Judge Smith's assistance.

22.    The Parties continued their efforts to resolve the matter after mediation, but after several months of discussion, came to an impasse.  During settlement negotiations, Plaintiffs' Counsel made it clear that while we were prepared to fairly assess the strengths and weaknesses of Plaintiffs' case, we would continue to litigate, and in fact did so, rather than settle for less than fair value.  The Parties continued to litigate and meet and confer about discovery.

23.    The Parties continued to conduct discovery, and also agreed to a second mediation session before Judge Smith, held on November 11, 2010.  Although the Parties began the process very far apart in their views on the case, Judge Smith assisted the Parties in bridging the gap.  When discussions hit another impasse, Judge Smith made a mediator's proposal, which formed the basis of the Parties' Agreement.  Attached hereto as **Exhibit 2** is a true and correct copy of the Declaration of Judge Smith regarding the Parties' settlement negotiations and a copy of Judge Smith's bio provided at the time of final approval in January 2012.  The Parties continued to negotiate the details of settlement for an additional month before finally agreeing to a term sheet on December 13, 2010.

24.    The Parties continued to vigorously debate the details of the term sheet, including the specifics of the cash refund, replacement program and all other aspects of the notice program, and finalized the details and signed the Agreement on July 1, 2011.

25.    The Agreement was the result of extensive arm's-length negotiations by sophisticated counsel based on an advanced understanding of the strengths and weaknesses of the case, including the risks for both sides and the nature and result obtained for the Class.  Importantly, at all times during the settlement discussions, the Parties refrained from discussing attorneys' fees or expenses until after they had finalized all material terms of the relief to the settlement Class. Plaintiffs' Counsel not only waited until they had secured benefits for the Class before discussing attorneys' fees with Apple, but they also used the same

MEHRI & SKALET, PLLC

mediated negotiation process with Judge Smith for settlement of attorneys' fees that led to the agreement on the substantive terms of the Agreement.

**III.    SETTLEMENT BENEFITS**

26.    As detailed in the Class Notice approved by the Court and the Settlement Agreement, the principal settlement terms are set forth below.

27.    The proposed settlement states that Apple shall provide to Settlement Class Members whose Adapter showed signs of Strain Relief Damage a ***cash*** refund of:

- **$79** for those who provide proof of purchase of a Replacement Adapter during the <u>first</u> year following purchase of the Subject Computer or Adapter;

- **$50** for those who provide proof of purchase of a Replacement Adapter during the <u>second</u> year; and

- **$35** for those who provide proof of purchase of a Replacement Adapter during the <u>third</u> year.

28.    The Settlement Class Members could claim refunds for up to three Replacement Adapters per Subject Computer upon showing proof of purchase.  In order to receive a cash refund, Class Members were required to submit a valid and timely Claim Form. Settlement Class Members had one-hundred and twenty (120) days from the Notice Date to submit a Claim Form.

29.    The proposed Settlement also provides that Apple will provide in-warranty and out-of-warranty replacements for Adapters that show signs of Strain Relief Damage for up to three years after the last sale of a MPM-1 MagSafe adapter and three times longer than the express one-year warranty that covered the original Adapter that came with the Subject Computers.  Any replacement Adapter was only covered by a 90-day warranty.  Pursuant to the original Agreement, under the replacement program, Settlement Class Members had until the later of 3 years from the date of purchase or May 21, 2012, to claim a free adapter.  This time-frame was structured to provide a 6-month grace period until May 21, 2012, to earlier purchasers whose three year period would have otherwise expired before the notice provided

MEHRI & SKALET, PLLC

under the settlement.  However, pursuant to information that subsequently came to light, namely, that there were some Apple sales of the adapter at issue until June 2010, the parties agreed to extend the replacement program until at least three years following the last sale of a subject computer or adapter, or until at least July 2013.  *See* Declaration of Allan Coulson in Support of Final Settlement Approval (Jan. 27, 2012) ("Coulson Decl.), ¶ 5 (Dkt. No. 98-13).

30.     Apple will pay all of the costs of notice and all costs associated with administering the settlement.  Because these costs are being paid directly by Apple, they do not reduce or affect the Class recovery.

31.     Apple agreed not to oppose an award to Class Counsel of attorneys' fees in the amount of $3 million; a service award of $5,000 to each Class Representative, subject to Court approval; and verified costs and expenses incurred in the prosecution of litigation up to $100,000, all of which is to be paid by Apple, not class members (the "Fees Amount").  The Fees Amount is separate from and does not in any way diminish the Class recovery.

## IV.     PRELIMINARY APPROVAL OF THE SETTLEMENT AND CLASS NOTICE

32.     After finalizing the settlement details, Plaintiffs submitted a motion for preliminary approval. (Dkt. No. 70.)  Judge Ware then entered an order requesting clarification of certain deadlines.  (Dkt. No. 72.) The parties complied by submitting a revised proposed order.  (Dkt. No. 73)  Judge Ware then held a preliminary approval hearing, wherein he inquired at length about the notice program.   Attached hereto as **Exhibit 3** is a true and correct copy of the September 12, 2011 Preliminary Approval Transcript of Proceedings.  Judge Ware ordered certain revisions to the notice and claim form, particularly concerning the proof of purchase requirement to obtain settlement relief. Apple maintained that "actual proof of purchase is essential both to prevent fraudulent claims and to accurately determine the amount to which each claimant is entitled."  (Dkt. Nos. 77, 78.)  Plaintiffs asserted that additional mechanisms should be added to give class members the opportunity to obtain duplicate receipts from Apple. (Dkt. No. 79.)  Judge Ware ordered Apple to provide a copy of a receipt to any class member who requested one. (Dkt. Nos. 80, 81.)   After amending the notice

MEHRI & SKALET, PLLC

MEHRI & SKALET, PLLC

program, and following the hearing, on September 27, 2011 the Court granted preliminary approval of the Settlement pursuant to Fed. R. Civ. P. 23(b)(3), and provisionally certified a national settlement class, which the parties estimate consists of about 9.6 million members. (See Dkt. No. 82.)   The Court also approved the parties' proposed Notice to the Settlement Class, appointed Kurtzman Carson Consultants to supervise and administer the notice plans, and approved Zeldes & Haeggquist, LLP and Mehri & Skalet, PLLC as Class Counsel.  (*Id.*). Attached hereto are true and correct copies of the District Court's orders regarding revisions to the notice program:

> **Exhibit 4**: Order Requesting Revised Proposed Order (Dkt. No. 72);

> **Exhibit 5**: Order Re Revised Proposed Order (Dkt. No. 74);

> **Exhibit 6:** Order Request Revised Proposed Orders (Dkt. No. 77);

> **Exhibit 7**: Apple's Motion for Reconsideration re Court's Order Requesting Revised Proposed Orders (Dkt. No. 78);

> **Exhibit 8**: Plaintiffs' Response to Apple's Motion for Reconsideration re Court's Order Requesting Revised Proposed Orders (Dkt. No. 79);

> **Exhibit 9**: Order Granting Apple's Motion for Reconsideration (Dkt. No. 80); and

> **Exhibit 10**: Pursuant to the revised orders, Order Granting Conditional Certification (Dkt. No. 82).

33.   The Preliminary Approval Order set a schedule for publishing the Notice in USA Today, Wired, and Macworld and mailing and emailing the Notice directly to members of the Settlement Class. The claims administrator sent notice to approximately 7,441,930 settlement class members. Notice also included publication in *USA Today*, *Macworld*, and *Wired* magazine. In addition, the claims administrator established a website (www.adaptersettlement.com) where the class notice and the claims form was available for download. One could also call a toll-free telephone number to receive the class notice and claims package, at Apple's expense.  Apple mailed the CAFA notice package to state and

1    federal officials on September 9, 2011.

2    34.    The Notice informed consumers of the terms of the Settlement, and further that

3    written objections to the proposed Settlement and/or Plaintiffs' Counsel's fees and expenses

4    must be filed with the Court and sent to the parties' counsel, so that counsel received the

5    objections no later than January 6, 2012.   On February 24, 2012, the parties caused

6    supplemental notice to be sent to 230,298 settlement class members who purchased a subject

7    Adapter in 2010, informing them that the end date of the extended warranty program had been

8    extended to July 31, 2013.   The purpose of extending the warranty program to July 31, 2013

9    (versus the previous end date of December 31, 2012) was to ensure that all class members,

10   including those who purchased subject Adapters in 2010, received a minimum of three years in

11   which to replace their Adapter if it failed.

## V.    FINAL APPROVAL OF SETTLEMENT AND FEES AND COSTS, APPEAL, AND REMAND

### A.    Final Approval Hearing

35.    On December 19, 2011, Plaintiffs filed a motion for attorneys' fees under a

lodestar approach, reimbursement of expenses and incentive awards. (Dkt. No. 83). Out of a

class of 9.6 million, only 11 individuals filed objections before the deadline (six of which were

filed by or at the behest of serial and/or professional -- just 0.0001% of the potential class.

36.    On February 27, 2012, the District Court held a hearing on Plaintiffs' motion

for final approval of the class settlement and Plaintiffs' motion for attorneys' fees,

reimbursement of expenses, and incentive awards. (Dkt. No. 104.) At the hearing, Plaintiffs

addressed, as they did in their papers to the court, the significant value of the settlement,

including a full cash refund for adapters that failed within one year, and reduced amounts for

those that failed after one year but within three years, a comprehensive notice program

informing consumers of cash relief and binding Apple to provide free replacements for failed

Adapters through at least July 2013 subject Adapters in 2010, received a minimum of three

years in which to replace their Adapter if it failed.  (Dkt. No. 104). Attached hereto as **Exhibit 11** is a true and correct copy of the February 27, 2012 hearing transcript.

MEHRI & SKALET, PLLC

37.     Newhouse, through her counsel, was the only objector to appear at the hearing, and only argued regarding the award of attorneys' fees. At the hearing Newhouse, through her attorney Daniel Greenberg, focused on "Bluetooth and the relevance of Bluetooth to this settlement" because Bluetooth was admittedly "extensively" addressed by objectors, Plaintiffs and Apple. Bluetooth was argued before the court. Plaintiffs presented declarations setting forth each attorney's hours and lodestar in the matter and costs expended. Judge Ware considered Plaintiffs' arguments, Apple's arguments and the objectors' arguments, and overruled the objections.

38.     On March 8, 2012, the District Court issued an order approving the class settlement and awarding Plaintiffs attorneys' fees, reimbursement of expenses, and incentive awards ("Final Order").  (Dkt. No. 107).

39.     On April 2, 2012, the District Court entered a separate Judgment pursuant to Federal Rule of Civil Procedure 58 ("Judgment").  Dkt. No. 110.  On April 3 and April 6, 2012, Gaudet and Newhouse filed notices of appeal from the District Court's Final Order.

**B.     Bond Motion**

40.     To secure Plaintiffs' costs on appeal, pursuant to Plaintiffs' motions (Dkt Nos. 127, 132), Judge Ware entered an order requiring Newhouse and Gaudet to post FRAP 7 bonds of $15,000 each. (the "May 29 Order").  (Dkt. No. 161).  Judge Ware further ordered the objectors to appear for depositions to establish their membership in the class, and to establish whether they were capable of posting a bond up to the amount of $25,000.  *Id.*

41.     Gaudet failed to appear for deposition, which was noticed for June 14, 2012 in El Paso, Texas – the city and state Gaudet alleges is his "permanent residence."  He also failed to post a bond of any amount.  He moved the 9th Circuit (not the District Court) to stay the May 29 Order, which the 9th Circuit denied. Judge Ware gave Gaudet another chance to post a FRAP 7 bond and warned him that failure to post a bond or dismiss his appeal could lead to a finding of contempt (the "July 6 Order"). (Dkt. Nos. 194, 195).   Again, Gaudet refused to post a bond in *any* amount.   Accordingly, on August 23, 2012, Judge Ware held Gaudet in

MEHRI & SKALET, PLLC

1    contempt of court for failing to comply with the May 29 Order, and sanctioned Gaudet by

2    striking his objection, stating that his objection "has no force or effect on the Final

3    Settlement."

4              **C.      Appeal**

5              42.     In an unpublished Memorandum Opinion dated April 24, 2014, the Court of

6    Appeals for the Ninth Circuit reversed the judgment of this Court, vacating its orders regarding

7    the settlement agreement and attorney fee award, and remanded the case for further

8    proceedings.

9    **VI.    FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT**

10             43.     The principal terms of the Settlement were fairly, honestly, and aggressively

11   negotiated by counsel for all parties over a period of about ten months while the case was

12   simultaneously actively litigated.

13             44.     As set forth above, the Settlement was reached after arms' length negotiations

14   between Plaintiffs' Counsel and counsel for Apple with the assistance of Judge Smith.

15   Throughout the negotiations, Apple consistently denied any liability, asserting that problems

16   with the Adapters were rare, and fraying was the result of abuse by customers.  At the same

17   time, Plaintiffs' Counsel advanced the Plaintiffs' position that the Adapter was defectively

18   designed, and were fully prepared to continue to litigate rather than accept a settlement that

19   was not in the best interests of the class.  All parties were represented by counsel with

20   extensive experience in consumer and class action litigation.

21             45.     While Plaintiffs' Counsel believes that Plaintiffs had a strong case as to class

22   certification, liability and damages, Plaintiffs' Counsel recognizes that the Court has yet to

23   reach those issues, and ultimate success on these issues is far from assured.

24             46.     This case entailed a number of complex issues on class certification, liability

25   and damages, including whether there was a design defect, whether class members were

26   similarly situated as to that defect, treatment of the warranty under law, and the amount of

27   damages.  Embedded within these questions are complicated technical issues.  Assuming

28

MEHRI & SKALET, PLLC

Plaintiffs survived Apple's motions for summary judgment, these complex legal, technical, and other issues posed a particular risk to Plaintiffs' hopes for success at trial. Plaintiffs could not be certain that there would be a factual determination in their favor, or that a hard-fought victory would not be overturned on appeal.

47.     In addition, this litigation would pose evidentiary problems that would become more challenging as time went on. Plaintiffs would have to rely in part on testimony from current and former Apple employees and agents, many of whom would be hostile witnesses, testifying about matters that occurred several years ago. As a result of the time between the events of interest and any deposition or trial, the ability, as well as the willingness, of many witnesses to testify completely about those events would be impaired. These issues would affect Plaintiffs' ability to successfully prosecute their claims.

48.     The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting opinions. The reaction to such complex expert testimony is highly unpredictable. Expert testimony about damages could rest on many subjective assumptions, which a court could reject as speculative and unreliable. Conceivably, there could be a finding that there were no damages, or that damages were only a fraction of the amount that Plaintiffs alleged.

49.     Although Plaintiffs' Counsel believes that they would be able to provide convincing expert testimony as to damages and establish substantial damages at trial, they also realize that in the "battle of experts," the view of Plaintiffs' expert might not prevail. Accordingly, the risk of proving damages could not be eliminated until after a successful trial and the exhaustion of all appeals. Had the settlement not been achieved, the parties would have continued to devote considerable resources to litigating these expert issues for many more months to come.

50.     Finally, any finding of monetary damages at trial could potentially result in a less than complete recovery by consumers. In contrast, the settlement here provides for cash payments to reimburse most, if not all, monies paid by consumers for Replacement Adapters

MEHRI & SKALET, PLLC

they purchased within the first three years following purchase of the Subject Computer or Adapter, and reflecting a reasonable argument that Adapters are product of limited life, and cannot reasonably be designed to last forever.  In addition, the parties have fashioned a comprehensive program to notify consumers of the Adapter Replacement Program.  This is a significant recovery for the Class.

51.     In view of the extensive investigation and settlement negotiations conducted during the Litigation, Plaintiffs' Counsel have been able to identify the issues that are critical to the outcome of this case.  Plaintiffs' Counsel thoroughly evaluated the strengths and weaknesses of Plaintiffs' claims, the evidence adduced to date, and considered the substantial risks, as well as the expense and length of time to prosecute the Litigation through trial and the inevitable subsequent appeals.  As a result, for all the reasons outlined herein, Plaintiffs' Counsel strongly believes that the Settlement represents an excellent result for the consumers.

## VII.    FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

### A.     Skill and Experience of Plaintiffs' Counsel

52.     Plaintiffs' Counsel are well-respected leaders in the fields of complex consumer class action litigation.  Plaintiffs' Counsel's skills in developing evidence, technical expertise, working with experts, and understanding the strengths and weaknesses of their respective cases were critical to the results achieved for the settlement Class.  Plaintiffs' Counsel was in a position to properly evaluate the risks and expenses of continued litigation, including the possibility that a class would not be certified, or liability not established.

### B.     The Nature, Complexity and Risks of the Litigation

53.     This Litigation was undertaken by Plaintiffs' Counsel on a wholly contingent basis.  From the outset, Plaintiffs' Counsel understood that we were embarking on an expensive and lengthy litigation with no guarantee of compensation for the enormous investment of time, money and effort the case would (and did) require.  The nature of our contingent practice involving complex class actions involves undertaking cases lasting several years, during which time the firm must not only pay regular overhead, but also advance the

MEHRI & SKALET, PLLC

1   substantial expense of the litigation. The financial burden on our firm in such cases is far

2   greater than on a firm that is paid on an ongoing basis. And there is never any guarantee of

3   success. Indeed, there are cases where Plaintiffs' Counsel in high-stakes contingent cases,

4   after the expenditure of thousands of hours, received no compensation.

5         54.     The specific risks involved in filing and prosecuting this case were significant. I

6   knew that obtaining a recovery would be far from easy. When Plaintiffs' Counsel analyzed the

7   risk of filing this lawsuit, it was known that legal and factual issues involving class

8   certification and damages would be complex and difficult, and would require a substantial

9   investment of time and money to review and extract critical data from Apple's records, as well

10  as analyze the same using expert consultants. In undertaking that responsibility, Plaintiffs'

11  Counsel were obligated to assure that sufficient resources of attorneys were dedicated to the

12  prosecution of the litigation and that funds were available to compensate staff and for the

13  considerable out-of-pocket costs a case such as this would entail. Moreover, in committing to

14  prosecute this case to the fullest, Plaintiffs' Counsel sacrificed work on other matters.

15        55.     Based on my investigation and many years of experience, I believed that Apple

16  would be a formidable defendant, and it was. Indeed, Apple has a proven track record of

17  vigorously defending consumer suits. From the inception of this case, and throughout the

18  negotiations, Apple adamantly denied any liability, and categorically rejected Plaintiffs'

19  allegations that the Adapter was defective, that Plaintiffs' could certify a class, or prevail on

20  their claims under the Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq.*, the

21  False Advertising Law, Cal. Bus. & Prof. Code §§17500, *et seq.*, or the Consumer Legal

22  Remedies Act, Cal. Civ. Code §§1750, *et seq.* To defend against Plaintiffs' claims, Apple

23  retained Morrison & Foerster LLP, a well-respected international law firm with attorneys at

24  offices worldwide, to represent it in this Litigation. This firm has a well-deserved reputation

25  for aggressively representing its clients, and did so in this Litigation.

26        56.     Although Plaintiffs and Plaintiffs' Counsel firmly believed that the claims

27  asserted against Apple have merit, in light of the risks Plaintiffs' faced, success was far from

28

MEHRI & SKALET, PLLC

guaranteed. Indeed, this Litigation involved a number of complex factual issues on the merits, including proving the extent, nature and source of the alleged Defect, which required detailed analysis of complex concepts relating to, *inter alia*, the Adapter's electrical capacity, the DC cable's inner conductor, insulation material, the Adapter's strain relief, the type of connection points used to transfer electricity within the Adapter, the testing conditions of the Adapter, the failure and replacement rate, the redesign of the Adapter, and the scope of the Class.

57.     This case also entailed a number of complex legal issues on the merits, including, *inter alia*: (a) proving Plaintiffs' warranty claims on a class-wide basis considering the involved elements such as satisfying the provisions of notice, an opportunity to cure, and reliance; (b) whether inclusion of an unsuitable part constitutes the "manifestation" of the defect under California law for purposes of warranty durational limits; and (c) satisfying Plaintiffs' burdens of certifying a Class under their remaining state law claims. Assuming Plaintiffs' successfully certified a nationwide class and survived Apple's inevitable motion for summary judgment, these complex legal, technical and other issues posed a particular risk to Plaintiffs' hopes for success at trial.

58.     Plaintiffs could not be certain that there would be a factual determination in their favor. Indeed, because Plaintiffs' claims are premised on problems with the design features of the Adapter, litigation through trial would entail extensive (and expensive) proof of Apple's procedures for design and manufacturing, quality and performance testing, product development, marketing and other relevant determinations. The evaluation and development of these complex factual issues would require substantial expert testimony. Yet, as discussed above, the acceptance of expert testimony by a jury is always far from certain, regardless of how distinguished the source. Settlement of this action avoids the risks and costs of competing experts that could result in a dispositive finding or ruling against Plaintiffs and the Class.

59.     Moreover, taking into account the likelihood of appeal, absent the settlement Agreement, this action likely would have continued for years. This case, however, called for

MEHRI & SKALET, PLLC

immediate relief because the Adapters allegedly spark, fray, overheat, and prematurely fail and consumers needed to be notified of the same.  Moreover, as the years continue to pass, Class members would continue to incur economic loss to replace and repair the Adapters, and the need for a replacement Adapter diminishes as the Adapters and Subject Computers are outdated and replaced with other products.

60.    Given all this, courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the consumer protection statutes and represent classes of the general public.  If this important public policy is to be carried out, the courts must award fees that will adequately compensate private plaintiffs' counsel, taking into account the risks undertaken with a clear view of the economics of a large contingent consumer class action.

61.    Since the inception of this case, Plaintiffs' Counsel have not been paid anything for their efforts in this Litigation.  Rather, in aggregate, Plaintiffs' Counsel have invested tens of thousands of dollars in expert consultant fees and other necessary expenses to obtain the settlement on behalf of the Class.

### C.    The Process for Determining the Attorneys' Fees Was Designed to Protect the Class and Ensure Fairness

62.    As discussed above, prior to entering into a settlement, Plaintiffs' Counsel became fully conversant with the strengths and weaknesses of this action through extensive pre- and post-filing investigation, including investigative interviews of several witnesses, consultation with experts and extensive document review, and fairly evaluated the risks associated with the continued litigation, as well as the fairness of its resolution at this time.

63.    As discussed above, the principal terms of the Agreement were fairly, honestly and aggressively negotiated by counsel for all Parties over an extended period of time while the case was simultaneously actively litigated. Fees were negotiated only after the merits agreement was concluded, and a well-respected mediator and former federal judge present at the negotiations provided assurance that the fee was not the result of collusion or sacrifice of the interest of the Class.  All Parties were represented by sophisticated counsel with extensive experience in consumer class action litigation.

MEHRI & SKALET, PLLC

64.     After hard-fought negotiations, Apple has agreed to pay Plaintiffs' requested attorneys' fees and expenses and requested service payments separate and apart from the relief provided to the Class.   Conversely, any reduction in the fee will not increase benefits to the Class, it will simply revert to Apple.

**D.      Total Value of the Settlement: the Results Obtained Are Exceptional**

65.     The Agreement provides an outstanding and truly exceptional recovery for the entire Class.  As set forth in detail below, adding all of the relief to the class together – the cash value, the replacement value, the notice value, the costs and fees paid for by Apple – the settlement is worth over $386 million in direct relief to the class.

**1.      Cash Payments to Settlement Class Members**

66.     Plaintiffs obtained not only full cash refunds for consumers whose adapters failed within the warranty period, but also substantial cash refunds for those who used their adapters for up to three years – well beyond the expiration of their warranty period. The Agreement provides that each Class member may submit claims for up to *three* Adapters under the first prong of the settlement, a value of up to $237 per member.  Agreement §II(D). Of the 9.6 million Class members, it has been verified that over 1.3 million have purchased replacement adapters from Apple directly.   Thus, the cash value of this prong alone is quite significant.

67.     Apple has confirmed the following number of valid claims were submitted:

| | |
|---|---|
| 3,839 at the $35 level = | $134,365 |
| 10,269 claims at the $50 level = | $513,450 |
| 1,898 claims at the $79 level = | 149,942 |
| **16,006 total claims =** | **$797,757** |

68.     In short, the class filed **16,006 valid claims**, for a total cash reimbursement of

MEHRI & SKALET, PLLC

**$797,757.**

## 2.      A Robust Adapter Replacement Program

69.      Pursuant to the settlement, Apple was required to disseminate court-ordered notice to the proposed class notifying them directly not only of the cash refunds available ***but also about a replacement program*** for all frayed and non-working adapters, ***legally binding*** Apple to provide the entire class with at least three years of replacement coverage; many class members received years more than that. Class members with such faulty Adapters are entitled to receive, at no cost, a ***redesigned*** replacement adapter.  Apple redesigned the MagSafe power adapter ***after*** the institution of this lawsuit.  Thus, consumers who received a replacement under the replacement program did not receive the same product that failed, but a redesigned product.

70.      Apple has maintained that it had a program of providing replacement Adapters. However, class members were unaware of this program, which they could only learn about if they knew to search for a particular page deeply buried on Apple's expansive website. The proposed settlement cured this problem, by notifying customers of their right to a Replacement Adapter, a settlement administrator to answer any questions and relay complaints, and class counsel to represent their interests. The success of the notice program is readily apparent from looking at the number of replacement adapters provided before and after notice went out:



MEHRI & SKALET, PLLC

71.     I created the above graph using Microsoft Excel, a program of which I am familiar with, wherein I input data from a true and correct copy of information set forth in **Exhibit 12** provided by Apple.

72.     The original Adapter that came with the Subject Computers was only covered by a one-year warranty, a true and correct copy of which is attached hereto as **Exhibit 13.** Any replacement Adapter was only covered by a 90-day warranty, a true and correct copy of which is attached hereto as **Exhibit 14.**  Notably, all 9.6 million Class members benefited from this part of the settlement, because they were given a replacement warranty period three to nine times longer than Apple originally gave them (*i.e.*, for at least three years).

73.     By comparison, at the time of settlement, Apple sold "AppleCare" two-year extended warranties for products in this price range (up to $80) for $39.  For example, a two-year AppleCare extended warranty for the iPod Shuffle 2GB (which sells for $49) cost $39. At a cost of $39 for a two-year extended warranty, for 9.6 million class members, the value of this part of the settlement is substantial.

74.     As a result of the notice program, based on available information to date, Apple provided **92,332 replacement adapters** during the existence of the program from November 2011 (date of class notice) to July 2013, for a total value of **$7,294,228** (92,332 adapters multiplied by their retail value, $79).  *See* Coulson Decl. ¶ 9.

### 3.     Value of Notice Costs, Costs of Administration, and Attorneys' Fees and Costs

75.     Apple agreed to pay all of the costs of notice and all costs associated with administering the settlement. Because these costs are being paid directly by Apple, they do not reduce or affect the Class recovery. Apple also agreed not to oppose an award to Class Counsel of attorneys' fees in the amount of $3 million; a service award of $5,000 to each Class Representative, subject to Court approval; and verified costs and expenses incurred in the prosecution of litigation up to $100,000, all of which is to be paid by Apple, not class members (the "Fees Amount"). The Fees Amount is separate from and does not in any way diminish the Class recovery.

MEHRI & SKALET, PLLC

76.     In addition, I am reliably informed by Kurtzman Carson Consultants that the cost of class notice to date, an obligation Apple has agreed to pay pursuant to the Agreement, is **$792,464**.

### 4.     Total Value of the Settlement

77.     Calculating the total recovery to the class, artificially discounting ***entirely*** the substantial value of the extended warranty, the requested $3.1 million in fees and expenses is still almost exactly at the 25% benchmark approved by the Ninth Circuit (and objector Newhouse) for common fund cases, and well below percentages awarded in many other cases. $7,294,228 (value of replacement adapters) + $797,757 (all-cash claims) + $3.1 million (fees, expenses and incentive awards) + $792,464, (cost of notice) = $11,991,985.  $3.1 million / $11,984,449 = 25.87% of the "fund."

## VIII.   THE CLASS REPRESENTATIVES DESERVE A SERVICE AWARD

78.     Under the terms of the Agreement, Apple has agreed to pay a service award of $5,000 to each Class Representative (total service awards not to exceed $30,000).   *See* Agreement, §V(A).  Apple voluntarily agreed to pay this service award, separate and apart from the relief provided to the Class, and payment of the same will not reduce or otherwise impact any monetary or other benefit provided to the Class.

79.     The requested amounts are based on time Plaintiffs' expended dealing with Apple on the issues that are the subject of the Litigation, gathering documents, assisting counsel in gathering facts, consulting for mediation, reviewing court documents, providing declarations, and considering the settlement to ensure it was reasonable.

## IX.    CONCLUSION

80.     For the reasons set forth above, I respectfully submit that the settlement is fair, reasonable, and adequate, and the agreed-upon fees and expenses is reasonable and should be granted.

1

I declare under penalty of perjury under the laws of the United States that the above is

2

true and correct.  Executed this 10th day in September, 2014, in Washington, DC.

3

/s/ Craig L. Briskin

CRAIG L. BRISKIN

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEHRI & SKALET, PLLC