# EXHIBIT 1

Dockets.Justia.com

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---oOo---

COPY

THE APPLE iPOD iTUNES ANTI-       No. C-050037-JW(RS)
TRUST LITIGATION,

_____/

VIDEOTAPED

<u>DEPOSITION OF ROGER G. NOLL, Ph.D.</u>

Taken before EARLY K. LANGLEY, RPR, RMR

CSR No. 3537

October 27, 2009

Aiken Welch COURT REPORTERS

One Kaiser Plaza, Suite 505
Oakland, California 94612
Ph  510-451-1580
Fax 510-451-3797
www.aikenwelch.com

1    direct purchaser classed plaintiffs.

2         THE VIDEOGRAPHER:  Could the court

3    reporter please swear in the witness and we can

4    begin.

5         (Witness sworn by the Reporter.)          10:07

6    <u>EXAMINATION BY MR. MITTELSTAEDT</u>:

7         Q.  Good morning.

8         A.  Good morning.

9         Q.  For your markup method, you are referring

10   in part to the study by Dedrick and others; is      10:07

11   that right?

12        A.  That is an illustration of how one does

13   the markup method.  But they don't have the right

14   data.

15        Q.  Assume that you got what you consider the  10:07

16   right data and you came up with the same gross

17   margins that they came up with, which of those

18   companies would you use to compare with Apple in

19   terms of telling us what Apple's gross margins

20   should be on iPods?                                 10:08

21        A.  I would not necessarily use any that were

22   in their study.  I might, but one possibility

23   would be to compare with other Apple products such

24   as they did.

25        Another possibility would be to compare       10:08

1  regress retail iPod prices?

2      A.  He proposes that as one possibility, yes.

3      Q.  Did you read Dr. French's testimony at his

4  deposition?

5      A.  I did.  But it was a long time ago and I    10:11

6  don't remember it.

7      Q.  Did you read his testimony from the

8  evidentiary hearing?

9      A.  Yes, I did.  I -- again, it was a long

10 time ago and I don't remember it.              10:11

11     Q.  Okay.  Let me hand you an object, says

12 "Martha Bursch" on the back.

13         Do you recognize that?

14     A.  Yeah.  It's an iPod.

15     Q.  And do you know what generation iPod that   10:11

16 is?

17     A.  Do I know what generation it is?

18     Q.  Yes.

19     A.  What do you mean by "generation"?  Do you

20 mean the date or do you mean the model?        10:11

21     Q.  Either.

22     A.  Well, I think -- I believe -- I'm not

23 certain, but I believe it's a Touch -- I have

24 never actually seen this particular version, but I

25 believe it's a Touch.  But I'm not certain.    10:12

1  that -- excuse me, that was the Mini.  That was

2  what's now called the Nano.

3      I -- I honestly have not attempted to

4  memorize by look what each model looks like, all

5  right?  I've seen them all, I've read their specs,  10:13

6  but I -- I don't remember when each was

7  introduced.

8      Q.  Have you ever used one?

9      A.  No.

10     Q.  What was the price of the first iPod that  10:13

11  was offered?

12     A.  I don't remember.  It's on the -- it's in

13  the evidence, but I don't remember what it is.

14     Q.  When did Apple first change the -- the

15  price of the first generation iPod?                10:14

16     MS. SWEENEY:  I'm going to object to

17  this -- this line of questioning.  If you have

18  some documents you want to show Professor Noll,

19  that's one thing, but if you're just going to ask

20  him to, you know, try and recite from memory      10:14

21  prices that are part of the evidentiary record,

22  that's another thing.

23     THE WITNESS:  I have not attempted to

24  memorize the dates at which prices of iPods were

25  posted.  I know some recent history because I      10:14

1  table of some sort, because it would be stupid to
2  try to memorize all the prices of all the
3  different iPods for eight years.  That would be
4  crazy.
5  BY MR. MITTELSTAEDT:                                    10:16
6     Q.  What I asked was have you made any
7  analysis of the price changes?
8     A.  The --
9        MS. SWEENEY:  Objection.  Asked and
10 answered.                                               10:16
11        THE WITNESS:  For my purposes, the
12 price -- the prices that matter are the actual
13 transactions prices at wholesale.  That's what I
14 need to do my analysis.  And I don't have those.
15        All I have is wholesale list prices, and I  10:17
16 do not know the extent to which those represent
17 actual transactions prices because the information
18 has never been discovered.  And I have retail
19 prices, posted retail prices on the -- the Apple
20 Store.                                                  10:17
21        I do not have the actual transactions
22 prices at wholesale which one would need.  You
23 started off with markup tests.  In order to do the
24 markup tests, I need to know what the actual
25 transaction prices were.                               10:17

1    BY MR. MITTELSTAEDT:

2         Q.  Let's focus on Apple's retail prices at --

3    for iPods at the Apple Store.

4         Have you made any analysis of those price

5    changes?                                              10:17

6         MS. SWEENEY:  I -- I'm going to object and

7    ask counsel to provide a reference point for me

8    for where this is in Professor Noll's reply

9    declaration because, as we discussed previously,

10   the scope of today's deposition is limited to        10:18

11   Professor Noll's reply declaration.

12        You had a full day to depose Professor

13   Noll about a year ago, so can you please tie that

14   into his reply declaration.

15        THE VIDEOGRAPHER:  Would you please put          10:18

16   your --

17        MS. SWEENEY:  Sorry.

18        THE VIDEOGRAPHER:  Thank you.

19   BY MR. MITTELSTAEDT:

20        Q.  Dr. Noll, in your second report, some        10:18

21   50-plus pages long, you proposed doing a

22   regression of retail prices; right?

23        A.  What I proposed was a regression on prices

24   in general, and, as I discussed in my first report

25   at length, and, as you examined me at length about   10:18

1  in my first deposition, I am not certain as to

2  whether a single regression that would include

3  both wholesale and retail transactions or two

4  regressions, one for wholesale and one for retail,

5  would be required.                                    10:19

6         And the reason I can't answer whether I

7  would do one or the other, or, indeed, whether I

8  would even do a regression, because in my first

9  deposition I also explained to you that in a

10 significant fraction of time, you don't do          10:19

11 regressions to estimate damages at retail if

12 retail prices don't change very much.  We went all

13 through that for a long time at the first

14 deposition.

15        I can't tell you until I have the data       10:19

16 about the wholesale prices how I'm going to handle

17 the combination of wholesale and retail

18 transactions.  Maybe there'll be a regression just

19 on retail prices, maybe there won't be.  Maybe

20 there'll be a markup analysis.  Maybe it'll be a    10:19

21 regression on retail, maybe it won't.  Until I

22 have data, I can't tell you.

23     Q.  You have proposed in your second report in

24 part doing a regression of retail prices for

25 iPods; correct?                                       10:20

1    Apple Store, his problem is much more severe, and

2    he would probably use a regression analysis,

3    collecting data from Best Buy and Amazon and other

4    leading retailers of iPods to try to estimate

5    damages.                                          10:23

6          In my case, I don't know whether that's --

7    it's very plausible that's not necessary to deal

8    with the retail aspect of the direct purchaser

9    case.

10         The hard part for the direct purchaser      10:23

11   case isn't the retail part, it's the wholesaler

12   part where you need to have the transactions

13   information or the wholesalers, and that's --

14   that's actually where most of the case is, is in

15   the sales to distributors and retail chains.      10:23

16        Q. The question was:  Does it matter to you

17   in trying to decide whether you're going to do a

18   regression analysis how many times Apple changed

19   the prices for iPods in the before period?

20         And your answer was -- the first part was: 10:23

21   The fewer price changes, the less you need

22   regression analysis.

23         Is it also true that the fewer price

24   changes, the more difficult it is to obtain

25   statistically significant results from the         10:23

1   Apple. They don't -- they don't sell it through

2   other distributors. It's exactly the same price

3   as all the others, but you have to buy it from

4   them.

5          So there can be -- there can be reasons      10:28

6   that are product-specific, that it's a particular

7   color that is only available from the store. Or

8   it may be you're buying a bunch of things you can

9   only buy from the store. And, for convenience

10  sake, you just add the iPod to it. So, I mean,    10:29

11  there could be many reasons why somebody would do

12  it. But that's the --

13     Q. Was one of the reasons you collected these

14  price changes for the before period to see how

15  many there were?                                   10:29

16     A. No. The reason I -- I -- I checked the

17  prices was to -- to assure myself that the data

18  were there. That's all.

19     Q. Did you -- have you reached any conclusion

20  on whether there are enough price changes in the   10:29

21  before period to do a regression analysis if you

22  decide you want to do one?

23     A. On retail price alone?

24     Q. Yes.

25     A. I probably -- as I said before, it's       10:29

1  plausible, and indeed possible, that a regression

2  analysis will not be used.  It's also plausible,

3  and possible, that the -- that the price

4  regression for retail and wholesale will be the

5  same equation, all right?                    10:29

6       So, again, I can't answer the question

7  until I have all the data and find out if a single

8  equation that's both wholesale and retail works.

9       Q.  Up to this point, have you reached a

10 conclusion, not on whether or not you're going to  10:30

11 do a regression analysis, but simply on whether

12 there are enough price changes in the before

13 period to do a regression analysis based on the

14 before/during approach, if you decide that's what

15 you want to do?                              10:30

16      A.  Let me add one more possibility which I

17 think is a likely possibility, which is that the

18 object of the regression analysis would be a

19 margin analysis as opposed to a simple price

20 analysis because I -- it's possible there's more  10:30

21 changes in transactions prices than there are in

22 retail prices so that the -- the -- using

23 wholesale prices as -- as an indicator of

24 opportunity cost, one -- one approach would be to

25 do a regression on margin because it's perfectly  10:31

Aiken Welch Court Reporters   R.G. Noll, Ph.D.,  10/27/09

1          So, obviously, I don't know what that

2     regression analysis, if any, is going to look

3     like.

4          As I said right from the beginning, the

5     absence of variation in retail price is not          10:32

6     sufficient to answer the question, all right?

7          The relatively lack -- small amount of

8     variation in retail price is just a piece of

9     information.  It's not by itself determinative.

10    You can't reach a conclusion just based on that.     10:32

11    BY MR. MITTELSTAEDT:

12         Q.  So let's say there was only one change in

13    iPod prices in the before period.

14         Are you saying you could still run a

15    regression analysis and reach a robust result?       10:32

16         A.  Yes.  You could under some circumstances,

17    and, no, you couldn't under other circumstances.

18         And until I have more information from

19    Apple, I don't know whether the result, the method

20    of doing damages but for the retail part of direct   10:32

21    sale by Apple is going to be a regression analysis

22    or something much simpler.

23         Q.  What further information do you need to

24    answer that question?

25         A.  The wholesale transactions data.            10:33

Aiken Welch Court Reporters   R.G. Noll, Ph.D.,  10/27/09

1   number of independent variables in a regression.

2         And, obviously, if you observe across five

3   different models of iPods, each of which has gone

4   through some changes in what -- what its

5   components are and has undergone several price          10:36

6   changes each, you're talking about a number of

7   price changes that limits the number of

8   independent variables.  But until you do them on

9   the regression, you don't know whether that

10  limitation is binding.                                  10:37

11        Q.  Because you don't know how many variables

12  you're going to use?

13        A.  You don't know whether the --

14        Let's put it a different way.  You don't

15  know how quickly you're going to be able to             10:37

16  explain everything.  Because the trouble in this

17  circumstance is going to be it's extremely easy to

18  explain price changes.  It's not that it's

19  extremely hard, it's extremely easy.  And a very

20  small number of variables is likely to do it.           10:37

21        Q.  I asked you before:  What data, what

22  information do you need from Apple to let you come

23  to a conclusion on whether you have enough price

24  changes in the before period to run a regression

25  on retail prices?                                       10:38

1      MS. SWEENEY:  Objection.  Asked and
2  answered.

3      THE WITNESS:  I -- I -- I don't know how
4  to answer the question.  What -- what -- you don't
5  know until you get the data and run the regression   10:38
6  whether you have -- whether you can do it.

7      I mean, there's no theoretical issue here
8  that there's some magic number that you need.
9  It's an empirical issue.

10  BY MR. MITTELSTAEDT:                                   10:38

11     Q.  You said before you needed data from Apple
12  to answer that question.  And so my -- my question
13  to you is:  What data do you need from Apple to
14  let you come to a conclusion on whether you have
15  enough price changes to do a regression on retail   10:39
16  prices?

17     MS. SWEENEY:  Same objection.

18     THE WITNESS:  Other than answering again
19  that until you run regressions you don't know how
20  much is enough, the -- I just repeat what I said   10:39
21  in my first report and in my first deposition:
22  You need data that enables you to determine
23  whether you can do one equation or two.

24     You asked me to assume that you can't do
25  two.  But now once you ask me about data, I can't   10:39

Aiken Welch Court Reporters   R.G. Noll, Ph.D.,  10/27/09

1   assume that anymore.  Because that's one of the

2   things you test is whether you need one or two.

3   And in order to do that, you need the wholesale

4   transactions data.

5   BY MR. MITTELSTAEDT:                                    10:39

6       Q.  I want you to assume that you're going to

7   end up trying to do a separate retail regression.

8   To tell me whether you have enough price changes

9   in the before period, do you need any information

10  from Apple?                                             10:40

11      A.  If I knew for certain that the method --

12  the method of estimating damages for retail was

13  going to be a single regression on price with no

14  information about cost -- and I cannot imagine a

15  universe in which I would do that, no sensible         10:40

16  economist would ever try to run a price regression

17  without a measure of cost.

18          But assuming that I were sufficiently

19  incompetent that I would want to run that

20  regression, I would say I probably won't run that      10:40

21  regression because if -- if I'm not going to have

22  cost data, I don't have any ability to rely on a

23  price regression.

24      Q.  I didn't ask you to assume that you're not

25  going to have any cost data.                            10:40

Aiken Welch Court Reporters    R.G. Noll, Ph.D.,  10/27/09

1          Where did that come from?

2      A.  Well, I have been previously answering

3  questions about data I need in cost and I was --

4  thought I was just told to assume that away.

5      Q.  No.  What I said was:  Assume that you're    10:40

6  going to run a separate retail regression.  You're

7  going to regress retail prices.

8          To tell me whether you have enough price

9  changes in the before period, do you need any

10  information from Apple?                             10:41

11      A.  In order to know that I want to run a

12  single regression on prices, I need to know that

13  the regression that had both wholesale and retail

14  prices in it didn't work.

15      Q.  That -- that's I'm asking you to assume.    10:41

16  Assume that the court says, Professor Noll, you

17  got to do a separate retail regression.

18      A.  Well, then I still need cost data to

19  identify the equation.

20      Q.  Okay.  So just tell me what data do you    10:41

21  need from Apple to -- for you to answer the

22  question whether you've got enough price changes

23  in the before period?

24      A.  Model-specific incremental costs.

25      Q.  Anything else?                             10:41

Aiken Welch Court Reporters    R.G. Noll, Ph.D.,  10/27/09

1     A.  I also need information about the

2   technical components inside.  And I need to know

3   something about Apple's pricing strategy, because

4   I want -- I would want the price regression to

5   reflect what Apple's actual pricing policy was.     10:42

6     Q.  Anything else?

7     A.  Well, let me first of all state what data

8   I need has been described in both reports.  And,

9   if I forget something that's in those reports by

10  going through your memory test, then I yield to my  10:42

11  report.

12     But I think what I have said is consistent

13  with that report:  Mainly, you need operating cost

14  information on a model-specific basis,

15  transactions cost data on a model-specific basis,   10:42

16  and technical characteristics as well as internal

17  company documents about their pricing policies and

18  their perceptions of competition.

19     Q.  And by "transaction data," what do you

20  mean?                                               10:43

21     A.  The individual transactions records at the

22  level of a transaction as opposed to averages over

23  large numbers or averages over time.

24     Q.  So, in the context of the Apple Store, for

25  retail transactions, what -- what is transaction    10:43

1  data mean?

2      A.  Well, the transactions -- once again, the

3  transactions at the retail store are just the

4  posted price.  There's nothing fancy about that.

5          So that's not -- that's not interesting     10:43

6  transactions data because we know there isn't any

7  variation at that level unless there would be

8  specific times when there may be a posted special,

9  and I don't know whether that exists or not.

10  Because that would require much more detailed      10:43

11  knowledge than I can get by simply looking

12  periodically at the Apple Store website by just

13  looking at what their prices are.

14          So I don't know if there are sort of

15  special things going on that have happened through  10:44

16  time, and transactions data at retail would allow

17  one to know whether there was ever some sort of

18  special going on there.  I have no reason to know

19  that there was, but I would check that.

20          The more important part is that the -- if   10:44

21  one is measuring actual costs and opportunity

22  costs of the retail sales, that's why you need

23  the -- that the -- the -- the operating costs by

24  model of the products that are sold at retail,

25  plus you need the transactions at wholesale,       10:44

1   because that's the opportunity cost of selling at

2   retail.

3       Q.  So by transaction data at wholesale, are

4   you talking about -- describe to me more

5   specifically what you're talking about.                    10:44

6       A.  On March 14th, 2007, Best Buy bought 5,000

7   iPods, and they paid the following amount for it

8   and they got the following quantity discount and

9   they got this, that and the other thing.  I mean,

10  that's the level of information you need.                   10:45

11      Q.  And if you end up trying to run a

12  regression using price, would you average those

13  transaction -- those transactions on a monthly

14  basis or a quarterly basis?

15      A.  Of course not.                                      10:45

16      Q.  You would input in the individual -- input

17  into your regression the individual

18  transaction-based prices?

19      A.  I've made that absolutely clear from the

20  submission of my first report that I want           10:45

21  individual transactions data.  I do not want

22  averages.

23      Q.  Because you're going to input that

24  individual transaction data into your regression;

25  is that correct?

1    A. The unit -- the unit of observation is a

2    transaction in the regression analysis.  An

3    observation in the regression analysis is an

4    individual transaction.

5    Q. Are you saying something different than      10:46

6    I'm asking?

7    A. Well, since I have no clue -- you don't

8    use the words in a way an economist would use

9    them.  And so I'm giving you the best benefit of

10   the doubt about what you really mean.           10:46

11   So, yes.  An individual unit of analysis,

12   an individual observation in the regression is a

13   specific transaction, a specific buyer on a

14   specific date buying a specific product.

15   Q. And you will use those data in your          10:46

16   regression?

17   A. That's correct.  Those will be the data

18   that are used to estimate the regression.  And

19   that's what I mean -- you don't say "in the

20   regression."  It's the estimation will be based on  10:46

21   those observations.

22   Q. Not on an average of those observations?

23   A. No.

24   Q. What are the variables that you said a

25   little bit ago would be likely to explain Apple's  10:47

1        Q.  Okay.  You -- you said earlier that you

2   think there would be relatively few variables that

3   are needed to explain iPod pricing.  And what I'm

4   trying to do is to ask you what you think those

5   variables are as specifically as you can tell us.   10:54

6   And what you have mentioned first is cost.

7        A.  That's correct.  That's -- that's --

8   indeed, it would be a horrendous mistake not to

9   include costs in a price regression for any

10  consumer electronics product.                        10:55

11       Q.  And what is the -- the next variable that

12  you think is -- will turn out to be among the

13  relatively few that you say will explain the iPod

14  pricing?

15       MS. SWEENEY:  I'm going to object that         10:55

16  these questions have been asked and answered

17  several times now.  Including in the first

18  deposition.

19       THE WITNESS:  The -- you don't know in

20  advance which technical characteristics are going   10:55

21  to prove to be most important.  And I explained

22  that in the context of memory, all right, in that

23  it may be that the cost of memory is sufficient.

24       It may be that it also makes sense -- you

25  know, Apple iPods vary in their history from 1      10:55

1    gigabyte to 160 gigabytes of memory.  It may be

2    you want a variable in there that's the memory.

3    It may be that just knowing the cost of the memory

4    is sufficient.  You don't know until you run the

5    regression.                                          10:56

6         So there -- there's -- just to repeat what

7    I've said before, there are technical

8    characteristics out there.

9         Weight and size, this thing is thick and

10   clunky relative to a Nano which is really tiny and   10:56

11   sleek.  Some people believe that's why they get

12   sold is that as time progresses they get less

13   clunky, all right?

14        Well, so you need to have an index of what

15   "clunkiness" means, which has to do with their      10:56

16   weight and size.

17        Then there's the -- there's specific

18   features they have:  Can it connect to the

19   Internet, can it run videos?  What is the --

20        These are the -- a handful of technical        10:56

21   features that differentiate the products.  If you

22   array all the Apples, iPods, the 43 different

23   models that they sell, they actually boil down to

24   a -- a small number of models that have undergone

25   a small number of changes.  And these changes have  10:57

1   to do with their memory and their size and their

2   video capability and their Internet connectivity.

3        So there aren't very many variables out

4   there that you need to try to use to capture the

5   technical characteristics.                          10:57

6   BY MR. MITTELSTAEDT:

7        Q.  So we've got cost of the manufacturer,

8   we've got some technical characteristics.

9        Are there any other variables that you

10  think are likely to explain the cost?  And I'm      10:57

11  talking about the ones that you think, just

12  sitting here today, based on your experience,

13  based on your thinking about this, are -- are

14  likely to explain Apple's pricing.

15       MS. SWEENEY:  Same objection.  Asked and       10:58

16  answered today and at the previous deposition.

17       THE WITNESS:  I am not capable of giving a

18  complete answer to that without seeing Apple's

19  pricing policy documents.

20  BY MR. MITTELSTAEDT:                                10:58

21       Q.  Okay.  I -- I understand your testimony on

22  that.  I understand your testimony from the first

23  deposition.  I understand all of that.  All I'm

24  asking you is -- you just said that you think

25  there are going to be relatively few, and I'm       10:58

1    explanatory power.  In this case, it didn't add

2    any explanatory power.

3        Q.  The regression analysis that you've just

4    described that was undertaken under your direction

5    in Flash Memory recently, what was the purpose of    11:28

6    that?

7        A.  The purpose was class certification, to

8    demonstrate that there was a common price

9    formulation process.  The -- the issue in every

10   class action I've ever been in, except this one,    11:28

11   was about the commonality of proof as opposed to

12   actually proving what the damages were.

13       The issue here isn't about commonality

14   because your expert believes that there's no way

15   to estimate damages even if the plaintiff were    11:28

16   Best Buy, all right?

17       So this isn't a case about -- at this

18   stage about commonality.  What that case is about,

19   and what other -- every other class action I've

20   ever been involved in is about, is demonstrating a  11:28

21   common process across all purchasers for setting

22   prices, and that was the purchase of that

23   regression was to show that I could produce a high

24   IR square on a regression to explain changes in

25   prices through time.    11:29

Aiken Welch Court Reporters    R.G. Noll, Ph.D.,  10/27/09

1   timing of when Apple would have licensed FairPlay

2   in the but-for world?

3      A. The assumption in the but-for world is

4   that the anticompetitive behavior never would have

5   happened, so it would have been in the very     11:46

6   beginning.

7      Q. So your assumption is Apple would have

8   licensed FairPlay to a couple of competitors in

9   April of 2003?

10      A. A couple of competitors is not the right   11:46

11   number. As you know from my prior deposition

12   where we talked about this for several pages, two

13   is insufficient. The right number is probably

14   about four or five.

15      Q. With that clarification, are you saying   11:46

16   the but-for world Apple would have licensed

17   FairPlay to four or five competitors as of April

18   2003; is that correct?

19      A. What I -- no, it's not correct because it

20   completely mischaracterizes what I said, and I'm   11:47

21   not going to let you put words in my mouth.

22   That's not what I said in my prior deposition.

23      Q. Well, what is your assumption about when

24   Apple would have licensed FairPlay to four or five

25   competitors in the but-for world that you're   11:47

1  trying to model?

2      A.  As I said before, the but-for world starts

3  off with the hypothesis that Apple is not a

4  vertically integrated firm, and asked the question

5  what would the strategy be of a firm that's not          11:47

6  vertically integrated into MP3 players, and

7  that -- and then the answer to that question, of

8  course, is they would have wanted to license the

9  formats, whether Digital Rights Management or the

10  actual MP3 version, the version of the MP3 format,   11:47

11  to as many portable digital media players as they

12  thought was necessary to maximize the sales of

13  portable digital media players so that, in fact,

14  they'd maximize the number of people who wanted to

15  buy downloads from the iTunes Music Store.               11:48

16      Q.  All I'm trying to ask is:  In your but-for

17  world that you're trying to model, when would

18  those licenses have been made?

19      A.  They would have had to have been made

20  at -- before the actual launch of the store              11:48

21  because there would have been no iPod-like product

22  out there to take advantage of them.

23          So they would have licensed them very

24  early on.  In fact, they may well have licensed

25  them earlier, you know, just to make certain that        11:48

1   people had enough time to develop a portable

2   digital media player in time for the launch of the

3   store.

4        Q.  But you've told me now that they would

5   have licensed them very early on, and then you say   11:48

6   they may well have licensed them earlier.

7        What I'm trying to find out is:  In your

8   but-for world, when?

9        A.  Because --

10        MS. SWEENEY:  Object.  You've asked and      11:49

11   answered --

12        THE WITNESS:  The data is irrelevant.

13        MS. SWEENEY:  -- this question several

14   times.

15        THE WITNESS:  The data is irrelevant.  The   11:49

16   relevant fact is, if they had not been vertically

17   integrated into portable digital media players,

18   they would have engaged in widespread licensing to

19   maximize the -- the degree of competition in

20   portable digital media players for the purpose of   11:49

21   getting those prices as low as possible for the

22   purpose of getting the demand for downloads from

23   their site to be as great as possible.

24        So the number and the date isn't the

25   point.  The point is, when portable digital media   11:49

1    determined far more by the number of observations.

2    So if you have endless numbers of transactions

3    records -- I've -- I've seen numerous regressions.

4    My students produce them all the time.

5         MR. MITTELSTAEDT:  Do we need to change    12:00

6    the tape?

7         Go ahead.

8         THE WITNESS:  I've seen numerous

9    regressions from my students where they get R

10   squares of less than .1 but highly significant    12:00

11   coefficients on variables because they have

12   thousands upon thousands upon thousands of

13   observations.

14        Detecting a variable's effect when it has

15   a small percentage of the variance that explains    12:00

16   is simply a function of how many observations you

17   have.  And if you have lots of observations,

18   you'll usually detect it.

19   BY MR. MITTELSTAEDT:

20        Q.  Is there any theoretical basis you know of  12:00

21   to predict what the relative impact of the

22   particular conduct that's at issue in this case is

23   going to have compared with the impact on price of

24   the other factors you mentioned earlier:  cost,

25   life cycle, technical characteristic changes?    12:01

1      A.  As I said, as a theoretical matter, the

2  effect could be zero.  This isn't a theoretical

3  issue.  It's a practical question.  What does the

4  regression actually show and does it have a

5  specification error?                          12:01

6      Q.  Have you -- have you, yourself, or anyone

7  working under your direction ever actually

8  calculated damages using a regression analysis in

9  any of the three methods that you've proposed

10 here?                                          12:02

11     A.  Yes.

12     Q.  In what cases?

13     A.  Well, there's -- there's Flash.

14     Q.  Let me just stop you so you understand the

15 question.                                      12:02

16     A.  Oh, wait.  Wait a minute.  Wait a minute.

17 You're right.  Flash, no one's ever actually

18 calculated damages yet.  I stand corrected.

19         DRAM, Dynamic Random Access Memory.

20 Tableware.  High speed photocopier service.  I    12:02

21 mean, there's -- I mean, there's a -- those are

22 just off the top of my head.

23     Q.  Do you have copies of your work in -- the

24 regression that calculated damages in DRAM?

25     A.  I do not have a copy of it, but one of the 12:02

Aiken Welch Court Reporters   R.G. Noll, Ph.D.,  10/27/09

1   gigabyte iPod Classic price correlated with

2   whatever the counterpart for SanDisk is for that

3   exact same model and you correlate the price to

4   time.  That's -- it produces exactly the same

5   results statistically in terms of explanatory   12:11

6   power as if you ran a regression price of the iPod

7   equals A plus B times the price of the SanDisk,

8   and the -- the R square of that regression is the

9   correlation.

10      Q.  Was the purpose of your correlation study   12:11

11   in your regression analysis the same, but the

12   regression is more sophisticated?

13      A.  The -- the purpose of the correlation

14   analysis was to get at some but not all of the

15   issues that were gotten at in the regression   12:11

16   analysis.

17      Q.  Do you agree that during this decade,

18   portable digital players have undergone rapid

19   technological progress in features and inputs?

20      MS. SWEENEY:  Can I just ask for a   12:12

21   clarification?  Are you asking about the past

22   ten-year period, or when you say this decade from

23   2000 forward?

24   BY MR. MITTELSTAEDT:

25      Q.  2000 forward.   12:12

1      A.  I agree that there has been rapid

2  technological progress in portable digital media

3  players of two different types.

4      Q.  And what are the two different types?

5      A.  Rapid technological progress in the          12:12

6  electronic components that they're made from and

7  technological progress as well in the features

8  that are offered in an iPod.

9      Q.  And do you agree that the -- there's been

10  a boom in sales of -- of those devices?          12:12

11      A.  Until recently.

12      Q.  And do you agree that since they were

13  introduced -- strike that.

14      Do you agree that since, say, 2002, the

15  end of 2002, the sales of those devices has          12:13

16  increased by several orders of magnitude?

17      A.  Several orders of magnitude.  Well, what's

18  the start date?  What start -- what is the start

19  date for my --

20      Q.  January 1, 2003.          12:13

21      A.  Well, in the first quarter of 2003, I

22  believe Apple sold something like 6 or 700,000

23  iPods.  So it wouldn't be several orders of

24  magnitude over that.

25      Q.  So you're saying -- where does that          12:13

1    before/after method and then the before/after

2    method was not, in fact, used.

3         I'm not -- I'm aware of some cases in

4    which other methods besides before/after were

5    used, but it's the most common form of damage          13:29

6    estimation is before/after.

7         Q.  Have you ever seen a case where you've

8    concluded that technological change was too rapid

9    and too complete so that the before/after temporal

10   method would not work?                                 13:30

11        A.  I have never seen a case.  I've seen many

12   cases in which technological progress was more

13   rapid and more complicated than this one, and I've

14   never seen one in which someone proposed it that

15   it wasn't actually done.  I'm not aware of any.        13:30

16        And this included -- and, moreover,

17   there's an economics literature about hedonic

18   price regressions of electronic products.  And

19   it's successful.

20        Q.  Didn't you conclude in Flash Memory that      13:30

21   trying to compare the price formulation process in

22   1997 to 1998 with prices after the boom in small

23   consumer electronic appliances is unlikely to

24   produce reliable results?

25        A.  That's not what I said.  What I said was      13:30

1    it's a problem.  I said, indeed the second report

2    that I wrote, the intertemporal price regression

3    worked.

4         Q.  How did you overcome the problem of -- of

5    rapid technological change in -- in Flash?          13:31

6         A.  More data.  More specification.  Look at

7    it this -- the notion of technological change is

8    not inimical to the estimation of supply demand

9    equations.  The underlying process is still there.

10        And the issue is, can you measure             13:31

11   characteristics in a product-differentiated market

12   in such a way that you can capture the effects of

13   changes in product attributes?  Usually you can.

14        Q.  You told me before lunch that you might

15   not do a regression here because it might turn out  13:32

16   to be so simple.  I want to ask you if -- if you

17   -- let me give you two products.  Giving you the

18   original iPod and an iPod Shuffle.

19        Do you agree that the iPod Shuffle --

20   incidentally, you were referring to that as the     13:32

21   Click before.

22        A.  Yeah.  That's what people call it in

23   common parlance.   It's a Shuffle is the model

24   name, yes.

25        Q.  Who calls it a Click?                      13:32

1    A.  Clip.

2    Q.  Who calls it a Clip?

3    A.  I've heard numerous people call it a Clip.

4    Even in some of the trade literature, they call it

5    a Clip, so.                                    13:32

6    Q.  You understand now that the model name is

7    Shuffle?

8    A.  I've always understood the model name is

9    Shuffle.

10    Q.  When -- are there any differences between    13:33

11    those two products in terms of attributes or

12    features that could impact their demand?

13    A.  Of course.

14    Q.  And their price?

15    A.  Of course.                                  13:33

16    Q.  Without doing the regression analysis, can

17    you tell us, based on what the prices were for the

18    original iPod in 2001 and 2002, what the but-for

19    price of the Shuffle would be in 2009?

20    A.  Can I use regression analysis to make an     13:33

21    estimate of that?  Yes.

22    Q.  That wasn't the question.  Without doing a

23    regression analysis, can you do that?

24    A.  It depends.  It depends.

25    Q.  What does it depend on?                      13:33

1     Q.  What does a user do -- let -- let's say,

2  contrary to fact, you had an iPod and let's say it

3  was a Nano.

4          MS. SWEENEY:  And I'm going to --

5  BY MR. MITTELSTAEDT:

6      Q.  How would you play music on that?

7          MS. SWEENEY:  Object as beyond the scope

8  of Professor Noll's reply declaration.

9          THE WITNESS:  There's -- there's a -- in

10  terms of the iPod Nano, I've never used one, I        13:51

11  have no clue about how I would use one, and

12  it's -- what I do know is what I see on the web

13  about what it is.  And there's -- there's a -- a

14  control device on -- on the earphone.  And beyond

15  that, I don't know anything about it.                 13:51

16  BY MR. MITTELSTAEDT:

17      Q.  With the iPod Nano, do you know how you

18  pause the playing of music?

19      A.  I do not.

20          MS. SWEENEY:  Objection.  Beyond the scope 13:51

21  of the reply declaration and beyond the admissible

22  scope of this deposition.

23          THE WITNESS:  I have -- do not know how to

24  operate an iPod Nano.  I know what functions it

25  has.  I know how to create a variable for each of    13:51

1  answered.

2  THE WITNESS:  I knew at one point when I

3  was writing my first report.  But I don't want try

4  to testify from memory what it is now.  I would --

5  I just don't remember.                    13:59

6  BY MR. MITTELSTAEDT:

7  Q.  Did the iPod ever allow for USB

8  connectivity?

9  MS. SWEENEY:  Objection.  Beyond the scope

10  of the reply declaration.                  13:59

11  MR. MITTELSTAEDT:  I said I'd give you a

12  standing objection to that.

13  MS. SWEENEY:  I don't understand how that

14  works, Bob --

15  MR. MITTELSTAEDT:  If I --

16  MS. SWEENEY:  -- if I want to object to

17  particular questions not just to every question

18  that you ask.

19  MR. MITTELSTAEDT:  But it's even better.

20  You can object to every question on that ground.    13:59

21  If you have an additional ground, you should state

22  that, but on the "beyond the scope," it's as if --

23  I am agreeing, it's as if you say that in response

24  to every question, just to save time.

25  THE WITNESS:  Yes.  IPods have connected    13:59

1   to a USB port on a computer at some point in

2   history.

3   BY MR. MITTELSTAEDT:

4       Q.  Would you expect that would influence

5   demand for iPod?                                    13:59

6       A.  I don't know whether it would or not.

7   Maybe, maybe not.

8       Q.  It would be something you'd want to test?

9       A.  In principle, although I would be -- I

10  would be surprised if that mattered a great deal,   14:00

11  but, yes, we could test that.

12      Q.  Well, what does a -- what is the -- why do

13  you say that, that you'd be surprised if -- if USB

14  connectivity mattered a great deal?

15      A.  Because that's not an issue that          14:00

16  differentiates this product from any other.  All

17  consumer electronics products have moved from

18  USB-wired connections to wireless connections.

19  Even a mouse.  So this is nothing unusual.  This

20  is standard technological change that's affected    14:00

21  all products.  There's nothing unique about iPods.

22      Q.  Because you say iPods have moved from

23  USB-wired connections to wireless connections with

24  the host computer?

25      A.  Yes.  Just like everything else has.       14:00

1      Q.  And so your belief now is that the way you

2  synch an iPod with your host computer is wireless?

3      A.  It can be, I think.  If it's not, it's

4  because I'm confusing it with another product that

5  I know you can, like a PDA and like a mouse.          14:01

6      Q.  I want you to assume that -- I want you to

7  assume that originally iPods connected to the host

8  computer only through firewire and then at some

9  point they could also connect through USB ports.

10     A.  Yes.                                          14:01

11     Q.  Can you think of any reason why that

12  change would increase iPod demand?

13     A.  It may.  I doubt it.  It may -- it may

14  have affected cost, affected price, and affected

15  sales.  We'd need data to be able to see whether    14:01

16  that's true.  The -- there's -- most all of these

17  questions have the form of, can you as a matter of

18  economic theory predict that some particular

19  characteristic change affects demand, and economic

20  theory cannot inform that.  It has to be            14:01

21  empirical.

22          THE WITNESS:  Can I take a short break?

23          MR. MITTELSTAEDT:  Sure.

24          THE VIDEOGRAPHER:  We are going off the

25  record at 2:02 p.m.                                 14:01

1  strike that.

2      When you were meeting with counsel and

3  thinking about your first report, before writing

4  the report, did you ever intend during that period

5  to actually run a regression analysis as part of      14:16

6  your report as opposed to proposing a method?

7      A.  Had the data been made available, I would

8  have run a regression.

9      Q.  And what data did you ask counsel to

10  provide?      14:16

11      A.  All the data that I've -- we've been

12  talking about at my two depositions that are in my

13  two reports.  I wanted complete information about

14  transactions and I wanted complete information

15  about pricing policies and I wanted complete      14:16

16  information about the qualitative characteristics

17  of the components of all the models of iPods.

18      And they said, no, that's not going to

19  happen.

20      We had a long conversation where I said      14:16

21  there's two ways that a court goes on class

22  certification.

23      One is, it's after all the discovery and

24  it's basically a component of summary judgment

25  and -- and -- where you're basically proving      14:16

1   iPods sold, the revenue, and the standard

2   manufacturing cost?

3       A.  Yes.

4       Q.  Have you done any analysis of that?

5       A.  I have looked at it and examined it and,    14:22

6   indeed, I referenced it in my first report.  And

7   there have been subsequent updates to that since

8   my first report which are somewhat more elaborate,

9   but it's basically the same material.

10      Q.  Okay.  You've done research on the concept  14:22

11  of coolness since your last deposition; correct?

12      A.  Oh, yes.  That was an exciting research

13  project.

14      Q.  Are you being facetious?

15      A.  I am being completely facetious.  That is   14:22

16  the most ridiculous literature I have ever read in

17  my entire life.  And the note -- the idea that a

18  professional economist would take that seriously

19  and write an expert report that takes it seriously

20  just is astonishing to me.  It is a complete joke.  14:22

21      Q.  And when you wrote your second report,

22  were you treating it as a joke?

23      A.  I concluded it was a joke after spending

24  several days doing Internet searches trying to

25  track down what it meant.  I mean, not -- not in    14:23

1   of iPods have fallen once we went to a complete

2   Digital Rights Management-free environment.

3   That's -- that's -- it's a -- it's a more serious

4   analysis of that fact that would be how you'd

5   address that question.                              15:52

6           Q.  Are you familiar with the statement in

7   Tirole, *Theory of Industrial Organization*, quote:

8   The price of the complementary or tied good is

9   higher under Italian sales; whereas, the price of

10  the basic tie-in good is lower?                     15:52

11          A.  Well, he says that under a particular

12  assumption about what the nature of the

13  complementarity is.  You can, as I said before,

14  you can create a model in which the price effect

15  is as you described.  You could also create a       15:52

16  model at which the price effect is the opposite of

17  what you described, which is the paper that I

18  referenced by Riordan.

19          What we know now to be the case after lots

20  of research in the 1990s, is that the effect can    15:53

21  go either way; that it's not a question of

22  economic theory how the effect goes.

23          Q.  Assume that music prices would be higher

24  in the but-for world.

25          Do you agree that means that heavier users   15:53

1  of iTunes Music Store may do better in -- with the

2  alleged anticompetitive conduct than in the

3  but-for world?

4      A.  Maybe or maybe not.  It depends what the

5  price effect was.                                    15:53

6          You know, we need some facts here.  What

7  are -- what is -- how many downloads does the most

8  intensive user produce and what is the estimated

9  price effect?  And the -- if the product of those

10 two is greater than the price differential, then    15:53

11 they could, in principle, be better off.

12     Q.  The price differential for iPods?

13     A.  Yes.  On the one hand, you have a price

14 differential.  All right?  For iPods.  IPods have

15 a higher price.  On the other hand, you're          15:54

16 hypothesizing that the price of music is low.

17         And so then the question is:  Is it how

18 much lower?  Is it one cent or ten cents or 30

19 cents?

20     Q.  Is -- does your regression analysis make    15:54

21 any assumptions about whether an increase in

22 demand for a product will always lead to a price

23 increase?

24     A.  Sometimes it leads to a price increase,

25 sometimes it leads to a price decrease.  It         15:54

1   that go into that regression are the same as the

2   variables that go into the iPod regression because

3   the products are the same.

4       The -- the problem with the method is --

5   is there can be a degree of -- of connectiveness        16:15

6   between the prices of the two -- of the iPod

7   versus the products of the others, in which case

8   an overcharge for iPods could cause the prices of

9   the benchmarks to be higher than they otherwise

10  would be, in which case you'd underestimate           16:15

11  damages.

12      Q.  Have you been able to identify a product

13  that you can compare with the iPod and obtain

14  robust results under your yardstick method?

15      A.  Until you run the regression, you don't        16:15

16  know if you have robust results.  We would have

17  to -- if we were going to do a yardstick method

18  and we were going to use different portable

19  digital media players as the benchmark, as the

20  competitive benchmark, we would have to collect       16:15

21  those data and run those regressions and see how

22  qualitative attributes affect price differentially

23  in the two categories.  If they don't

24  differentially affect them, once again, there's no

25  damages.  It would have to be the case that there      16:16

1    The -- the markup method is a distinct

2    method and it -- it -- it has the strength and the

3    weakness that the premise of it is that you can

4    identify a group of things which are not

5    identical, which have different characteristics,    16:28

6    but that there's commonality across them in such a

7    way that if you identify leading firms in a group

8    of markets, their performance, you could make the

9    case, a plausible, more likely than not case, that

10   this product would have been in that category but    16:28

11   for the acts of -- of an incumbent monopolist.

12   Now, how do you that is different than how

13   you do a yardstick method.  All right?  The

14   yardstick is more like the before/after test where

15   you're doing regressions and things like that to    16:28

16   estimate price equations and show that they come

17   out different.

18   That's not what markup does.  What markup

19   does is look at the -- a set of products that have

20   similar R&D intensity, that have similar scale,    16:29

21   similar production technologies, and make the

22   analogy that the markups in those industries, on

23   average, of leading firms, are a good benchmark

24   for the but-for world in this market.  And --

25   Q.  So do you use a regression analysis for    16:29

Aiken Welch Court Reporters    R.G. Noll, Ph.D., 10/27/09

1  the markup method?

2      A.  Usually not.

3      Q.  And do you --

4      A.  But you might.  I mean, you don't want to

5  preclude it.  But you -- it's -- it's not likely.   16:29

6  But you might.

7      Q.  And do you need to examine technical

8  details of the products that you're using for your

9  markup methods?

10      A.  You -- yeah.  They -- they should be        16:30

11  products that have the same kind of components

12  like a microprocessor, a flash memory, LCD

13  display, some buttons to push, you know, a similar

14  kind of circuit board.

15          Yeah.  You're -- you're looking for things  16:30

16  that have the same basic attributes as products

17  that are based on the same technologies and have

18  similar rates of product change that -- where

19  people are introducing new products every year,

20  that kind of thing.                                 16:30

21      Q.  Okay.  And so you find those products, you

22  see what their markup is, and you -- and then what

23  do you do; do you compare Apple's markup with the

24  average of all those companies or with the highest

25  or with the lowest?                                 16:30

1    A.  Well, you could do that, but I think that

2    would be stupid, all right?  I think what you

3    would want to do is -- is see if you could develop

4    explanations for whatever variance you observed,

5    all right, in the -- in the set of -- of            16:30

6    comparative products and see if you could find one

7    that you think is for one or two or three that are

8    more plausible indicators of what would have

9    happened in the case of the iPod.

10         But, you know, until you get at the -- the   16:31

11   nuts and bolts of this and get all the information

12   about what their scale is, how many of them they

13   sell, what their costs look like, what their

14   components look like, you really can't make an

15   argument that this is really similar to that.       16:31

16   Q.  Do -- do you have a leading candidate for

17   which company you're going to compare iPod margins

18   with?

19        A.  The -- if -- if the product were -- if

20   there were -- for example, one -- one product       16:31

21   would be 3G cell phones, okay?  That's a potential

22   product, and there what you do is decide what firm

23   would be the candidate for the leading edge firm

24   in 3G cell phones.

25        Q.  And which one's that?                      16:31

1        A.  Until I do the analysis I don't know for

2    sure.

3        Q.  Do you need data from Apple to do that

4    analysis?

5        A.  What you -- what you need from that -- you  16:32

6    need two things.  You need -- you need information

7    about market shares and product reviews to decide

8    which products you're going to look at.  And then

9    you need discovery from those companies, which is

10   the hard part, of course.                          16:32

11       Q.  Have you done the first step?

12       A.  No.  I -- what -- what I was in the

13   process of explaining to you is who the candidates

14   were, the very first one, and you interrupted me.

15       Q.  Okay.  But -- let's just take that one    16:32

16   unless you want to finish your answer.  I'm just

17   trying to speed this up.

18       A.  No.  I --

19       MS. SWEENEY:  Objection.  Can -- wait a

20   sec.  I'm not sure what the question is.  I think  16:32

21   that there's question fragments floating around

22   here, and...

23       MR. MITTELSTAEDT:  Fair enough.

24   BY MR. MITTELSTAEDT:

25       Q.  Let's just take the cell phone company.   16:32

1  You said you need information about market share

2  and product reviews.

3       Have you gathered market share data and

4  product reviews to decide what products you're

5  going to look at?                                    16:33

6       A.  Not in a systematic way because I can't go

7  to the next step until I get the actual

8  information and see if it's a reasonable

9  comparison.

10      But I know -- I know enough about some of    16:33

11  these other products to know that there are

12  leaders and there are followers.  There are people

13  who get good reviews and people who get bad

14  reviews.

15      So, I mean, I know how to do it and I can    16:33

16  cite where the information is.  But there's no

17  point in going beyond that, because I don't have

18  enough information to know if it really makes

19  sense to -- to -- to do it, to even do this method

20  to begin with from -- as a better method than --  16:33

21  that one of the others, in particular, the

22  before/after method which is, I think, the one

23  that's going to be used.  My guess.

24      Q.  But let's just focus on this markup

25  method.                                              16:33

1          Is Apple doing anything to keep you from
2   doing your markup method?

3       A.   The markup method depends on markups.

4       Q.   And so one step is to identify, to gather
5   market data, product reviews, market share data      16:34
6   from cell phone companies.  That's one step;
7   right?

8       A.   Well, it's more than that.  You have to
9   know -- you have to know quantity of sales by
10  model so you know they're roughly the same scale,    16:34
11  and I don't know that.

12      Q.   Is that publicly available?

13      A.   No.

14      Q.   Okay.  Have you asked counsel to subpoena
15  from these potential markup comparators the data     16:34
16  that you need?

17      A.   I haven't asked counsel to subpoena
18  anybody.  I've explained to counsel what the data
19  are, but I -- I don't know what they do with it.
20  That's their business.                               16:34

21          I mean, I -- it seems to me that you
22  wouldn't ask -- you wouldn't expect to get data
23  from LG and Nokia and Motorola and BlackBerry and
24  Palm before you get data from Apple.  That's
25  ridiculous.                                          16:34



# EXHIBIT 2

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
BONNY E. SWEENEY (176174)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bonnys@csgrr.com

THE KATRIEL LAW FIRM
ROY A. KATRIEL (*pro hac vice*)
1101 30th Street, N.W., Suite 500
Washington, DC 20007
Telephone: 202/625-4342
202/330-5593 (fax)
rak@katriellaw.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

RECEIVED
MAY 26 2009
JONES DAY - SF

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | Lead Case No. C-05-00037-JW(RS) |
| | CLASS ACTION |
| This Document Relates To: | PLAINTIFFS' AMENDED FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT APPLE, INC. |
| ALL ACTIONS. | |

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs Melanie Tucker, Somtai Charoensak, and Mariana Rosen request defendant Apple, Inc. ("Apple" or "Defendant"), produce and permit their counsel to inspect and copy those documents specified herein which are in Apple's possession, custody or control, at the law offices of Coughlin Stoia Geller Rudman & Robbins LLP, 655 West Broadway, Suite 1900, San Diego, CA 92107, within 30 days of service thereof.

## I. DEFINITIONS

1. "You" or "your" refers to Apple.

2. "Apple" means defendant Apple, Inc. and any of its predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of its present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on its behalf.

3. "Communication(s)" refers to any exchange of information by any means of transmission, sending or receipt of information of any kind by or through any means including, but not limited to, speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or electronic data, e-mail, instant messages, voicemail, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind. The term "communication" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity or trade releases.

4. "Concerning" shall mean constituting, analyzing, discussing, evaluating, estimating, measuring evidencing, reflecting, incorporating, effecting, including, or otherwise pertaining or relating, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or request. Requests for "documents concerning" any subject matter include documents concerning communication regarding that subject matter.

5. Cost of Manufacturing refers to the "manufacturing standard cost" figure that Apple refers to in Note 11 to the Notes to Consolidated Financial Statements, located on page 110 of

1  Apple's Annual Report (Form 10-K), filed with the Securities and Exchange Commission on or

2  about December 29, 2006.

3     6.    "Digital audio file" means a computer file containing audio data, regardless of format,

4  including without limitation, AAC, FLAC, MP3, Real Audio, WAV and WMA, and which can be

5  played on a computer or portable digital media player.

6     7.    "Digital video file" means a computer file containing video data, regardless of format,

7  that can be played on a computer or portable digital media player.

8     8.    "DRM" refers to digital rights management software and technology, including

9  Apple's FairPlay.

10    9.    "Document(s)" is intended to be interpreted in the broadest possible sense and

11  includes, but is not limited to, all electronic data and all communications which are stored or

12  retrievable or recorded in any manner and also includes, without limitation, any writing or other

13  record of information or images, including, but not limited to, print, handwriting, photographs, film,

14  recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge

15  slips, letters, e-mail, compact discs, CD-ROMs, magnetic tape, videotape, magnetic or optical disks,

16  floppy disks, PowerPoint or other presentation software systems, metadata belonging to any

17  electronic document, telegrams, mailgrams, correspondence, notes and minutes of meetings,

18  conversations or telephone calls, resolutions, interoffice memoranda, work papers, reports, projects,

19  tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal

20  briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks,

21  contracts, agreements, diaries, telephone records, desk calendars, appointment books, circulars,

22  charts, transcripts, news releases, trade releases, advertisements, press books, teletype messages,

23  licenses, financial statements, stenographers' notebooks, punchcards, computer printouts and data,

24  telecopier or facsimile transmissions and printouts, letters of credit, stock certificates and securities.

25  The term "document" also includes preliminary drafts or revisions or copies of any such document if

26  the copy is in any way different from the original, now in your possession, custody or control, or in

27  the possession, custody or control of your advisors, agents, employees, servants, representatives,

28  trustees, counsel or other persons acting or purporting to act on your behalf.

1    10.    "Electronic data" refers to any original and any non-identical copies (whether non-
2    identical because of notes made on copies or attached comments, annotations, marks, transmission
3    notations, or highlighting of any kind), of mechanical, facsimile, electronic, magnetic, digital or
4    other programs (whether private, commercial, or work-in-progress), programming notes or
5    instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use
6    of any software program, including word processing documents, spreadsheets, database files, charts,
7    graphs and outlines, e-mail, personal digital assistant ("PDA") messages, instant messenger
8    messages, operating systems, source code of all types, programming languages, linkers and
9    compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys,
10   pull down tables, logs, file layouts and any and all miscellaneous files or file fragments, regardless of
11   the media on which they reside and regardless of whether said electronic data consists of an active
12   file, deleted file or file fragment. "Electronic data" also includes any and all items stored on
13   computer memory or memories, hard disks, floppy disks, zip drives, CD-ROMs, Bernoulli Boxes
14   and their equivalents, magnetic tapes of all types and kinds, microfiche, punched cards, punched
15   tape, computer chips (including, but not limited to, EPROM, PROM, ROM or RAM of any kind) on
16   or in any other vehicle for digital data storage or transmittal, files, folder tabs, or containers and
17   labels appended to or associated with any physical storage device associated with each original and
18   each copy.
19   11.    "Financial statements" includes, but is not limited to, interim, final, pro forma, actual,
20   projected, complete, or partial, annual, quarterly, monthly, weekly or otherwise, audited or
21   unaudited, budgets, budget plans, balance sheets, schedules of direct costs, schedules of
22   miscellaneous income, schedules of general services, fiscal serviceman administrative services,
23   statements of earnings and earnings per share, income statements, cash flow statements, statement of
24   revenues and statements of expenses, all notes or other commentary concerning any of the foregoing
25   and all underlying work papers and all drafts used in connection with the preparation of any of the
26   foregoing.
27
28

12. "iPod" refers to all portable digital media players manufactured by Apple, including but not limited to, all generations of iPod, iPod Touch, iPod Photo, iPod Mini, iPod Nano, iPod Shuffle, and iPhone which were released during the Relevant Time Period.

13. "iTunes store" means Apple's online store through which Apple sells digital audio and video files to consumers.

14. "Labels" means BMG Music, EMI Recoded Music Holdings, Inc., Sony Music, UMG Recordings Inc., and Warner Music Inc. and any of their predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

15. "Microsoft" means Microsoft Corporation and any of its predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of its present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on its behalf.

16. "Online music store" relates to any place on the internet from which digital audio files or digital video files may be purchased and downloaded.

17. "Portable digital media player" means any device that can be easily transported, weighs less than 12 ounces, is capable of playing a digital audio file, can store more than 150 audio files assuming an average file size of 3.0 MB, but does not employ external media such as compact discs, cartridges, cassettes, or compact flash cards.

18. "Telephone records" includes, without limitation, telephone directories, rolodexes, messages, telephone logs, recordings of telephone conversations and telephone bills (local and long distance).

## II.    INSTRUCTIONS

1. Words used in the plural include the singular, and words used in the singular include the plural.

2. The words "and" and "or" shall be used interchangeably and interpreted in the most inclusive manner possible.

1    3.    All documents shall be produced in the order they are kept in the ordinary course of

2   business, and shall be produced in their original folders, binders, covers or containers, or facsimile

3   thereof.

4    4.    These requests relate to all documents which are in your possession, custody or

5   control.

6    5.    You shall produce the original of each document described below or if the original is

7   not in your custody, then a copy thereof, and in any event, all non-identical copies which differ from

8   the original or from the other copies produced for any reason, including, but not limited to, the

9   making of notes thereon.

10    6.    If production of documents is withheld on the ground of privilege, as to each such

11   withheld document provide the following information no later than the first date on which

12   documents are produced:

13        (a)    which privilege is claimed;

14        (b)    a precise statement of the facts upon which said claim of privilege is based;

15        (c)    the following information describing each purportedly privileged document:

16            (i)    its nature (*e.g.*, agreement, letter, memorandum, tape, etc.);

17            (ii)    the date it was prepared;

18            (iii)    the date it bears;

19            (iv)    the date it was sent;

20            (v)    the date it was received;

21            (vi)    the identity of the person preparing it;

22            (vii)    the identity of the person sending it;

23            (viii)    the identity of each person to whom it was sent or was to have been

24   sent, including all addressees and all recipients of copies;

25            (ix)    a statement as to whom each identified person represented or

26   purported to represent at all relevant times; and

27

28

(x)      a description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file.

7.     Documents shall be produced in such fashion as to identify the department, branch or office in whose possession they were located and, where applicable, the natural person in whose possession they were found and the business address of each document's custodian(s).

8.     Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe with particularity those portions of the document which are not being produced.

9.     If a document responsive to these requests was at any time in your possession, custody or control but is no longer available for production, as to each such document state the following information:

        (a)     whether the document is missing or lost;

        (b)     whether the document has been destroyed;

        (c)     whether the document has been transferred or delivered to another person and, if so, at whose request;

        (d)     whether the document has been otherwise disposed of; and

        (e)     the circumstances surrounding the disposition of the document and the date of its disposition.

10.     These document requests are deemed continuing and any documents or information secured after the service of your responses, which would have been included in the responses had they been known or available at the time of the response, must be supplied in supplemental responses as required by the Federal Rules of Civil Procedure.

11.     No document request shall be construed to include individual transactional documents, unless otherwise specified.

## III.   RELEVANT TIME PERIOD

Unless otherwise indicated, these requests relate to the period between January 1, 2000 and the present (the "Relevant Time Period"). Your responses should reflect information for the entire

Relevant Time Period. Where your responses relate to only a portion of the Relevant Time Period,
indicate the date or dates to which your response relates.

**IV.     REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

REQUEST FOR PRODUCTION NO. 1:

All documents concerning or discussing the market for Apple's iPods in the United States.

REQUEST FOR PRODUCTION NO. 2:

All documents concerning or discussing the market for digital video files purchased from
Apple's iTunes store in the United States.

REQUEST FOR PRODUCTION NO. 3:

All documents concerning or discussing the market for digital audio files purchased from
Apple's iTunes store in the United States.

REQUEST FOR PRODUCTION NO. 4:

All documents discussing the Digital Millennium Copyright Act.

REQUEST FOR PRODUCTION NO. 5:

All documents concerning, analyzing or discussing Apple's use of a DRM other than
FairPlay.

REQUEST FOR PRODUCTION NO. 6:

All communications between you and Microsoft concerning or discussing licensing or
royalty agreements and/or payments concerning media formats, including audio, image, and video
file formats, and all communications with Microsoft concerning digital music players and/or DRM.

REQUEST FOR PRODUCTION NO. 7:

All communications between you and RealNetworks, Inc.; Archos S.A.; the companies over the class period that have controlled Rio (including D&M Holdings U.S., Inc); and Creative Technologies Ltd., concerning the interoperability of music purchased from online music stores other than iTunes store with the iPod and/or the interoperability of portable digital media players other than iPods and audio and video files purchased from iTunes Store and documents concerning, analyzing, or discussing these communications.

REQUEST FOR PRODUCTION NO. 8:

All documents and communications concerning Apple's request to license or agreement to license DRM software, including the agreements themselves, and any request by any company to license Apple's FairPlay DRM.

REQUEST FOR PRODUCTION NO. 9:

All documents concerning exporting, copying, burning, transferring, converting or "ripping" of digital audio files from one audio format to another. For example, the conversion of AAC files to MP3 files.

REQUEST FOR PRODUCTION NO. 10:

Full copies of the spreadsheets for which excerpts were produced to Somtai Troy Charoensak and marked APPLE CHAR 00059 TO APPLE CHAR 00066 and all documents used in the production of these documents, including but not limited to all profit and loss statements for all iPod models.

REQUEST FOR PRODUCTION NO. 11:

All documents and answers Apple produced, and all transcripts of depositions taken in litigation or investigations involving the iPod, iTunes and/or iTunes store brought by the governments of France, Germany, Norway, Sweden, Finland, Denmark, the United Kingdom, the European Union/European Commission, and the French consumer rights organization Union Fédérale des Consommateurs Que Choisir.

REQUEST FOR PRODUCTION NO. 12:

1     All documents that identify, describe or refer to any actual, prior or potential competitor of

2 Apple's iPod and digital audio and video files sold by iTunes store.

3 REQUEST FOR PRODUCTION NO. 13:

4     All documents analyzing, describing, estimating or projecting the past, present, future or

5 projected market share in the United States of:

6         (a)    iPod;

7         (b)    online music files; and

8         (c)    online video files.

9 REQUEST FOR PRODUCTION NO. 14:

10     All documents analyzing, describing, estimating or projecting your sales in the United States

11 of:

12         (a)    the iPod;

13         (b)    online music files; and

14         (c)    online video files.

15 REQUEST FOR PRODUCTION NO. 15:

16     All documents concerning the actual or potential impact on your iPod and/or iTunes audio

17 and video market shares, sales or profits in the United States resulting from the introduction,

18 modification, changes to the terms of use for, changes to the pricing, employment or maintenance of

19 FairPlay DRM.

20 REQUEST FOR PRODUCTION NO. 16:

21     All documents concerning the actual or potential impact on your market share, sales or

22 profits in the United States resulting from any restriction or limitation on the compatibility of audio

23 files or video files protected by Apple's FairPlay DRM with any portable digital media player other

24 than iPod.

25

26

27

28

REQUEST FOR PRODUCTION NO. 17:

All documents reflecting or constituting any internal communications concerning the licensing or sharing of FairPlay DRM.

REQUEST FOR PRODUCTION NO. 18:

All documents reflecting or constituting any internal communications concerning the compatibility (or lack thereof) of files protected by Apple's FairPlay DRM with other file formats or any portable digital media player other than iPod.

REQUEST FOR PRODUCTION NO. 19:

All documents reflecting or constituting any internal communications concerning the actual, anticipated or potential actions of any actual or potential competitor of the iPod or iTunes store.

REQUEST FOR PRODUCTION NO. 20:

All documents analyzing, describing, estimating or projecting the impact on your market share or sales in the United States resulting from the licensing of Apple's FairPlay DRM to third parties.

REQUEST FOR PRODUCTION NO. 21:

All documents analyzing, describing, estimating or projecting the impact on your market share or sales in the United States resulting from any measures that would make iPods interoperable with digital audio files protected by means other than Apple's FairPlay DRM.

REQUEST FOR PRODUCTION NO. 22:

All documents analyzing, describing, estimating or projecting the impact on your market share or sales in the United States resulting from any measures that would make digital audio files purchased from the iTunes Store interoperable with any portable digital media player other than iPod.

REQUEST FOR PRODUCTION NO. 23:

Documents sufficient to allow the calculation for each quarter since the introduction of the iPod for each model of iPod that Apple has sold in the United States, the number of iPods that have been purchased, Apple's total revenue from sales of each iPod model and Apple's cost of manufacturing and cost of sales for each model of iPod.

REQUEST FOR PRODUCTION NO. 24:

All complaints and other correspondence from individuals Apple has received regarding the lack of interoperability of iTunes audio and video files with non-Apple digital media players, the iPod and non-Apple audio and video file formats concerning FairPlay DRM and any summaries or analysis of such complaints.

REQUEST FOR PRODUCTION NO. 25:

All documents concerning RealNetworks Harmony Technology, which according to RealNetworks "enables consumers to securely transfer purchased music to every popular secure music device" and "frees consumers from the limitation of being locked into a specific portable device when they buy digital music."

REQUEST FOR PRODUCTION NO. 26:

All personnel charts, related personnel listing, indices or directories, organizational charts and documents retention policies produced, compiled or dated after January 1, 2000.

REQUEST FOR PRODUCTION NO. 27:

All versions of the iTunes Store Terms of Service Agreements that were in effect during any portion of the time period from April 28, 2003 to the present, as well as all versions of any documents setting forth policies, practices, licenses and/or agreements applicable to the use of the iTunes store by consumers in the United States during the period April 28, 2003 to the present.

REQUEST FOR PRODUCTION NO. 28:

Documents sufficient to show the number of digital audio files sold by iTunes store in the United States during the period April 28, 2003 to the present.

REQUEST FOR PRODUCTION NO. 29:

For each different model of iPod sold by Apple, documents sufficient to show the number of iPod units sold directly by Apple in the United States during the period April 28, 2003 to the present.

1 REQUEST FOR PRODUCTION NO. 30:

2    Documents sufficient to show the number of consumers in the United States who have

3 purchased one or more digital audio or video files from iTunes store and downloaded the file(s) onto

4 an iPod during the period April 28, 2003 to the present.

5 DATED: May 22, 2009                    COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
6                                         BONNY E. SWEENEY

7

8                                         *Bonny Sweeney /pm*
                                          BONNY E. SWEENEY
9
                                          655 West Broadway, Suite 1900
10                                        San Diego, CA 92101
                                          Telephone: 619/231-1058
11                                        619/231-7423 (fax)

12                                        THE KATRIEL LAW FIRM
                                          ROY A. KATRIEL
13                                        1101 30th Street, N.W., Suite 500
                                          Washington, DC 20007
14                                        Telephone: 202/625-4342
                                          202/330-5593 (fax)
15
                                          Co-Lead Counsel for Plaintiffs
16
                                          BONNETT, FAIRBOURN, FRIEDMAN
17                                           & BALINT, P.C.
                                          ANDREW S. FRIEDMAN
18                                        FRANCIS J. BALINT, JR.
                                          ELAINE A. RYAN
19                                        TODD D. CARPENTER
                                          2901 N. Central Avenue, Suite 1000
20                                        Phoenix, AZ 85012
                                          Telephone: 602/274-1100
21                                        602/274-1199 (fax)

22                                        BRAUN LAW GROUP, P.C.
                                          MICHAEL D. BRAUN
23                                        12304 Santa Monica Blvd., Suite 109
                                          Los Angeles, CA 90025
24                                        Telephone: 310/442-7755
                                          310/442-7756 (fax)
25
                                          MURRAY, FRANK & SAILER LLP
26                                        BRIAN P. MURRAY
                                          JACQUELINE SAILER
27                                        275 Madison Avenue, Suite 801
                                          New York, NY 10016
28                                        Telephone: 212/682-1818

PLTFS' AMENDED 1ST SET OF RFP TO DEFENDANT APPLE, INC. - C-05-00037-JW(RS)      - 12 -

212/682-1892 (fax)

GLANCY BINKOW & GOLDBERG LLP
MICHAEL GOLDBERG
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: 310/201-9150
310/201-9160 (fax)

Additional Counsel for Plaintiffs

S:\CasesSD\Apple Tying\RFP00059243 doc

<u>DECLARATION OF SERVICE BY MAIL</u>

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.    That on May 22, 2009, declarant served the PLAINTIFFS' AMENDED FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT APPLE, INC. by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of May, 2009, at San Diego, California.

_____
SHONDA L. LANDRY

**Counsel For Defendant(s)**

Agent for Service of Process
CT Corporation System
818 West Seventh Street
Los Angeles, CA 90017

Caroline N. Mitchell
Robert A. Mittelstaedt
Adam R. Sand
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104
    415/626-3939
    415/875-5700 (Fax)

**Counsel For Plaintiff(s)**

Andrew S. Friedman
Elaine A. Ryan
Todd D. Carpenter
Bonnett, Fairbourn, Friedman & Balint, P.C.
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
    602/274-1100
    602/274-1199 (Fax)

Michael D. Braun
Marc L. Godino
Braun Law Group, P.C.
10680 West Pico Blvd., Suite 280
Los Angeles, CA 90064
    310/836-6000
    310/836-6010 (Fax)

John J. Stoia, Jr.
Bonny E. Sweeney
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
    619/231-1058
    619/231-7423 (Fax)

Eric J. Belfi
Labaton Sucharow LLP
140 Broadway, 34th Floor
New York, NY 10005
    212/907-0700
    212/818-0477 (Fax)

Jacqueline Sailer
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY 10016
    212/682-1818
    212/682-1892 (Fax)

Roy A. Katriel
The Katriel Law Firm
101 30th Street, N.W., Suite 500
Washington, DC 20007
    202/625-4342
    866/373-4023 (Fax)

# EXHIBIT 3

1        UNITED STATES DISTRICT COURT FOR THE

2        NORTHERN DISTRICT OF CALIFORNIA

3        SAN JOSE DIVISION

4        ---oOo---

5

6  THE APPLE iPOD iTUNES ANTI-    No. C-050037-JW(RS)
    TRUST LITIGATION,

7

8  _____/

9

10

11       DEPOSITION OF ROGER G. NOLL, Ph.D.

12

13

14

15

16

17     Taken before EARLY K. LANGLEY, RPR, RMR

18        CSR No. 3537

19       September 19, 2008

20

21

22

23



24     One Kaiser Plaza, Suite 505
       Oakland, California 94612
25     Ph 510-451-1580
       Fax 510-451-3797
       www.aikenwelch.com

COPY

1    appearing.

2         MS. SWEENEY:  Bonny Sweeney from the

3    Coughlin Stoia law firm representing the direct

4    purchaser plaintiffs.

5         MS. ROACH:  Paula Roach from Coughlin        10:10

6    Stoia representing plaintiffs.

7         MS. ZELDES:  Helen Zeldes from Zeldes &

8    Haeggquist representing the indirect purchaser

9    plaintiffs.

10        MR. MITTELSTAEDT:  And Bob Mittelstaedt      10:10

11   for the defendant with Jeff LeVee, Michael Scott

12   and Carlyn Clause.

13        THE VIDEOGRAPHER:  Would the counsel

14   please state any stipulations or statements that

15   they would like on the record at this time.      10:11

16        MR. MITTELSTAEDT:  None.

17        THE VIDEOGRAPHER:  The reporter may now

18   swear the witness.

19              ROGER NOLL, Ph.D.

20              sworn as a witness,

21              testified as follows:

22   EXAMINATION BY MR. MITTELSTAEDT:

23        Q.  Good morning.  If you would state your

24   name and business address, please.

25        A.  My name is Roger G. Noll and I'm in the  10:11

1    advantage.  I don't know.

2         Q.  Okay.  Are you sure that the yardstick

3    method can be implemented in this case?

4         A.  As I have said in my report, that is the

5    one I'm least happy about, all right, in that it          11:33

6    requires identifying the appropriate comparative

7    products.  And my -- I believe that's -- that's

8    the hangup, is identifying the appropriate

9    benchmark products.

10            But, you know, as I've said in the report,    11:34

11   there are some candidates out there.  If the

12   plaintiffs had completed the market correctly,

13   then the most obvious candidates are the products

14   that are the closest functionally to portable

15   digital media players, but that are not in the          11:34

16   same market.

17        Q.  Okay.

18        A.  And I also gave an explanation of why it's

19   possible, although you normally don't do it, you

20   might even be able to use products in the same          11:34

21   market because of the effect that tying has in

22   segmenting the market, so that even though in the

23   absence of anticompetitive acts, all the products

24   would be in the same market, the anticompetitive

25   act may have reduced competition among portable         11:34

1    income, the penetration of complementary products

2    like personal computers and then there's market

3    level phenomenon such as the price of

4    alternatives.

5        Q.  All right.  Anything else that you would    11:46

6    list as factors that you would need to include, or

7    at least test in your regression analysis?

8        A.  No.  That's it.  I mean, it's -- it's the

9    standard approach to supply and demand analysis

10   where you look at the way costs and the way demand    11:46

11   affects price.

12       Q.  Okay.  Do you also look at the reason that

13   people buy iPods?

14       A.  Well, the reason that people buy iPods is

15   background information to what the demand curve    11:46

16   looks like.  So you don't go out and measure

17   people's moods and things like that.  You measure

18   the qualitative attributes of the product and the

19   conditions in the market as a way to capture what

20   their demand is.  What their reasons are in some    11:47

21   sort of psychological sense is irrelevant.

22       Q.  Okay.  What are the qualitative factors or

23   the attributes that you would look at?

24       A.  The, first of all, the functional features

25   of a product, what --    11:47

1  somebody had trouble with some particular program

2  isn't sufficient.  You really have to do a serious

3  comparative analysis.

4       Q.  You're aware that the iPod was offered for

5  sale some 18 months before the Music Store was        14:07

6  launched; right?

7       A.  At least, yeah.

8       Q.  Is it possible that the demand for the

9  iPod after April 2003, was caused by the same

10  factors as the demand for the iPod before April      14:07

11  2003?

12       A.  Well, is it possible, yes.

13       Q.  Plausible?

14       A.  I want to say that the demand for the iPod

15  was unaffected by the launching of iTunes Music       14:07

16  Store would be ridiculous.

17       Q.  Okay.  Let's say that on April 1st, 2003,

18  hypothetically, three things happened, the Music

19  Store was launched.

20       A.  No, it wasn't.  Not April 1st.  April 20      14:08

21  something.

22       Q.  That will not matter for purposes of this

23  hypothetical.

24            Music Store was launched, it included

25  something that resulted in a differential ease of     14:08

Aiken & Welch Court Reporters      R. G. Noll    9/19/08

1  entry, and a new iPod version was introduced that

2  had some functional improvement.

3      Part of your task will be to try and

4  determine the impact on the demand for the iPod

5  from each of those three things; right?          14:08

6      A.  What was the third?

7      Q.  The new iPod.

8      A.  Well, the new iPod, I understand, and the

9  launch of iTMS, I understand.  What's the third?

10     Q.  Two aspects of iTMS.  One is just the     14:08

11 existence of a new supply for music for an iPod

12 and the other is the differential ease of entry

13 aspect that we talked about this morning.

14     A.  Right.

15     Q.  So of those three aspects of what happened 14:09

16 in this hypothetical in April of 2003, one of your

17 tasks will be to separate the impact on the demand

18 for the iPod of those three factors.

19     A.  That's correct.

20     Q.  And how are you going to do that?          14:09

21     A.  Well, the -- let's go back a step as to

22 why this is a problem.  All right.

23     So, the econometric problem here is to

24 separate out the fact, assuming that everything is

25 as stated in the hypothetical.  So three things   14:09

1    A.  Yeah.  I mean I did, in fact, look at

2    the -- both the Apple website to see what was

3    currently being offered and then I went back

4    through the press releases.  I read about when

5    they introduced various products, so I can't          17:14

6    recite for you a number but I have in my mind, you

7    know, I know that such information is easily

8    accessible and that there are, you know, ten or so

9    such models.

10    Q.  Is there some issue about whether there     17:14

11    are enough price changes or prices that a

12    regression with all the important variables can be

13    estimated?

14    A.  Of course there is.  There is -- that's

15    why probably -- probably a minority of antitrust     17:15

16    cases end up with regression analysis being used

17    to prove things like market power or market

18    definition, is the extreme difficulty of

19    identification that one faces in a differentiated

20    product industry.  I mean that's absolutely right.   17:15

21    It's less likely to be a problem in the damages

22    side.

23        So frequently -- I mean the common mode is

24    the liability expert really doesn't do much in the

25    way of regression analysis because it's too          17:15

1  difficult, beyond the scope of a reasonable

2  attainment by an econometrician, so he uses other

3  kinds of evidence.  But the damages guy does do a

4  price model.  That's the standard antitrust case.

5      Q.  But why isn't the problem of having enough  17:15

6  prices compared to the variables an issue when you

7  get to damages?

8      A.  Because the reduced form estimate of

9  damages is more reliable than a reduced form

10  estimate of cross elasticity as a demand.  That's  17:16

11  just a joke if you try to do that.

12      Q.  And "reduced form" means you don't use as

13  many variables?

14      A.  You don't use enough equations.  See, in

15  principle, if you're going to attack the market  17:16

16  definition and market power issue, you need an

17  equation -- you need two equations for every

18  product, one for price and one for quantity.

19          And, you know, so here we've got -- you

20  know, we go on to Amazon.com and we find they're  17:16

21  selling 50 portable digital media players, and the

22  chances you're going to be able to identify that

23  there's going to be differences among these that

24  are sufficient that you can identify 100 prices

25  and 100 quantities is very low.  17:16

1  STATE OF CALIFORNIA     )

2                          )      ss.

3  COUNTY OF ALAMEDA       )

4

5

6        I, EARLY LANGLEY, a Shorthand Reporter, State

7  of California, do hereby certify:

8        That ROGER G. NOLL, in the foregoing deposition

9  named, was present and by me sworn as a witness in the

10 above-entitled action at the time and place therein

11 specified;

12       That said deposition was taken before me at

13 said time and place, and was taken down in shorthand by

14 me, a Certified Shorthand Reporter of the State of

15 California, and was thereafter transcribed into

16 typewriting, and that the foregoing transcript

17 constitutes a full, true and correct report of said

18 deposition and of the proceedings that took place;

19 IN WITNESS WHEREOF, I have hereunder subscribed my hand

20 this 24th day of September 2008.

21

22                   _____

23                   EARLY LANGLEY, CSR NO. 3537
                     State of California

24

25

Aiken & Welch Court Reporters        R. G. Noll    9/19/08

# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---oOo---

THE APPLE iPOD iTUNES          )
ANTI-TRUST LITIGATION,         )
                               )
                               )
                               )   No. C 05-00037 JW
                               )   C 06-04457 JW
_____)

VIDEOTAPE DEPOSITION OF MICHELLE M. BURTIS, Ph.D.

WEDNESDAY, SEPTEMBER 30, 2009

PAGES 1 - 203

```
 1              MICHELLE M. BURTIS, Ph.D.,

 2        after having been duly sworn, testified as follows:

 3                          ---o0o---

 4

 5                                                    8:32:06AM

 6              THE VIDEOGRAPHER:  Good morning.  We're on

 7    the record at 8:59 a.m. on September 20th (sic),

 8    2009.  This is the videotape deposition of Michelle

 9    Burtis, Ph.D.  My name is Nick Kasimatis here with

10    Court Reporter Kelli Combs.  We're here from          8:59:18AM

11    Veritext National Deposition & Litigation Services

12    at the request of counsel for Plaintiff.  This

13    deposition is being held at the offices of Coughlin,

14    Stoia, Geller, Rudman & Robbins.  100 Pine Street,

15    San Francisco.                                        8:59:33AM

16              The caption of this case is The Apple

17    iPod iTunes Anti-Trust Litigation.  Case number

18    C 05-0037 JW, C 06-04457 JW.

19              Please note audio/video recording will

20    take place unless all parties agree to go off the     8:59:54AM

21    record.  Microphones are sensitive and may pick up

22    whispers and private conversations.

23              At this time will counsel and all present

24    please identify themselves for the record.

25              MS. SWEENEY:  Bonny Sweeney from Coughlin,   9:00:05AM
```

1    it all out and went back and -- and was a little bit    11:04:54AM

2    more rigorous about what the problems were, that

3    would be when I wrote this report.

4        Q    So when you initially reviewed Professor

5    Noll's report and you had these initial    11:05:08AM

6    conversations with counsel for Apple, you had not

7    yet reached the conclusion that Professor Noll's

8    proposed methodologies for calculating damages would

9    not work in this case?

10       A    I don't know.  I don't know if -- I just    11:05:23AM

11   don't remember what I thought at that time.  As I

12   said, if I -- I'm sure that when I read it for the

13   first time, it is fairly -- there isn't a lot of

14   information, so I'm -- I'm -- I'm willing to --

15   well, I'm -- I'm sure that I thought at the time    11:05:52AM

16   there was not a lot of information in his report

17   about these damage methodologies.

18       Q    Now, I had asked or we asked in the

19   subpoena to you for you to produce all your time

20   records in this case.  We haven't gotten those.    11:06:13AM

21            Where are those time records?

22       A    They are with Jones Day.

23            MS. SWEENEY:  I'd like those before the

24   end of this deposition because I want to question

25   her about them.    11:06:26AM

1    before and after iPod prices.  And they both propose    11:22:11AM

2    that there would be other variables in -- in the

3    regression equation that they would use.

4              But neither one of them really set out the

5    regression equation or, you know, said what    11:22:26AM

6    particular variables they were going to use, so I

7    can't tell you that they would be identical

8    regressions.

9         Q    But based on the reports as written, and

10   you have also read their deposition testimony, I    11:22:38AM

11   believe, what differences can you identify?

12        A    Well, I guess I would just repeat my same

13   answer.

14        Q    You can't identify any differences in the

15   three basic approaches taken by the two experts?    11:23:00AM

16        A    The three basic approaches are really the

17   same.  The differences, I think, would come in the

18   way that they were implemented, and none of them

19   really went very far along the road of implementing

20   them.  So we don't really know what differences    11:23:19AM

21   there would be.

22        Q    But I'm just asking you based on the

23   report.  I'm not saying, you know, based on what

24   they might ultimately do.

25              I'm saying based on their report, can you    11:23:30AM

f5deed1f-7c51-40ce-9bc4-6e5b91c3322c

1    Dr. French?                                    11:24:36AM

2         A    Yes.

3         Q    Now, based on that information, can you,

4    as you're sitting here today right now, identify any

5    differences in the approaches taken by the two          11:24:45AM

6    experts with respect to the before and after

7    methodology, the yardstick methodology or the markup

8    methodology for calculating damages?

9         A    So I would -- I would refer back to my

10   earlier answers.  And here is an example of the         11:25:03AM

11   difficulty in answering this question more

12   specifically:  In Dr. Noll's report, he describes

13   generally a before and after regression analysis.

14   He describes generally the kinds of variables that

15   he would include in that analysis.  I think he          11:25:24AM

16   actually says there might be two different analyses,

17   one for the consumers and one for the wholesalers.

18             In his deposition, when he was asked some

19   questions about how he would implement that before

20   and after analysis, he said, "Well, I don't know if     11:25:45AM

21   I'm going to use a dummy variable approach."

22             Now, that would be a difference from

23   Dr. French, who, I think, was planning on using a

24   dummy variable approach.  But Dr. Noll has not told

25   us exact- -- what he would do in place of the dummy     11:26:07AM

1  variable approach.                                    11:26:11AM

2        So it's unclear to me -- that is an

3  example of why it's difficult to know without

4  further information from both of them, frankly, what

5  they would do.                                        11:26:26AM

6        MS. SWEENEY:  I'm going to move to strike

7  the answer as nonresponsive and ask the Court

8  Reporter to read back my question.

9                (Record read as follows:

10              "Q    Now, based on that               11:26:33AM

11              information, can you, as you're

12              sitting here today right now,

13              identify any differences in the

14              approaches taken by the two experts

15              with respect to the before and        11:26:33AM

16              after methodology, the yardstick

17              methodology or the markup

18              methodology for calculating

19              damages?")

20        THE WITNESS:  I'm sorry, I don't know how    11:26:58AM

21  else to answer that question.

22  BY MS. SWEENEY:

23    Q    Okay.

24        You said in your report -- and I'm looking

25  at paragraph 8 where you summarize your            11:27:09AM

```
1    STATE OF CALIFORNIA        )

                                ) :ss

2    COUNTY OF SAN FRANCISCO )

3

4         I, KELLI COMBS, CSR NO. 7705, a Certified Shorthand

5    Reporter of the State of California, do hereby certify:

6         That the foregoing proceedings were taken before me

7    at the time and place herein set forth; that any

8    witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that the verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14        I further certify that I am neither financially

15   interested in the action nor a relative or employee of

16   any attorney of any of the parties.

17        IN WITNESS WHEREOF, I have this date subscribed my

18   name.


19        Dated: October 1, 2009



          KELLI COMBS, CSR NO. 7705

                                                        201
```